## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CMS BANCORP, INC., | : |
| Plaintiff, | : |
| v. | :   Civil Action No. |
| CUSTOMERS BANCORP, INC. | : |
| Defendant | : |

## COMPLAINT

Plaintiff CMS Bancorp, Inc., by and through its attorneys, Bochetto and Lentz, P.C., by way of Complaint against Defendant Customers Bancorp, Inc., avers as follows:

### I. THE PARTIES

1.  Plaintiff CMS Bancorp, Inc. ("CMS" or "Plaintiff") is a Delaware Corporation with its principal place of business being located at 123 Main Street, White Plains, NY 10601. Plaintiff, therefore, is a citizen of Delaware and New York for diversity jurisdiction purposes.

2.  Defendant Customers Bancorp, Inc. ("Customers" or "Defendant") is a Corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business located at 1015 Penn Avenue, Suite 103, Wyomissing, PA 19610. Defendant is, therefore, a citizen of Pennsylvania for diversity jurisdiction purposes.

### II. JURISDICTION AND VENUE

3.  This Court has diversity jurisdiction over the instant matter pursuant to 28 U.S.C. §1332(a)(1) because the opposing parties are citizens of different states/commonwealths and the amount in controversy exceeds $75,000.00, exclusive of costs and interest.

1

4.   Venue is proper pursuant to 28 U.S.C. § 1391 because Defendant is subject to personal jurisdiction in this District and because a substantial part of the events, acts and/or omissions giving rise to Plaintiff's claims occurred in this District.  Customers' principal place of business is in this District and negotiations, communications, and other proceedings relating to the Merger Agreement (as defined below) occurred in or originated from this District.

### III. THE FACTS

5.   CMS and Customers entered into an Agreement and Plan of Merger dated August 10, 2012 ("Merger Agreement").  A true and correct copy of the Merger Agreement is attached hereto as Exh. "A."

6.   Pursuant to the Merger Agreement, the parties sought to "effect a business combination through the merger of CMS with and into Customers (the 'Parent Merger'), with Customers continuing as the surviving entity."  Merger Agreement, Recitals, ¶ A.

7.   The Merger Agreement sets forth a detailed process through which the Parent Merger was to occur.

8.   This detailed process included a number of contingencies and conditions that were to be met before the Parent Merger could occur.

9.   In that regard, the "Effectiveness", "Effective Time", "Effective Date", and the "Closing" of the Parent Merger were expressly "Subject to the satisfaction or waiver of the conditions set forth in Article VII [of the Merger Agreement]."  See Merger Agreement, §§ 2.03 and 2.04.

10. Subject to the satisfaction or waiver of the conditions in Article VII, the "Effective Time" of the Parent Merger was defined as:

2

upon the occurrence of the filing by Customers of the articles of merger with the Department of State of the Commonwealth of Pennsylvania pursuant to the PBCL, and by the filing by CMS of the articles of merger with the Delaware Secretary of State, or such later date and time as may be set forth in such filings (the time the Parent Merger becomes effective on the Effective Date being referred to as the "*Effective Time*").

See Merger Agreement, § 2.03 (emphases in original).

11. Subject to the satisfaction or waiver of the conditions in Article VII, the "Effective Date" and "Closing" were either:

(i) the date designated by Customers that is within fifteen (15) days following the satisfaction or waiver of the conditions set forth in Article VII, other than those conditions that by their nature are to be satisfied as the Closing (subject to such conditions being satisfied at the Closing, the "*Effective Date*"); provided, however, that no such election shall cause the Effective Date to fall after the Termination Date, as may be extended pursuant to Section 8.01(c), or after the date or dates on which any Regulatory Approval or any extension therefore expires, or (ii) such other date as to which the parties may agree in writing (the "*Closing Date*").

See Merger Agreement, §§ 1.01, 2.03 and 2.04 (emphases in original).

12. The Termination Date was originally defined as April 30, 2013. See Merger Agreement, §§ 1.01, 8.01(c).

13. Because of regulatory and other issues faced by Customers, in particular, ongoing Community Reinvestment Act ("CRA") and consumer compliance examinations and other issues arising in connection with regulatory review of another proposed acquisition by Customers, it was necessary for Customers and CMS to extend the Termination Date in order to keep the transaction alive.

14. Pursuant to an Amendment to Agreement and Plan of Merger dated April 22, 2013 ("Amendment"), the Termination date was extended to December 31, 2013. See Amendment, § 2. A copy of the Amendment is attached hereto as Exh. "B".

3

15. In connection with the parties' negotiation of the Amendment, CMS had expressed a concern about Customers' ability to resolve its CRA and other regulatory issues by the extended Termination Date. As an inducement for CMS to agree to amend the Merger Agreement and to extend the Termination date to December 31, 2013 and for CMS to continue to forebear from certain aspects of its business as set forth in Section 4.01 of the Merger Agreement to its detriment, Customers agreed in Section 8.02(b) of the Merger Agreement, as amended, to pay CMS a termination fee of One Million Dollars ($1,000,000) if the Merger Agreement, as amended, was terminated pursuant to Sections 8.01(c), 8.01(d)(i) or 8.01(d)(iii) of the Merger Agreement.

16. Section 8.02(b) of the Merger Agreement, as amended, stated, in pertinent part:

> (b)  *Payment of Fees and Expenses by Customers.*
> (i)  On or before April 22, 2013, Customers shall pay to CMS Three Hundred Thousand Dollars ($300,000) as partial reimbursement for its documented expenses incurred as of March 31, 2013 relating to the transactions contemplated by this Agreement.
> (ii)  In the event that the Agreement is terminated pursuant to Section 8.01(c), 8.01(d)(i), or 8.01(d)(iii) of this Agreement, Customers shall pay to CMS a termination fee of One Million Dollars ($1,000,000), which shall be paid within fifteen (15) business days of the date of termination.
> (iii)  The parties hereto agree that this Section 8.02(b) shall survive Termination of this Agreement.

See Amendment, ¶ 3, amending § 8.02(b) of the Merger Agreement (emphases in original).

17. The One Million Dollar ($1,000,000) termination fee was specifically intended by the parties to serve as a material part of the consideration given by Customers in exchange for CMS's agreement to extend the Termination Date from April 30, 2013 to December 31, 2013 to compensate CMS for the disruption of its business, employee, and customer relationships, loss of competitive advantage to its competitors, legal expenses and other costs related to and

4

incurred by further delaying the merger consummation process should the merger ultimately be unable to close successfully.

18. Customers acknowledged in its securities filing announcing the Amendment on April 24, 2013 that its agreement to pay the One Million Dollar ($1,000,000) termination fee was a material inducement for CMS to agree to the terms of the Amendment. Specifically, Customers noted in its Form 8-K that a "key term" agreed to by Customers and CMS under the Amendment was that Customers would pay "to CMS a termination fee of $1.0 million in the event the Merger Agreement, as amended, is terminated under certain provisions primarily relating to failure to consummate the Parent Merger due to non-receipt of required government approvals. See Customers' Current Report on SEC Form 8-K dated April 24, 2013, a copy of which is attached hereto as Exh. "C."

19. The One Million Dollar ($1,000,000) termination fee is within the range of customary termination fees for a merger of this value and type.

20. The One Million Dollar ($1,000,00) termination fee was a material part of CMS's consideration for agreeing to extend the Termination Date from April 30, 2013 to December 31, 2013.

21. Customers also agreed to and did pay CMS the $300,000 required under Section 8.02(b)(ii) of the Merger Agreement, as amended, to cover costs and expenses incurred by CMS until the time of the Amendment.

22. As amended, Section 8.01(c) of the Merger Agreement provides that the Merger Agreement can be terminated for delay, stating:

> (c)    *Delay.*    At any time prior to the Effective Time, upon written notice given by CMS or Customers, if its Board of Directors so determines by vote of a majority of the members of its entire Board, in the event that

the Parent Merger is not consummated by December 31, 2013 ("*Termination Date*"); *provided* that if (i) the Effective Time has not occurred by such date by reason of non-satisfaction of any condition set forth in Section 7.01(b), (ii) if Customers shall have made all filings with Governmental Authorities required in connection with the Parent Merger and the Subsidiary Merger and no such applications shall have been withdrawn and/or requested to be withdrawn by any Governmental Authority, and (iii) all other conditions in Article VII have theretofore been satisfied or are capable of being satisfied on or prior to March 31, 2014, either CMS or Customers may extend the Termination Date until March 31, 2014 upon written notice to the other party prior to December 31, 2013; *provided, however*, that the right to terminate this Agreement or delay the Termination Date pursuant to this Section 8.01(c) shall not be available to a party if the failure of the Parent Merger than to be consummated arises out of or results from the action or inaction, in breach of the obligation in Section 6.01, of the party seeking to terminate the Agreement or delay the Termination Date. Further, CMS may be entitled to reimbursement of reasonable and document expenses pursuant to Section 8.02(b).

See Amendment, ¶ 2, amending § 8.01(c) of the Merger Agreement (emphases in original).

23. Section 8.01(d) also provided that the Merger Agreement could be terminated in the absence of necessary approvals or the failure to fulfill the closing contingencies, stating, in pertinent part:

(d)     No Approval. Upon written notice given by Customers or CMS in the event ... (iii) any of the closing conditions have not been met as required by Article VII hereof and cannot be met prior to the Termination Date, unless otherwise agreed to by the parties pursuant to Article VIII.

See Merger Agreement, § 8.01(d).

24. By October 2013, it had become apparent to Customers that the necessary closing conditions for the Parent Merger, as set forth in Article VII of the Merger Agreement, would again not be able to be met due to the continuing regulatory issues faced by Customers which would delay its ability to submit applications for and receive the required regulatory approvals necessary to consummate the merger.

6

25. Recognizing its inability to resolve the regulatory issues faced by Customers and to timely secure regulatory approvals by the December 31, 2013 Termination Date, Customers requested a face-to-face dinner meeting between their respective principals to update CMS on the status of Customers' regulatory issues as well as to request that CMS consider agreeing to further extend the Termination Date for another full year (nine months beyond even the March 31, 2014 conditional extension date already provided for in the Merger Agreement, as amended).

26. The Termination Date had already been previously extended from April 30, 2013 to December 31, 2013 due to Customers' inability to obtain regulatory approvals and to meet closing conditions.

27. In making the new request, Customers contended that "We would feel very comfortable about assuring you that the deal will close if we can extend till end of next year", i.e. December 31, 2014. See October 25, 2013 E-mail exchange attached hereto as Exh. "D". Notably, Customers was unable to make the same representation with respect to its ability to close by the March 31, 2014 conditional extension date already provided for in the Merger Agreement, as amended.

28. As a result of Customers' request, CMS asked to be permitted to conduct additional due diligence; on November 13, 2013 Customers made available for review certain documents related to its most recent CRA and consumer compliance examinations and related matters, as well as correspondences from the U.S. Department of Justice ("DOJ") and the Federal Reserve Bank of Philadelphia ("Federal Reserve").

29. The review of Customers' regulatory documents indicated that, among other things, Customers had serious regulatory issues with respect to its CRA and consumer compliance examinations and related matters, the DOJ and the Federal Reserve.

30. Thus, as a result of the November 13, 2013 review and/or CMS's other dealings with Customers through the lengthy merger process, CMS concluded that the Merger Agreement could not be consummated by December 31, 2013 due to the delays and uncertainty in the timing of receipt of regulatory approvals and the ongoing and substantial regulatory issues faced by Customers. CMS also concluded that the merger could not concluded by the March 31, 2014 conditional extension date already provided by the Merger Agreement, as amended. Indeed, it seemed highly unlikely to CMS that the required regulatory approvals could be received and the merger be consummated within even a new extended twelve (12) month extension requested by Customers; this assessment was relayed to the CMS Board.

31. On November 26, 2013, Customers pressured CMS to make a decision on whether it would agree to further extend the Merger Agreement beyond December 31, 2013. In an e-mail sent by Jay S. Sidhu (Chairman and CEO of Customers) to John E. Ritacco (President and CEO of CMS), Mr. Sidhu stated "we need to either extend or terminate this week." A copy of the November 26, 2013 E-mail exchange is attached hereto as Exh. "E".

32. However, as set forth below, CMS was unwilling to agree to extend the Termination Date yet again in the absence of the previously agreed contractual criteria laid down in Section 8.02(b) of the Merger Agreement, as amended, for such an extension.

33. After receiving the November 26, 2013 E-mail, John Ritacco of CMS spoke with Jay S. Sidhu of Customers by telephone about CMS' "deal weariness" and inclination to not further extend the Merger Agreement as a result of the due diligence findings in regard to

8

Customers' ongoing regulatory issues that would result in continued delay of receipt by

Customers of required regulatory approvals.  In response, Sidhu offered to "sweeten the pot"

and promised to send a written proposal.

34. Later that day, Customers made the following proposal to CMS:

Here is our revised proposal.
1. We increase the price payable to CMS shareholders to 1.2X book at time of closing. The exchange ratio will be determined based on CUBI price at time of closing and book value at CMS at time of closing. However, the exchange ratio will in no circumstance be lower than what our agreement calls for today.
2. We agree to extend time period to allow CUBI to file application with Fed by Sept 30, 2014 and a drop dead date for closing of Dec. 31, 2014.
3. In the event CUBI is not able to meet its obligations by Sept. 30, 2014, CMS has a right to terminate the agreement.
4. If the transaction is not consummated by Dec 31, 2014, CUBI pays $1 million fee to CMS.
4. John Rittaco [sic] will be provided an employment agreement by CUBI and asked to serve as Regional President of CUBI Hudson Valley upon closing of our transaction.

See 2nd November 26, 2013 E-mail exchange attached hereto as Exh. "F".

35. The CMS Board reviewed and rejected the proposal.

36. In connection with rejecting Customers's November 26, 2013 proposal for

amending the Merger Agreement, CMS also concluded that (i) Customers was unable to meet

the closing conditions as required by Article VII of the Merger Agreement prior to the

Termination Date (indeed, Customers was unable to even apply for the necessary governmental

approvals that were the prerequisite for many of the Article VII conditions until its regulatory

issues were resolved), and (ii) Customers Bank would be unable to meet the necessary criteria

required to extend the Termination Date to March 31, 2014 as set forth in Section 8.01(c) of

the Merger Agreement, as amended.

9

37. As a consequence of the review, the Board of CMS determined that in the event that the Parent Merger is not consummated by December 31, 2013, the Merger Agreement would not be extended and would be terminated as of December 31, 2013 unless Customers could meet the previously agreed upon conditions for an extension to March 31, 2014 under the Merger Agreement, as amended.

38. Also at the November 26, 2013 Board meeting, the CMS Board authorized John Ritacco, the President and CEO of CMS, to notify Customers of the CMS Board's decision to reject Customers' revised proposal, and that CMS had determined not to extend the termination date of the Merger Agreement beyond December 31, 2013, for the reason of Customers' failure to receive – and continued delay in receiving – the required regulatory approvals to consummate the transaction.

39. On November 29, 2013, CMS sent a letter to Customers indicating that "the CMS Board is not willing at this time to consider any further extension of the Termination Date." The November 29, 2013 letter also informed Customers of the CMS Board's determination made from its due diligence findings regarding the current regulatory issues faced by Customers that Customers would be unable to obtain the required regulatory approvals in order to consummate the merger by December 31, 2013 nor meet the necessary criteria required to extend the Termination Date to March 31, 2014 as set forth in Section 8.01(c) of the Merger Agreement, as amended.  See November 29, 2013 Correspondence from CMS to Customers, a copy of which is attached hereto as Exh. "G."

40. The November 29, 2013 letter emphasized that, as a result of Customers' ongoing and substantial regulatory issues, it was the CMS Board's view that Customers was not in a

position to even get the required regulatory clearances to file regulatory applications to obtain

approval for the merger prior to the December 31, 2013 Termination Date.

41. Given that, without an extension of the Merger Agreement, it was a certainty that

the merger could not be consummated by December 31, 2013 (nor by March 31, 2014, since

there was no indication that Customers had even made any attempt to file any applications for

regulatory approval) and therefore the Merger Agreement would need to be terminated as a

next step, the November 29, 2013 letter also informed Customers that CMS would work with

Customers regarding termination of the Merger Agreement, which required final acts of

coordination by the parties in ending the relationship, e.g., with respect to agreement on the

terms of termination and announcing the termination.

42. Given that CMS had made the determination to not further extend the Merger

Agreement termination date – which determination was made at the request of Jay Sidhu by

email on November 26, 2013 in which he demanded an answer "this week" – CMS also

informed Customers in the November 29, 2013 letter about CMS' securities disclosure

obligations and the need to announce the decision sooner rather than later because CMS had a

shareholder disclosure obligation to file its Annual Report on Form 10-K by December 29,

2013.

43. At no time did CMS offer or indicate to Customers that CMS was mutually

consenting to an early termination of the Merger Agreement, i.e., before December 31, 2013,

without payment to CMS by Customers of the One Million Dollar ($1,000,000) Termination

Fee that Customers and CMS had specifically agreed to in April 2013 for precisely the scenario

that had arisen, which was that the merger could not proceed and the Merger Agreement

11

needed to be terminated because Customers could not meet the December 31, 2013 deadline to consummate the merger due to its non-receipt of the required government approvals.

44. After receipt of the November 29, 2013 letter from CMS, Customers devised and clung to whatever tenuous or weak argument it could make to claim that CMS had agreed to termination of the Merger by mutual consent – completely ignoring the context of the letter, which was that CMS was specifically responding to Customers' November 26, 2013 request that CMS make a decision "this week" about Customers' revised proposal and agree to extend the Merger Agreement beyond the December 31, 2013 termination date.  Showing an absence of good faith, Customers clung to its flawed argument that the Agreement had terminated by mutual consent under Section 8.01(a) of the Merger Agreement, thereby relieving Customers of its obligation to pay the One Million Dollar ($1,000,000) Termination Fee.

45. At no time after receipt of CMS' November 29, 2013 letter responding to Customers' November 26, 2013 request did Customers engage CMS to follow up or to discuss any terms of termination of the Merger Agreement as the natural result of CMS having made the decision that it would reject Customers' request to extend the termination date. Notwithstanding having been informed on repeated occasions between November 29, 2013 and December 19, 2013 that CMS was seeking to discuss the terms of termination with Customers – which was a clear indication to Customers that by no means had the parties agreed to the terms of how the Merger Agreement would be terminated and accordingly there could not possibly be any termination by mutual consent – Customers and Mr. Sidhu intentionally avoided making Customers or its representatives available to discuss the November 29, 2013 letter or any terms of termination with CMS.

46. On December 19, 2013, Customers finally responded to CMS and informed CMS – for the first time and to the shock of CMS – that Customers had decided that the Merger Agreement had been terminated by "mutual consent" prior to the actual December 31, 2013 Termination Date, and that Customers was prepared to announce that the Merger Agreement had been terminated by mutual consent in a press release that Customers planned to issue the next day.

47. Despite having been informed by CMS and CMS' counsel that the parties never discussed nor agreed to the terms of termination of the Merger Agreement, and therefore there was no termination by mutual consent, on December 20, 2013, Customers made false and public misstatements in its press release and related securities filing about the Merger Agreement having been terminated by mutual consent in an effort to cover up Customers' liability to pay CMS the $1,000,000 termination fee, despite Customers being well aware of the fact that the Merger Agreement was not being extended and thus would need to be terminated as a next step due to Customers' ongoing regulatory issues that led to its inability to obtain the required regulatory approvals to consummate the merger.  A copy of Customers' Press Release dated December 20, 2013 is attached hereto as Exh. "H".

48. Notably, at no time did Customers purport to issue a notice pursuant to Section 8.01(c), as amended, seeking to extend the Termination Date to March 31, 2014 on the basis of the previously agreed criteria for such an extension that was set forth in Section 8.01(c).

49. Following its November 29, 2013 letter and not having heard back from Customers with any claim that Customers was seeking to extend the Merger Agreement to at least the March 31, 2014 conditional extension date (which was within Customers' right to do if the requisite conditions for extension were met), CMS proceeded to issue to Customers a formal

notice of termination, effective December 31, 2013, pursuant to Sections 8.01(c) and (d)(iii) in accordance with the notice provisions of the Merger Agreement.  See December 24, 2013 Correspondence from CMS to Customers, a copy of which is attached hereto as Exh. "I".

50. Consequently, on December 31, 2013, the Merger Agreement expired and terminated.  See Merger Agreement, as amended,  § 8.01(c).

51. The failure of the Parent Merger and the termination of the Merger Agreement did not arise out of or result from the action or inaction of CMS.

52. Notwithstanding its clear legal obligations to do so under the Merger Agreement, as amended, and subsequent demand therefore by CMS, see January 22, 2014 Correspondence from CMS's counsel to Customers, a copy of which is attached hereto as Exh. "J", Customers has failed, and continues to refuse, to pay $1,000,000 to CMS within 15 business days of the Termination Date as required by Section 8.02(b) of the Merger Agreement, as amended.

53. Pursuant to the Merger Agreement, as amended, Pennsylvania law governs this dispute.  See Merger Agreement, § 9.03.

54. Pursuant to the Merger Agreement, as amended, the parties have waived the right to a jury trial.  See Merger Agreement, § 9.08.

55. Pursuant to the Merger Agreement, as amended, CMS is entitled to recover its attorneys' fees, costs and interest upon obtaining a judgment in this action.  See Merger Agreement, § 8.02(d).

56. CMS has incurred and is likely to continue to incur substantial attorneys' fees and costs as a result of Customers's refusal to honor its contractual commitments as described herein.

14

## COUNT I
## BREACH OF CONTRACT
## (MERGER AGREEMENT, AS AMENDED)

57. Plaintiff hereby repeats and incorporates all other allegations contained in this pleading as set forth at length herein.

58. Plaintiff and Defendant entered into a binding agreement, the Merger Agreement, as amended, as set forth more fully above.

59. At all relevant times, Plaintiff performed its obligations under the Merger Agreement, as amended.

60. Defendant has failed to pay the $1,000,000 termination fee due to Plaintiff in the time and manner required under the Merger Agreement, as amended, and has disputed its obligation to do so.

61. As a direct and proximate result of Defendant's breach of the terms of the Merger Agreement, as amended, Plaintiff has been damaged in the amount of $1,000,000 plus past and ongoing interest, attorneys' fees and costs.

**WHEREFORE**, Plaintiff CMS Bancorp, Inc. demands judgment in its favor and against Defendant Customers Bancorp, Inc. and requests that the Court enter an order:

a.      awarding Plaintiff actual damages, including nominal, compensatory, and/or consequential damages, in excess of $75,000 in an amount to be determined at trial;

b.      awarding Plaintiff pre- and post-judgment interest in an amount to be determined at trial; and

c.      awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper, including the award of costs, expenses, and attorneys' fees incurred by Plaintiff in enforcing its rights and in prosecuting this action.

Respectfully submitted.

**BOCHETTO & LENTZ, P.C.**

Dated:   March 24, 2014          BY:  _____

George Bochetto, PA I.D. No. 27783,
Albert M. Belmont, III, PA I.D. No. 84817
David P. Heim, PA I.D. No. 84323
1524 Locust Street
Philadelphia, PA 19102
Ph: (215) 735-3900
gbochetto@bochettoandlentz.com
abelmont@bochettoandlentz.com
dheim@bochettoandlentz.com
Attorneys for Plaintiff CMS Bancorp, Inc.

16

# EXHIBIT

# A

**EXECUTION VERSION**

**AGREEMENT AND PLAN OF MERGER**

**DATED AS OF**

**AUGUST 10, 2012**

**BY AND BETWEEN**

**CMS BANCORP, INC.**

**AND**

**CUSTOMERS BANCORP, INC.**

# TABLE OF CONTENTS

**Page**

ARTICLE I  CERTAIN DEFINITIONS ............................................................................ 1

    Section 1.01.  Certain Definitions .......................................................................... 1

ARTICLE II  THE MERGER .......................................................................................... 8

    Section 2.01.  The Parent Merger ........................................................................ 8

    Section 2.02.  The Subsidiary Merger .................................................................. 8

    Section 2.03.  Effectiveness of the Parent Merger ............................................... 9

    Section 2.04.  Effective Date and Effective Time ................................................ 9

    Section 2.05.  Possible Alternate Structures ........................................................ 9

ARTICLE III  MERGER CONSIDERATION; EXCHANGE PROCEDURES ................. 9

    Section 3.01.  Effect on Capital Stock ................................................................. 9

    Section 3.02.  Fractional Shares ........................................................................ 10

    Section 3.03.  Exchange Procedures .................................................................. 10

    Section 3.04.  Anti-Dilution Provisions ............................................................. 11

    Section 3.05.  Options ....................................................................................... 11

    Section 3.06.  Restricted Shares ........................................................................ 12

    Section 3.07.  Dissenters' Rights ...................................................................... 12

ARTICLE IV  ACTIONS PENDING ACQUISITION ................................................... 12

    Section 4.01.  Forbearances of CMS ................................................................ 12

    Section 4.02.  Forbearances of Customers ........................................................ 14

ARTICLE V  REPRESENTATIONS AND WARRANTIES ......................................... 17

    Section 5.01.  Disclosure Schedules ................................................................. 17

    Section 5.02.  Representations and Warranties of CMS ..................................... 17

    Section 5.03.  Representations and Warranties of Customers ............................. 34

ARTICLE VI  COVENANTS ....................................................................................... 44

    Section 6.01.  Reasonable Best Efforts .............................................................. 44

    Section 6.02.  Stockholder Approval ................................................................. 45

    Section 6.03.  Proxy Statement-Prospectus ....................................................... 45

    Section 6.04.  Press Releases ............................................................................ 46

    Section 6.05.  Access; Information .................................................................... 46

    Section 6.06.  Acquisition Proposals ................................................................. 48

Section 6.07.  Financial and Other Statements ................................................51

Section 6.08.  Takeover Laws........................................................................51

Section 6.09.  Reports ....................................................................................52

Section 6.10.  Intentionally omitted ...............................................................52

Section 6.11.  Regulatory Applications ..........................................................52

Section 6.12.  CMS Employees; Director and Management; Indemnification.................52

Section 6.13.  Notification of Certain Matters ................................................56

Section 6.14.  Governance Matters .................................................................56

Section 6.15.  Tax Treatment .........................................................................56

Section 6.16.  No Breaches of Representations and Warranties .......................56

Section 6.17.  Consents ..................................................................................56

Section 6.18.  Insurance Coverage .................................................................56

Section 6.19.  Correction of Information .........................................................56

Section 6.20.  Confidentiality .........................................................................56

Section 6.21.  Certain Policies .......................................................................57

Section 6.22.  Taxes ......................................................................................57

ARTICLE VII  CONDITIONS TO CONSUMMATION OF THE PARENT MERGER ..........57

Section 7.01.  Conditions to Each Party's Obligation to Effect the Parent Merger..........57

Section 7.02.  Conditions to Obligation of CMS .............................................58

Section 7.03.  Conditions to Obligation of Customers .....................................59

ARTICLE VIII  TERMINATION ......................................................................60

Section 8.01.  Termination..............................................................................60

Section 8.02.  Termination Fee .......................................................................61

ARTICLE IX  MISCELLANEOUS .....................................................................63

Section 9.01.  Survival ...................................................................................63

Section 9.02.  Waiver; Amendment .................................................................63

Section 9.03.  Governing Law ........................................................................63

Section 9.04.  Expenses .................................................................................63

Section 9.05.  Notices ....................................................................................63

Section 9.06.  Entire Understanding; No Third-Party Beneficiaries .................64

Section 9.07.  Interpretation; Effect................................................................64

Section 9.08.  Waiver of Jury Trial.................................................................65

Section 9.09.  Severability ..............................................................................65

Section 9.10.  Specific Performance; Jurisdiction ................................................................65

Section 9.11.  Assignment ................................................................65

Section 9.12.  Time of Essence ................................................................65

Section 9.13.  Counterparts ................................................................65

LEGAL_US_E # 99757909.22

## AGREEMENT AND PLAN OF MERGER

This AGREEMENT AND PLAN OF MERGER, dated as of August 10, 2012 (this "*Agreement*"), is by and between CMS Bancorp, Inc. ("*CMS*"), a Delaware corporation, and Customers Bancorp, Inc. ("*Customers*"), a Pennsylvania corporation.

## RECITALS

A.    *The Merger*.  The parties intend to effect a business combination through the merger of CMS with and into Customers (the "*Parent Merger*"), with Customers continuing as the surviving entity.

B.    *Board Determination*.  The respective boards of directors of CMS and Customers have each determined that the Parent Merger, and the other transactions contemplated hereby are in the best interests of their respective shareholders, and, therefore, have approved the Parent Merger, this Agreement and the plan of merger contained in this Agreement.

C.    *Voting Agreements*.  As a condition to the willingness of Customers to enter into this Agreement, each of the directors and executive officers of CMS has entered into a Voting and Lock-Up Agreement, substantially in the form of Exhibit "C" hereto, dated as of the date hereof, with Customers (the "CMS Voting Agreements"), pursuant to which each such director and executive officer has agreed, among other things, to vote all shares of CMS Common Stock owned by such person in favor of the approval of this Agreement and the transactions contemplated hereby, upon the terms and subject to the conditions set forth in the CMS Voting Agreements.

D.    *Intended Tax Treatment*.  The parties intend the Parent Merger to qualify as a reorganization under Section 368(a) of the Internal Revenue Code of 1986, as amended (the "*Code*"), and intend for this Agreement to constitute a "plan of reorganization" within the meaning of Treasury Regulations Section 1.368-2(g).

NOW, THEREFORE, in consideration of the foregoing and of the mutual covenants, representations, warranties and agreements contained herein, the parties, intending to be legally bound, agree as follows:

## ARTICLE I
## CERTAIN DEFINITIONS

Section 1.01.   *Certain Definitions*.  The following terms are used in this Agreement with the meanings set forth below (such meaning to be equally applicable to both the singular and plural forms of the term defined):

"*Acquisition Proposal*" has the meaning set forth in Section 6.06(g)(i).

"*Affiliate Agreements*" has the meaning set forth in Section 5.02(k)(i)(M).

"*Agreement*" has the meaning set forth in the preamble hereof, as amended or modified from time to time in accordance with Section 9.02.

"*Agreement to Merge*" has the meaning set forth in Section 2.02.

"*Business Day*" means any day other than (i) Saturday or Sunday or (ii) any other day on which banks in Pennsylvania are permitted or required to be closed.

"*Certificates*" has the meaning set forth in Section 3.01(a)(ii).

"*Change in Recommendation*" has the meaning set forth in Section 6.06(c).

"*Claim*" has the meaning set forth in Section 6.12(f).

"*Closing*" has the meaning set forth in Section 2.04.

"*Closing Date*" has the meaning set forth in Section 2.04.

"*CMS*" has the meaning set forth in the preamble to this Agreement.

"*CMS Articles*" means the Certificate of Incorporation of CMS, as amended.

"*CMS Bank*" means CMS Bank, a state-chartered bank organized under the Laws of the State of New York and a wholly-owned subsidiary of CMS.

"*CMS Board*" means the Board of Directors of CMS.

"*CMS Bylaws*" means the Bylaws of CMS, as amended.

"*CMS Common Stock*" means the common stock of CMS, par value $0.01 per share.

"*CMS Disclosure Schedule*" means the Disclosure Schedule of CMS to this Agreement.

"*CMS Meeting*" has the meaning set forth in Section 6.02.

"*CMS Off Balance Sheet Transaction*" has the meaning set forth in Section 5.02(u).

"*CMS Plans*" has the meaning set forth in Section 5.02(m)(i).

"*CMS Recommendation*" has the meaning set forth in Section 6.02.

"*CMS Restricted Shares*" has the meaning set forth in Section 3.06.

"*CMS SEC Documents*" has the meaning set forth in Section 5.02(g)(i).

"*CMS Stock Option*" has the meaning set forth in Section 3.05.

"*CMS Stockholder Approval*" has the meaning set forth in Section 5.02(e).

"*CMS Valuation*" means: (i) 95% of CMS' common stockholders' equity (as determined according to GAAP, but excluding any merger-related charges or accruals, including without limitation, those incurred pursuant to Section 6.21 hereof) as of the most recent calendar month-

end prior to the Effective Time (unless the Effective Time takes place on or after April 30, 2013, in which case, the date to be used shall be March 31, 2013), divided by (ii) the number of shares of CMS Common Stock outstanding at the Effective Time.

"*COBRA Coverage*" has the meaning set forth in Section 5.02(m)(xii).

"*Code*" has the meaning set forth in Recital C.

"*Continuing Employees*" has the meaning set forth in Section 6.12(a).

"*Covered Parties*" has the meaning set forth in Section 6.12(g).

"*CRA*" has the meaning set forth in Section 5.02(j)(i).

"*Customers*" has the meaning set forth in the preamble to this Agreement.

"*Customers Articles*" means the Amended and Restated Articles of Incorporation of Customers, as amended.

"*Customers Bank*" means Customers Bank, a bank organized under the Laws of the Commonwealth of Pennsylvania and a wholly-owned subsidiary of Customers.

"*Customers Board*" means the Board of Directors of Customers.

"*Customers Bylaws*" means the Amended and Restated Bylaws of Customers.

"*Customers Common Stock*" means the voting common stock, par value $1.00 per share, of Customers.

"*Customers Disclosure Schedule*" means the Disclosure Schedule of Customers to this Agreement.

"*Customers Plan*" has the meaning set forth in Section 5.03(l).

"*Customers SEC Documents*" has the meaning set forth in Section 5.03(g)(i).

"*Customers Valuation*" means (i) 125% of Customers' modified common stockholders' equity (as determined according to GAAP) as of the most recent calendar month-end prior to the Effective Time (unless the Effective Time takes place on or after April 30, 2013, in which case, the date to be used shall be March 31, 2013), divided by (ii) the number of shares of Customers Common Stock outstanding at June 30, 2012. As used in this definition, "modified common stockholders' equity" shall mean Customers' June 30, 2012 common stockholders' equity, plus retained earnings generated from operations from July 1, 2012 through the most recent calendar month-end prior to the Effective Time (unless the Effective Time takes place on or after April 30, 2013, in which case, the date to be used shall be March 31, 2013). For the avoidance of doubt, it is understood and agreed that any bargain purchase gain recognized by Customers as a result of any acquisition transaction shall not be included in retained earnings generated from operations for purposes of the above calculation.

"*DGCL*" means the Delaware General Corporation Law.

"*Disclosure Schedule*" has the meaning set forth in Section 5.01.

"*Effective Date*" means the date on which the Effective Time occurs, as provided for in Section 2.04.

"*Effective Time*" means the time on the Effective Date as provided for in Section 2.03.

"*Environmental Laws*" means all applicable local, state and federal environmental, health and safety Laws, including, without limitation, the Resource Conservation and Recovery Act, the Comprehensive Environmental Response, Compensation and Liability Act, the Clean Water Act, the Federal Clean Air Act, and the Occupational Safety and Health Act, each as amended, the regulations promulgated thereunder, and their respective state counterparts.

"*EPCRS*" has the meaning set forth in Section 5.02(m)(viii).

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"*ERISA Affiliate*" has the meaning set forth in Section 5.02(m)(i).

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"*Exchange Ratio*" means, subject to the provisions of Section 3.04, the quotient, rounded to the nearest one ten thousandth, of (i) the CMS Valuation, divided by (ii) the Customers Valuation.

"*Fannie Mae*" has the meaning set forth in Section 5.02(cc).

"*FDIA*" has the meaning set forth in Section 5.02(c)(iv).

"*FDIC*" means the Federal Deposit Insurance Corporation.

"*FRB*" means the Board of Governors of the Federal Reserve System.

"*Freddie Mac*" has the meaning set forth in Section 5.02(cc).

"*GAAP*" means accounting principles generally accepted in the United States.

"*Governmental Authority*" means any court, administrative agency or commission or other federal, state or local governmental authority or instrumentality.

"*Hazardous Material*" means, collectively, (i) any "hazardous substance" as defined by the Comprehensive Environmental Response, Compensation, and Liability Act, (ii) any "hazardous waste" as defined by the Resource Conservation and Recovery Act, as amended through the date hereof, and (iii) other than common office supplies, any pollutant or contaminant or hazardous, dangerous or toxic chemical, material or substance imposing liability

or standards of conduct concerning any hazardous, toxic or dangerous waste, substance or material under Environmental Laws as now in effect.

"*HOLA*" means the Home Owners' Loan Act, as amended, and the rules and regulations promulgated thereunder.

"*Indemnified Parties*" has the meaning set forth in Section 6.12(f).

"*Information*" has the meaning set forth in Section 6.20.

"*Insurance Amount*" has the meaning set forth in Section 6.13(h).

"*IRS*" means the Internal Revenue Service.

The term "*knowledge*" means the actual knowledge after reasonable investigation (i) with respect to Customers, by the executive officers and directors of Customers or Customers Bank and (ii) with respect to CMS, by the executive officers and directors of CMS and CMS Bank.

"*Law*" or "*Laws*" means all constitutions, laws, statutes, ordinances, rules, rulings, regulations, orders, charges, directives, determinations, executive orders, writs, judgments, injunctions or decrees of any Governmental Authority.

"*Lien*" means any charge, mortgage, pledge, security interest, restriction, claim, lien, or encumbrance of any kind.

"*Material Adverse Effect*" means, with respect to Customers or CMS, any effect that (A) is material and adverse to the financial position, results of operations or business of Customers and its Subsidiaries taken as a whole, or CMS and its Subsidiaries taken as a whole, respectively, or (B) would materially impair the ability of either Customers or CMS to perform its obligations under this Agreement or otherwise materially threaten or materially impede the consummation of the Merger and the other transactions contemplated by this Agreement, including the inability of Customers to achieve any required regulatory approval from a Government Authority, as provided under Section 8.02(b); provided, however, that in determining whether a Material Adverse Effect has occurred there shall be excluded any effect on the referenced party due to (i) any change in banking Laws, or of other Laws, in each case of general applicability or interpretations thereof by courts or governmental authorities to the extent not affecting such party to a materially greater extent than it affects other Persons in the banking business, (ii) any change in GAAP or regulatory accounting requirements applicable to financial institutions or their holding companies generally, (iii) any change, circumstance, development, condition or occurrence in economic, business, political or financial conditions generally or affecting the banking business, including changes in interest rates to the extent not affecting such party to a materially greater extent than it affects other Persons in the banking business, (iv) actions and omissions of a party hereto (or any of its Subsidiaries) taken at the direction of the other party in contemplation of the transactions contemplated hereby or taken as specifically provided in this Agreement, (v) the direct effects of the entry into or  announcement of this Agreement, including any related litigation, and compliance with the terms of this Agreement on the operating performance of the party, including expenses incurred by such party in consummating the transactions contemplated by this Agreement, (vi)  any outbreak or escalation

of hostilities, declared or undeclared acts of war or terrorism or natural disasters, or (vii) a decline in a party's common stock price or failure to meet any internal or analyst projections (it being agreed that these exceptions do not cover the underlying reason for such stock price decline or failure to meet projections, except to the extent that such reason is within the scope of other exceptions within this definition).

"*Material Contracts*" has the meaning set forth in Section 5.02(k)(ii).

"*Merger*" collectively refers to the Parent Merger and the Subsidiary Merger, as described in Section 2.01 and Section 2.02, respectively.

"*Merger Consideration*" has the meaning set forth in Section 3.01(a)(i).

"*Merger Registration Statement*" means the registration statement, together with all amendments, filed with the SEC under the Securities Act for the purpose of registering the offering of Customers Common Stock to the holders of CMS Common Stock in connection with the Parent Merger.

"*NASDAQ*" means The NASDAQ Stock Market LLC.

"*Nonperforming Asset*" with respect to CMS Bank means an asset (other than property originally acquired for future expansion but no longer intended to be used for that purpose) required to be reported, as of any date of reference, in Item 3 of Schedule RC-M to FFIEC Form 041 (Consolidated Report of Condition and Income), as in force on the date of this Agreement, whether or not CMS Bank is required to report such items or is required to report as required in the instructions to such form, and "Nonperforming Assets" shall mean them collectively.

"*Nonperforming Loan*" with respect to CMS Bank means an asset required to be reported, as of any date of reference, in Column B or Column C of Items 1 through 9 of Schedule RC-N to FFIEC Form 041 (Consolidated Report of Condition and Income), as in force on the date of this Agreement, whether or not CMS Bank is required to report such items or is required to report as required in the instructions to such form, and "Nonperforming Loans" shall mean them collectively.

"*NYDFS*" means the New York Department of Financial Services.

"*PADOB*" means the Pennsylvania Department of Banking.

"*Parent Merger*" has the meaning set forth in Recital A.

"*Patriot Act*" means the United and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, and the rules and regulations promulgated thereunder.

"*PBCL*" means the Pennsylvania Business Corporation Law.

"*PBGC*" means the Pension Benefit Guaranty Corporation.

"*Pension Plan*" has the meaning set forth in Section 5.02(m)(vi).

"*Person*" has the meaning set forth in Section 5.02(k)(i)(D).

"*Previously Disclosed*" by a party shall mean information set forth in its respective Disclosure Schedule.  Disclosure of any information, agreement, or other item in a party's Disclosure Schedule referenced by a particular Section in this Agreement shall, should the existence of such information, agreement, or other item or its contents be relevant to any other Section, be deemed to be disclosed with respect to such other Section if (i) such information is explicitly discussed in that Section of the Disclosure Schedule, (ii) such other Section shall be cross-referenced in another Section of the Disclosure Schedule, or (iii) a particular fact's or item's relevance is reasonably apparent on the face of such disclosure.

"*Proxy Statement-Prospectus*" has the meaning set forth in Section 6.03(a).

"*RAP Cycle*" has the meaning set forth in Section 5.02(m)(viii).

"*Regulatory Authority*" shall mean any Governmental Authority charged with the supervision or regulation of financial institutions and their subsidiaries (including their holding companies) or issuers of securities (including, without limitation, the NYDFS, the FRB, the FDIC, the OCC, the PADOB, the Treasury and the SEC).

"*Representatives*" has the meaning set forth in Section 6.06(a)(i).

"*Rights*" means, with respect to any Person, securities or obligations convertible into or exercisable or exchangeable for, or giving any Person any right to subscribe for or acquire, or any options, calls or commitments relating to, or any stock appreciation right or other instrument the value of which is determined in whole or in part by reference to the market price or value of, shares of capital stock of such Person.

"*SEC*" means the Securities and Exchange Commission.

"*Securities Act*" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"*Stock Consideration*" has the meaning set forth in Section 3.01(a)(i).

"*Subsidiary*," "*Subsidiaries*" and "*Significant Subsidiary*" have the meanings ascribed to them in Rule 1-02 of Regulation S-X of the SEC.

"*Subsidiary Merger*" has the meaning set forth in Section 2.02.

"*Superior Proposal*" has the meaning set forth in Section 6.06(g)(ii).

"*Takeover Laws*" has the meaning set forth in Section 5.02(o).

"*Takeover Provisions*" has the meaning set forth in Section 5.02(o).

"*Tax*" or "*Taxes*" means any and all federal, state, local or foreign taxes, charges, fees, levies, duties, tariffs, imposts, other assessments and other similar fees or similar charges of any kind whatsoever, however denominated (together with any and all interest, penalties, additions to tax and additional amounts imposed with respect thereto),the liability for which is imposed by any government, Governmental Authority or taxing authority, whether or not directly or by contractual agreement, as a result of being a member of any affiliated, consolidated, combined, unitary or similar group, as a successor to or transferee of another Person, or otherwise or as a result of any tax sharing, tax indemnity or tax allocation agreement or any other express or implied agreement to indemnify another Person for Taxes, and including, without limitation, all income, franchises, windfall or other profits, gross receipts, license, property, sales, use, service, service use, capital stock, payroll, employment, social security, disability, severance, workers' compensation, employer health, unemployment compensation, net worth, excise, withholding, estimated, occupancy, lease, premium, recapture, parking, occupation, customs, duties, fees, ad valorem, property (whether real, personal, intangible or other), environmental, stamp, transfer, value added, gains, license, registration, recording and documentation fees or other taxes, custom duties, fees, assessments or charges of any kind whatsoever.

"*Tax Return*" or "*Tax Returns*" means returns, declarations, reports, forms, statements, elections, estimates, claims for refund, information returns or other documents (including, without limitation, any related or supporting schedules, exhibits, statements or information, any amendment to the foregoing, and any sales and use and resale certificates) filed or required to be filed in connection with the determination, assessment, payment, deposit, collection or reporting of any Taxes of any party or the administration of any Laws relating to any Taxes.

"*Termination Date*" has the meaning set forth in Section 8.01(c).

"*Termination Fee*" has the meaning set forth in Section 8.02(a)(ii).

"*Treasury*" means the U.S. Department of the Treasury.

## ARTICLE II
## THE MERGER

Section 2.01.  *The Parent Merger.*  At the Effective Time, (i) CMS shall be merged with and into Customers, and (ii) the separate corporate existence of CMS shall cease and Customers shall survive and continue to exist as a Pennsylvania corporation.  The Customers Articles, in the form attached hereto as Exhibit A, shall be the Articles of Incorporation of the surviving corporation, and the Customers Bylaws, in the form attached hereto as Exhibit B, shall be the Bylaws of the surviving corporation.

Section 2.02.  *The Subsidiary Merger.*  As soon as practicable after the execution and delivery of this Agreement, CMS shall cause CMS Bank and Customers shall cause Customers Bank to enter into an agreement (the "*Agreement to Merge*"), pursuant to which CMS Bank will merge with and into Customers Bank (the "*Subsidiary Merger*").  The Agreement to Merge shall provide that the closing of the Subsidiary Merger shall take place immediately after the Closing and that the Subsidiary Merger shall become effective immediately after the Effective Time.  Upon consummation of the Subsidiary Merger, the separate corporate existence of CMS

Bank shall cease and Customers Bank shall survive and continue to exist as a bank organized under the Laws of the Commonwealth of Pennsylvania.

Section 2.03. *Effectiveness of the Parent Merger.* Subject to the satisfaction or waiver of the conditions set forth in ARTICLE VII, the Parent Merger shall become effective upon the occurrence of the filing by Customers of the articles of merger with the Department of State of the Commonwealth of Pennsylvania pursuant to the PBCL, and the filing by CMS of the articles of merger with the Delaware Secretary of State, or such later date and time as may be set forth in such filings (the time the Parent Merger becomes effective on the Effective Date being referred to as the *"Effective Time"*).

Section 2.04. *Effective Date and Effective Time.* Subject to the satisfaction or waiver of the conditions set forth in ARTICLE VII, the closing of the Parent Merger (the *"Closing"*) will take place at such location as the parties may mutually agree at 11:00 a.m., Eastern Time, on (i) the date designated by Customers that is within fifteen (15) days following the satisfaction or waiver of the conditions set forth in ARTICLE VII, other than those conditions that by their nature are to be satisfied at the Closing (subject to such conditions being satisfied at the Closing, the *"Effective Date"*); provided, however, that no such election shall cause the Effective Date to fall after the Termination Date, as may be extended pursuant to Section 8.01(c), or after the date or dates on which any Regulatory Authority approval or any extension thereof expires, or (ii) such other date to which the parties may agree in writing (the *"Closing Date"*).

Section 2.05. *Possible Alternate Structures.* Notwithstanding anything to the contrary contained in this Agreement, prior to the Effective Time, Customers shall be entitled to revise the structure of the Parent Merger or the Subsidiary Merger, including without limitation, by merging CMS into a wholly-owned Subsidiary of Customers; provided that (a) any such Subsidiary shall become a party to, and shall agree to be bound by, the terms of this Agreement; (b) there are no adverse federal or state income tax or other adverse tax consequences to CMS shareholders as a result of the modification; (c) the consideration to be paid to the holders of CMS Common Stock under this Agreement is not thereby changed in kind or value or reduced in amount; and (d) such modification will not delay or jeopardize the receipt of Regulatory Approvals or other consents and approvals relating to the consummation of the Parent Merger and the Subsidiary Merger, or otherwise delay or jeopardize the satisfaction of any condition to Closing or otherwise adversely affect CMS or the holders of CMS Common Stock. The parties hereto agree to appropriately amend this Agreement and any related documents in order to reflect any such revised structure.

## ARTICLE III
## MERGER CONSIDERATION; EXCHANGE PROCEDURES

Section 3.01. *Effect on Capital Stock.* Subject to the provisions of this Agreement, at the Effective Time, automatically by virtue of the Parent Merger and without any action on the part of any Person:

(a)     *CMS Common Stock.*

(i)     Each share of CMS Common Stock (excluding CMS Restricted Shares, which shall be governed by Section 3.06 below) issued and outstanding immediately prior to the Effective Time, other than shares of CMS Common Stock to be cancelled and retired pursuant to Section 3.01(b), shall be converted into the right to receive such number of shares of Customers Common Stock as shall equal the Exchange Ratio (the "*Stock Consideration*"). The aggregate Stock Consideration, together with any cash to be paid for fractional shares, is sometimes referred to herein as the "*Merger Consideration*."

(ii)     As of the Effective Time, all such shares of CMS Common Stock shall no longer be outstanding and shall automatically be cancelled and retired and shall cease to exist, and each holder of record of a certificate or certificates ("*Certificates*") that immediately prior to the Effective Time represented any such share(s) of CMS Common Stock shall cease to have any rights with respect thereto, other than to receive the consideration provided under this ARTICLE III.

(b)     *Cancellation of Treasury Stock and Customers-Owned CMS Common Stock.* Each share of CMS Common Stock that is owned immediately prior to the Effective Time by Customers, CMS, or by any of their respective wholly-owned Subsidiaries, other than shares owned in a fiduciary capacity or as a result of debts previously contracted, shall automatically be cancelled and retired and shall cease to exist, and no consideration shall be issued in exchange therefor.

(c)     *Outstanding Customers Capital Stock.* Each share of Customers Capital Stock issued and outstanding immediately prior to the Effective Time shall remain issued and outstanding and unaffected by the Merger.

Section 3.02.     *Fractional Shares.* Notwithstanding any other provision hereof, no fractional shares of Customers Common Stock and no certificates or scrip therefor, or other evidence of ownership thereof, will be issued in the Parent Merger. In lieu of the issuance of any such fractional share, Customers will pay to each former holder of CMS Common Stock who would otherwise be entitled to a fractional share of Customers Common Stock, an amount, in cash, rounded to the nearest cent and without interest, equal to the product of (i) the fraction of a share to which the holder would have otherwise been entitled, and (ii) the Customers Valuation.

Section 3.03.     *Exchange Procedures.*

(a)     *Exchange of Shares.* Customers, or its exchange agent, shall mail to each holder of record of one or more shares of CMS Common Stock as of immediately prior to the Effective Time instructions for effecting the surrender of such Certificates in exchange for the Stock Consideration. Upon surrender of a Certificate and such other documents as may reasonably be required by Customers or its exchange agent, each holder of shares of CMS Common Stock that have been converted into a right to receive the Stock Consideration will be entitled to receive in exchange therefor shares of Customers Common Stock which shall be in uncertificated book-entry form unless a physical certificate is requested and which shall represent, in the aggregate, the whole number of shares that such holder has the right to receive

pursuant to Section 3.01(a)(i) (after taking into account all shares of CMS Common Stock then held by such holder).

        (b)    *No Further Ownership Rights in CMS Common Stock.* All shares of Customers Common Stock issued shall be deemed to have been issued or paid in full satisfaction of all rights pertaining to the shares of CMS Common Stock previously represented by such Certificates.

        (c)    *Further Assurances.* After the Effective Time, the officers and directors of Customers will be authorized to execute and deliver, in the name and on behalf of CMS, any deeds, bills of sale, assignments or assurances and to take and do, in the name and on behalf of CMS, any other actions and things to vest, perfect or confirm of record or otherwise in Customers any and all right, title and interest in, to and under any of the rights, properties or assets acquired or to be acquired by Customers as a result of, or in connection with, the Merger.

Section 3.04.   *Anti-Dilution Provisions.* If, between the date hereof and the Effective Time, CMS or Customers undergoes a stock split, stock dividend, extraordinary dividend, reclassification, split up, combination, exchange of shares, readjustment or similar transaction and the record date therefor shall be prior to the Effective Time, the Exchange Ratio shall be proportionately adjusted to provide the CMS stockholders with the same economic effect as contemplated by this Agreement prior to such event, provided that any issuance of shares in connection with a merger or acquisition or a capital raise shall not be considered for purposes of this section.

Section 3.05.   *Options.* At the Effective Time, whether or not then exercisable, each outstanding option to purchase shares of CMS Common Stock (each, a "CMS Stock Option") shall be assumed by Customers. Each CMS Stock Option assumed by Customers will continue to have, and be subject to, the same terms and conditions of such option immediately prior to the Effective Time, except for administrative changes and changes to which the holder consents, and provided that (i) the number of shares of Customers Common Stock to be subject to such CMS Stock Option shall be equal to the product of the number of shares of CMS Common Stock subject to the CMS Stock Option immediately prior to the Effective Time and the Exchange Ratio, provided that any fractional shares of Customers Common Stock resulting from such multiplication shall be rounded down to the nearest whole share and (ii) the exercise price per share of Customers Common Stock shall be equal to the exercise price per share of CMS Common Stock under the original CMS Stock Option immediately prior to the Effective Time divided by the Exchange Ratio, provided that such exercise price shall be rounded up to the nearest whole cent. The assumption and conversion of CMS Stock Options under this Section 3.05 shall be implemented in accordance with Code Section 424(a) so as not to constitute a modification, extension or renewal of the CMS Stock Option within the meaning of Code Section 424(h). CMS and Customers shall take all action that may be necessary (under the CMS Bancorp, Inc. 2007 Stock Option Plan or otherwise) to effectuate the provisions of this Section 3.05. Customers shall take all actions necessary to ensure that any current directors of CMS are not required to exercise any CMS Stock Option after the Effective Time so long as they elect to join and remain on the Hudson Valley Advisory Board. Customers has reserved and shall continue to reserve adequate shares of Customers Common Stock for delivery upon exercise of any assumed CMS Stock Option. As soon as practicable after the Effective Time, if it has not

already done so, and to the extent Customers shall have a registration statement in effect or an obligation to file a registration statement on Form S-3 or S-8, as the case may be (or any successor or other forms), and Customers shall use its reasonable efforts to maintain the effectiveness of such registration statement (and to maintain the current status of the prospectus contained therein) for so long as such assumed CMS Stock Option remains outstanding. As soon as practicable after the Effective Time, Customers shall deliver to the participants holding assumed CMS Stock Options reasonable notice of the foregoing events (including designation of the number of shares and exercise price as adjusted as of the Effective Time).

Section 3.06.  *Restricted Shares*.  Provided such restricted stock automatically vests by its terms upon a change in control, each share of CMS Common Stock granted subject to vesting or other lapse restrictions under the CMS Bancorp, Inc. 2007 Recognition and Retention Plan (the "CMS Restricted Shares") which is outstanding immediately prior to the Effective Time shall vest and become free of such restrictions as of the Effective Time and the holder thereof shall be entitled to receive the Merger Consideration, subject to applicable Tax withholding requirements.

Section 3.07.  *Dissenters' Rights*.  Shareholders are not entitled to dissenters' rights of appraisal under the DGCL.

## ARTICLE IV
## ACTIONS PENDING ACQUISITION

Section 4.01.  *Forbearances of CMS*.  From the date hereof until the Effective Time, except as expressly contemplated by this Agreement and/or disclosed on the CMS Disclosure Schedule, without the prior written consent of Customers, which consent shall not be unreasonably withheld, CMS will not, and will cause each of its Subsidiaries not to:

(a)     *Ordinary Course*.  (i) Conduct the business of CMS and its Subsidiaries other than in the ordinary and usual course or fail to use their reasonable best efforts to preserve intact their business organizations and assets and maintain their rights, franchises and existing relations with customers, suppliers, employees and business associates, or voluntarily take any action which, at the time taken, has or is reasonably likely to have a Material Adverse Effect, or (ii) enter into any new material line of business or materially change its lending, investment, underwriting, risk, asset liability management or other banking and operating policies, except as required by generally accepted accounting principles or applicable Law.

(b)     *Capital Stock*.  Other than pursuant to this Agreement and Section 5.02(b) of the CMS Disclosure Schedule and Rights as Previously Disclosed and outstanding on the date hereof, (i) issue, sell or otherwise permit to become outstanding, or authorize the creation of, any additional shares of CMS Common Stock or any Rights, (ii) enter into any agreement with respect to the foregoing, or (iii) permit any additional shares of CMS Common Stock to become subject to new grants of employee or director stock options, other Rights or similar stock-based employee rights.

(c)     *Dividends, etc*.  (i) Make, declare, pay or set aside for payment any dividend, other than (if permitted by applicable Law, or otherwise by the FDIC, NYDFS or other

Regulatory Authority) dividends from wholly-owned Subsidiaries to CMS, or (ii) directly or indirectly adjust, split, combine, redeem, reclassify, purchase or otherwise acquire, any shares of its capital stock.

(d)     *Compensation; Employment Agreements; etc.*  Except as Previously Disclosed, enter into or amend or renew any employment, consulting, severance or similar agreements or arrangements with any current or former director, officer, employee or other service provider of or to CMS or its Subsidiaries, or grant any salary or wage increase or increase any employee benefit (including incentive or bonus payments), except:  (i) for normal individual increases in compensation to employees (other than executive officers) in the ordinary course of business consistent with past practice; (ii) for other changes that are required by applicable Law, and (iii) to satisfy Previously Disclosed contractual obligations existing as of the date hereof.

(e)     *Benefit Plans.*  Enter into, establish, adopt or amend (except as may be required by applicable Law or to comply with the obligations of Section 6.12(d)) any pension, retirement, stock option, stock purchase, savings, profit sharing, deferred compensation, consulting, bonus, group insurance or other employee benefit, incentive or welfare contract, plan or arrangement, or any trust agreement (or similar arrangement) related thereto, in respect of any current or former director, officer, employee or other service provider of or to CMS or its Subsidiaries or take any action to accelerate the vesting or exercisability of stock options, restricted stock or other compensation or benefits payable thereunder.

(f)     *Dispositions.*  Sell, transfer, mortgage, encumber or otherwise dispose of or discontinue any of its assets, deposits, business or properties except in the ordinary course of business.

(g)     *Acquisitions.*  Other than in the ordinary course of business, acquire (other than by way of foreclosures or acquisitions of control in a bona fide fiduciary capacity or in satisfaction of debts previously contracted in good faith) all or any portion of, the assets, business, deposits or properties of any other entity.

(h)     *Governing Documents.*  Amend the CMS Articles, CMS Bylaws (or similar governing documents) or the Articles of Incorporation or Bylaws (or similar governing documents) of any of CMS's Subsidiaries.

(i)     *Accounting Methods.*  Implement or adopt any material change in its accounting principles, practices or methods, other than as may be required by GAAP or regulatory accounting principles.

(j)     *Contracts.*  Except in the ordinary course of business consistent with past practice, enter into or terminate any Material Contract or amend or modify in any material respect any of its existing Material Contracts.

(k) .    *Claims.*  Except in the ordinary course of business consistent with past practice, settle any claim, action or proceeding, except for any claim, action or proceeding that does not create an adverse precedent that could be relied upon by a third party for any other material claim, action or proceeding and that involves money damages in an amount,

individually or in the aggregate for all such settlements, that is not material to CMS and its Subsidiaries.

(l)    *Adverse Actions.*   (i) Take any action that would, or is reasonably likely to, prevent or impede the Parent Merger from qualifying as a reorganization within the meaning of Section 368(a) of the Code; or (ii) knowingly take any action that is intended or is reasonably likely to result in (A) any of its representations and warranties set forth in this Agreement being or becoming untrue in any material respect at any time at or prior to the Effective Time, (B) any of the conditions to the Parent Merger set forth in ARTICLE VII not being satisfied, or (C) a material violation of any provision of this Agreement except, in each case, as may be required by applicable Law or by any Regulatory Authority.

(m)    *Risk Management.*   Except pursuant to applicable Law or as required by applicable Regulatory Authority, (i) implement or adopt any material change in its interest rate risk management and other risk management policies, procedures or practices; or (ii) fail to follow in all material respects its existing policies or practices with respect to managing its exposure to interest rate and other risk.

(n)    *Indebtedness.*   Incur any indebtedness for borrowed money in excess of $100,000, other than FHLB advances, in connection with the Certificate of Deposit Account Registry program or brokered deposits, and in the ordinary course of business consistent with past practice.

(o)    *Capital Expenditures.*   Except as Previously Disclosed, make any capital expenditure or commitments with respect thereto in an amount in excess of $50,000 for any item or project, or $150,000 in the aggregate for any related items or projects, except as have been previously committed to prior to the date hereof.

(p)    *New Offices, Office Closures, etc.*   Close or relocate any offices at which business is conducted or open any new offices or ATMs, except as Previously Disclosed.

(q)    *Taxes.*   (1) Fail to prepare and file or cause to be prepared and filed in a manner consistent with past practice all Tax Returns (whether separate or consolidated, combined, group or unitary Tax Returns that include CMS or any of its Subsidiaries) that are required to be filed (with extensions) on or before the Effective Date, (2) make, change or revoke any material election in respect of Taxes, enter into any material closing agreement, settle any material claim or assessment in respect of Taxes or offer or agree to do any of the foregoing or surrender its rights to do any of the foregoing or to claim any refund in respect of Taxes, (3) file an amended Tax Return, if necessary, or (4) fail to maintain the books, accounts and records of CMS or any of its Subsidiaries substantially in accordance with past custom and practice, including without limitation, making the proper accruals for Taxes, bonuses, vacation and other liabilities and expenses.

(r)    *Commitments.*   Agree or commit to do any of the foregoing.

Section 4.02.   *Forbearances of Customers.*   From the date hereof until the Effective Time, except as expressly contemplated by this Agreement and/or disclosed on the Customers Disclosure Schedule, without prior consultation with CMS (provided that, except with respect to

Section 4.02(k), Customers shall have the right to take any such action following consultation with CMS), Customers will not, and will cause each of its Subsidiaries not to:

(a)    *Ordinary Course.*  (i) Conduct the business of Customers and its Subsidiaries other than in the ordinary and usual course or fail to use their reasonable best efforts to preserve intact their business organizations and assets and maintain their rights, franchises and existing relations with customers, suppliers, employees and business associates, or voluntarily take any action which, at the time taken, has or is reasonably likely to have a Material Adverse Effect, or (ii) enter into any new material line of business or materially change its lending, investment, underwriting, risk, asset liability management or other banking and operating policies, except as required by generally accepted accounting principles or applicable Law.

(b)    *Capital Stock.*  Other than pursuant to this Agreement and Rights as Previously Disclosed and outstanding on the date hereof, (i) issue, sell or otherwise permit to become outstanding, or authorize the creation of, any additional shares of Customers Common Stock or any Rights, (ii) enter into any agreement with respect to the foregoing, or (iii) permit any additional shares of Customers Common Stock to become subject to new grants of employee or director stock options, other Rights or similar stock-based employee rights.

(c)    *Dividends, Etc.*  (i) Make, declare, pay or set aside for payment any dividend, other than, if permitted by applicable Law, or otherwise by the FRB or other Regulatory Authority, dividends from wholly-owned Subsidiaries to Customers, or (ii) directly or indirectly adjust, split, combine, redeem, reclassify, purchase or otherwise acquire, any shares of its capital stock.

(d)    *Benefit Plans.*  Enter into, establish, adopt or amend (except as may be required by applicable Law or to comply with the obligations of Section 6.12(d)) any pension, retirement, stock option, stock purchase, savings, profit sharing, deferred compensation, consulting, bonus, group insurance or other employee benefit, incentive or welfare contract, plan or arrangement, or any trust agreement (or similar arrangement) related thereto, in respect of any current or former director, officer, employee or other service provider of or to Customers or its Subsidiaries or take any action to accelerate the vesting or exercisability of stock options, restricted stock or other compensation or benefits payable thereunder.

(e)    *Dispositions.*  Sell, transfer, mortgage, encumber or otherwise dispose of or discontinue any of its assets, deposits, business or properties except in the ordinary course of business.

(f)    *Acquisitions.*  Other than in the "ordinary course of business," acquire (other than by way of foreclosures or acquisitions of control in a bona fide fiduciary capacity or in satisfaction of debts previously contracted in good faith) all or any portion of, the assets, business, deposits or properties of any other entity.  For the sake of clarity, "ordinary course of business" does not include transactions that require the submission of a Bank Merger Act application or any application on Federal Reserve Forms Y-3 or Y-4, except for the acquisition of Acacia Federal Savings Bank by Customers.

(g)  *Governing Documents.*  Amend the Customers Articles or Customers Bylaws (or similar governing documents) or the Articles of Incorporation or Bylaws of any of Customers' Subsidiaries (or similar governing documents).

(h)  *Accounting Methods.*  Implement or adopt any material change in its accounting principles, practices or methods, other than as may be required by GAAP or regulatory accounting principles.

(i)  *Contracts.*  Except in the ordinary course of business consistent with past practice, enter into or terminate any Material Contract or amend or modify in any material respect any of its existing Material Contracts.

(j)  *Claims.*  Except in the ordinary course of business consistent with past practice, settle any claim, action or proceeding, except for any claim, action or proceeding that does not create an adverse precedent that could be relied upon by a third party for any other material claim, action or proceeding and that involves money damages in an amount, individually or in the aggregate for all such settlements, that is not material to Customers and its Subsidiaries.

(k)  *Adverse Actions.* (i) Take any action that would, or is reasonably likely to, prevent or impede the Parent Merger from qualifying as a reorganization within the meaning of Section 368(a) of the Code; or (ii) knowingly take any action that is intended or is reasonably likely to result in (A) any of its representations and warranties set forth in this Agreement being or becoming untrue in any material respect at any time at or prior to the Effective Time, (B) any of the conditions to the Parent Merger set forth in ARTICLE VII not being satisfied, or (C) a material violation of any provision of this Agreement except, in each case, as may be required by applicable Law or by any Regulatory Authority; or, except with the prior written consent of CMS, which consent shall not be unreasonably withheld:  (iii) sell or offer to sell Customers Common Stock if such offering or sale is intended or is reasonably likely to materially delay the Merger Registration Statement from being declared effective by the SEC, or materially delay receipt of any regulatory approvals required to consummate the transactions contemplated hereby, other than such a sale or offering which has been Previously Disclosed; or (iv) acquire or agree to acquire all or substantially all of the assets, business, deposits or properties of any other entity if such acquisition is intended or is reasonably likely to materially delay the Merger Registration Statement from being declared effective by the SEC, or materially delay receipt of any regulatory approvals required to consummate the transactions contemplated hereby, other than such an acquisition which has been Previously Disclosed.

(l)  *Risk Management.*  Except pursuant to applicable Law or as required by any Regulatory Authority, (i) implement or adopt any material change in its interest rate risk management and other risk management policies, procedures or practices; or (ii) fail to follow in all material respects its existing policies or practices with respect to managing its exposure to interest rate and other risk.

(m)  *Indebtedness.*  Incur any indebtedness for borrowed money in excess of $500,000 other than in the ordinary course of business consistent with past practice.

(n)     *Taxes.* (1) Fail to prepare and file or cause to be prepared and filed in a manner consistent with past practice all Tax Returns (whether separate or consolidated, combined, group or unitary Tax Returns that include Customers or any of its Subsidiaries) that are required to be filed (with extensions) on or before the Effective Date, (2) make, change or revoke any material election in respect of Taxes, enter into any material closing agreement, settle any material claim or assessment in respect of Taxes or offer or agree to do any of the foregoing or surrender its rights to do any of the foregoing or to claim any refund in respect of Taxes, (3) file an amended Tax Return, if necessary, or (4) fail to maintain the books, accounts and records of Customers or any of its Subsidiaries substantially in accordance with past custom and practice, including without limitation, making the proper accruals for Taxes, bonuses, vacation and other liabilities and expenses.

(o)     *Commitments.* Agree or commit to do any of the foregoing.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

Section 5.01.   *Disclosure Schedules.*  On or prior to the date hereof, CMS has delivered to Customers the CMS Disclosure Schedule and Customers has delivered to CMS the Customers Disclosure Schedule setting forth, among other things, items, the disclosures of which are necessary or appropriate either in response to an express disclosure requirement contained in a provision hereof or as an exception to one or more representations or warranties contained in Section 5.02, in the case of CMS, or Section 5.03, in the case of Customers, or to one or more of its respective covenants contained in ARTICLE IV and ARTICLE VI; provided, however, the mere inclusion of an item in a Disclosure Schedule as an exception to a representation or warranty shall not be deemed an admission by a party that such item represents a material exception, fact, event, development, change, effect or circumstance, or that such item is reasonably likely to have, or result in, a Material Adverse Effect on the party making the representation.

Section 5.02.   *Representations and Warranties of CMS.*  Subject to Section 5.01 and except as Previously Disclosed, CMS hereby represents and warrants to Customers:

(a)     *Organization, Standing and Authority.*  CMS is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware and is duly licensed or qualified to do business in any foreign jurisdictions where its ownership or leasing of property or assets or the conduct of its business requires it to be so qualified except where the failure to be so licensed or qualified would not constitute a Material Adverse Effect.  CMS is registered as a savings and loan holding company under the HOLA.  CMS Bank is a state-chartered non-member bank duly organized, validly existing under the Laws of the State of New York.  CMS Bank is a member in good standing of the Federal Home Loan Bank of New York.

(b)     *Capital Structure of CMS.*  The authorized capital stock of CMS consists of (i) 7,000,000 shares of CMS Common Stock and 1,000,000 shares CMS preferred stock, of which 1,862,803 shares of CMS Common Stock were issued and outstanding as of July 31, 2012 and no shares of preferred stock were issued and outstanding. As of July 31, 2012, 82,206

restricted shares were outstanding. 205,516 shares of CMS Common Stock are authorized and reserved for issuance upon exercise of CMS Stock Options as of July 31, 2012. The outstanding shares of CMS Common Stock have been duly authorized, are validly issued and outstanding, fully paid and nonassessable, and are not subject to any preemptive rights (and were not issued in violation of any preemptive rights). Except pursuant to this Agreement or as Previously Disclosed, as of the date hereof, (i) there are no shares of CMS Common Stock authorized and reserved for issuance, (ii) CMS does not have any Rights issued or outstanding with respect to CMS Common Stock and (iii) CMS does not have any commitment to authorize, issue or sell any CMS Common Stock.

      (c)    *Subsidiaries.*

      (i)    (A) CMS has Previously Disclosed a list of all of its Subsidiaries, together with the jurisdiction of organization of each such Subsidiary, (B) CMS owns, directly or indirectly, all the issued and outstanding equity securities of each of its Subsidiaries, (C) no equity securities of any of CMS's Subsidiaries are or may become required to be issued (other than to CMS or its wholly-owned Subsidiaries) by reason of any Right or otherwise, (D) there are no contracts, commitments, understandings or arrangements by which any of such Subsidiaries is or may be bound to sell or otherwise transfer any equity securities of any such Subsidiaries (other than to it or its wholly-owned Subsidiaries), (E) there are no contracts, commitments, understandings, or arrangements relating to its rights to vote or to dispose of such securities and (F) all the equity securities of each Subsidiary held by CMS or its Subsidiaries are fully paid and nonassessable and are owned by CMS or its Subsidiaries free and clear of any Liens.

      (ii)    Except as Previously Disclosed, CMS does not own beneficially, directly or indirectly, any equity securities or similar interests of any Person, or any interest in a partnership or joint venture of any kind, other than its Subsidiaries.

      (iii)    Each of CMS's Subsidiaries has been duly organized and is validly existing or in good standing under the Laws of the jurisdiction of its organization, as applicable, and is duly qualified to do business and is in good standing in the jurisdictions where its ownership or leasing of property or the conduct of its business requires it to be so qualified except where the failure to be so licensed or qualified would not constitute a Material Adverse Effect.

      (iv)    CMS Bank is an "insured bank" as defined in the Federal Deposit Insurance Act, as amended, and the rules and regulations promulgated thereunder (the "*FDIA*").

      (d)    *Corporate Power.* Each of CMS and its Subsidiaries has the requisite corporate power and authority to carry on its business as it is now being conducted and to own all its properties and assets. CMS has the corporate power and authority to execute and deliver and, subject to the satisfaction of the conditions set forth at Section 7.01(a) - (c), perform its obligations under this Agreement, including the execution and filing of the articles of merger with the Delaware Secretary of State. CMS Bank has the corporate power and prior to the Effective Time will have the corporate authority to consummate the Subsidiary Merger and the Agreement to Merge in accordance with the terms of this Agreement.

(e)     *Corporate Authority; Authorized and Effective Agreement.*  Subject to the affirmative vote of a majority of the outstanding shares of CMS Common Stock entitled to vote at the CMS Meeting as set forth in Section 6.02 (the *"CMS Stockholder Approval"*), which is the only stockholder vote required to approve this Agreement pursuant to the DGCL and the CMS Articles, this Agreement and the transactions contemplated hereby have been authorized by all necessary corporate action of CMS and the CMS Board prior to the date hereof.  This Agreement is a valid and legally binding obligation of CMS, enforceable in accordance with its terms (except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar Laws of general applicability relating to or affecting creditors' rights or by general equity principles).

(f)     *Regulatory Approvals; No Defaults.*

(i)     No consents or approvals of, or filings or registrations with, any Governmental Authority are required to be made or obtained by CMS or any of its Subsidiaries in connection with the execution, delivery or performance by CMS of this Agreement or to consummate the Merger except for (A) filings of applications, notices and the Agreement to Merge with, or requests for approvals and waivers from, as applicable, federal and state banking authorities and other Regulatory Authorities; (B) receipt of the regulatory approvals set forth in Section 7.01(b); (C) the filing of the Proxy Statement-Prospectus; (D) the filing of the articles of merger with the Delaware Secretary of State; and (E) the expiration or termination of any applicable waiting period under any applicable regulation.  As of the date hereof, except as Previously Disclosed, CMS is not aware of any reason related to CMS or its Subsidiaries why the approvals set forth in Section 7.01(b) will not be received without the imposition of a condition, restriction or requirement of the type described in Section 7.01(b).

(ii)     Subject to receipt of regulatory approvals, the CMS Stockholder Approval and third-party consents with respect to Material Contracts as Previously Disclosed, the expiration of certain regulatory waiting periods and required filings under federal securities Laws, the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby do not and will not (A) constitute a breach or violation of, or a default under, or give rise to any Lien, any acceleration of remedies or any right of termination under, any Law, governmental permit or license or any Material Contract of CMS or of any of its Subsidiaries or to which CMS or any of its Subsidiaries or properties is subject or bound except for any breach, violation, default, Lien, acceleration or right of termination which would not, individually or in the aggregate, result in a Material Adverse Effect, (B) constitute a breach or violation of, or a default under, the CMS Articles or the CMS Bylaws, or (C) require any consent or approval under any such Law, governmental permit or license or Material Contract.

(g)     *Financial Information and SEC Documents.*

(i)     Each of the consolidated balance sheets of CMS and its Subsidiaries and the related consolidated statements of income (loss), statements of stockholders' equity and comprehensive income (loss) and cash flows, together with the notes thereto, for the last three (3) years included in any annual report and all other reports, registration statements, definitive proxy statements or information statements filed or to be filed by it or any of its Subsidiaries on or prior to the Effective Time with the SEC under the Securities Act, or under

Section 13, 14 or 15(d) of the Exchange Act, in the form filed or to be filed (collectively, "*CMS SEC Documents*") as of the date filed, (A) complied or will comply in all material respects with the applicable requirements under the Securities Act or the Exchange Act, as the case may be, and (B) each of the balance sheets or statements of condition contained in or incorporated by reference into any such CMS SEC Document (including the related notes and schedules thereto) fairly presents, or will fairly present, the financial position of CMS and its Subsidiaries as of its date, and each of the statements of income or results of operations and changes in stockholders' equity and cash flows in such CMS SEC Documents (including any related notes and schedules thereto) fairly presents, or will fairly present, the results of operations, changes in stockholders' equity and cash flows, as the case may be, of CMS and its Subsidiaries for the periods to which they relate, in each case in accordance with GAAP consistently applied during the periods involved, except in each case as may be noted therein, subject to normal year-end audit adjustments and the absence of footnotes in the case of unaudited statements.

(ii)     Except as Previously Disclosed, for the last three (3) years, CMS has filed all CMS SEC Documents required to be filed under applicable Law.  As of their respective filing dates or the filing dates of amendments, the CMS SEC Documents complied as to form in all material respects with the requirements of the Exchange Act, and none of the CMS SEC Documents as of such respective dates or the respective filing dates of amendments contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

(iii)     The records, systems, controls, data and information of CMS and its Subsidiaries are recorded, stored, maintained and operated under means (including any electronic, mechanical or photographic process, whether computerized or not) that are under the exclusive ownership and direct control of CMS or its Subsidiaries or accountants (including all means of access thereto and therefrom), except for any non-exclusive ownership and non-direct control that would not reasonably be expected to have a material adverse effect on the system of internal accounting controls described below in this Section 5.02(g)(iii).  CMS (A) has implemented and maintains disclosure controls and procedures (as defined in Rule 13a-15 promulgated under the Exchange Act) designed and maintained to ensure that material information relating to CMS, including its consolidated Subsidiaries, is made known to the chief executive officer and the chief financial officer of CMS by others within those entities, and (B) has disclosed, based on the most recent evaluation by such officers prior to the date hereof, to CMS's outside auditors and the audit committee of CMS's Board of Directors (y) any significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting (as defined in Rule 13a-15 promulgated under the Exchange Act) that are reasonably likely to adversely affect CMS's ability to record, process, summarize and report financial information and (z) any fraud, whether or not material, that involves management or other employees who have a significant role in CMS's internal controls over financial reporting.  These disclosures, if any, were made in writing by management to CMS's auditors and audit committee and a copy has previously been made available to Customers.  As of the date hereof, and except as Previously Disclosed, CMS knows of no reason related to CMS to believe that CMS's Chief Executive Officer and Chief Financial Officer will not be able to give the certifications and assessments required pursuant to Sections 302 and 404 and 906 of the Sarbanes-Oxley Act, without qualification, when next due.

(iv)    Since September 30, 2011, (A) through the date hereof, neither CMS nor any of its Subsidiaries nor, to CMS's knowledge, any director, officer, employee, auditor, accountant or representative of CMS or any of its Subsidiaries has received any material complaint, allegation, assertion or claim, whether written or oral, regarding questionable accounting or auditing practices, procedures, methodologies or methods of CMS or any of its Subsidiaries or their respective internal accounting controls, including any material complaint, allegation, assertion or claim that CMS or any of its Subsidiaries has engaged in questionable accounting or auditing practices and (B) no attorney representing CMS or any of its Subsidiaries, whether or not employed by CMS or any of its Subsidiaries, has reported evidence of a material violation of securities Laws, breach of fiduciary duty or similar violation by CMS or any of its Subsidiaries or any of their respective officers, directors, employees, or agents to the Board of Directors of CMS or any committee thereof or to any director or officer of CMS.

(h)    *Litigation.*  Except as Previously Disclosed, there is no material suit, action, investigation, audit or proceeding (whether judicial, arbitral, administrative or other) pending or, to CMS's knowledge, threatened against or affecting CMS or any of its Subsidiaries, nor is there any judgment, decree, injunction, rule or order of any Governmental Authority or arbitration outstanding against CMS or any of its Subsidiaries.

(i)    *Regulatory Matters.*

(i)    Except as Previously Disclosed, neither CMS nor any of its Subsidiaries or properties is a party to or is subject to any order, decree, agreement, memorandum of understanding or similar arrangement with, or a commitment letter or similar submission to, or extraordinary supervisory letter from, any Regulatory Authority charged with the supervision or regulation of financial institutions and their subsidiaries (including their holding companies) or issuers of securities.

(ii)    Neither CMS nor any of its Subsidiaries has been advised by any Regulatory Authority that such Regulatory Authority is contemplating issuing or requesting (or is considering the appropriateness of issuing or requesting) any such order, decree, agreement, memorandum of understanding, commitment letter, supervisory letter or similar submission nor to its knowledge has any Regulatory Authority commenced an investigation in connection therewith.

(j)    *Compliance with Laws.*  Except as Previously Disclosed, each of CMS and its Subsidiaries:

(i)    is in material compliance with all applicable federal, state, local and foreign Laws applicable thereto or to the employees conducting such businesses, including, without limitation, the Equal Credit Opportunity Act, the Fair Housing Act, the Community Reinvestment Act (*"CRA"*) (which includes a CRA Rating of "satisfactory" or better), the Home Mortgage Disclosure Act, and the rules and regulations promulgated thereunder, and all other applicable fair lending Laws and other Laws relating to discriminatory business practices;

(ii)    has all permits, licenses, authorizations, orders and approvals of, and has made all filings, applications and registrations with, all Governmental Authorities that

are required in order to permit them to own or lease their properties and to conduct their businesses as presently conducted except where the failure to make any such filing or have any such licenses would not constitute a Material Adverse Effect, and, to CMS's knowledge, no suspension or cancellation of any such permits, licenses, authorizations, orders or approvals is threatened; and

(iii)    has not, within the three years prior to the date hereof, received any notification or communication from any Governmental Authority (A) asserting that CMS or any of its Subsidiaries is not in material compliance with any of the statutes, regulations, or ordinances which such Governmental Authority enforces or (B) threatening to revoke any license, franchise, permit, or governmental authorization.

(k)    *Material Contracts; Defaults.*

(i)    Except as set forth in the CMS Disclosure Schedule, neither CMS nor any of its Subsidiaries is a party to or is bound by any contract of the following types that involve CMS or any of its Subsidiaries:

(A)    Any contract involving commitments to others to make capital expenditures or purchases or sales in excess of $50,000 in any one case or $150,000 in the aggregate in any period of 12 consecutive months;

(B)    Any contract relating to any indebtedness for borrowed money of CMS or any of its Subsidiaries (including loan agreements, lease purchase arrangements, guarantees, agreements to purchase goods or services or to supply funds or other undertakings on which others rely in extending credit), or any conditional sales contracts, chattel mortgages, equipment lease agreements and other security arrangements with respect to personal property, other than contracts entered into in the ordinary course of business consistent with past practice and policies;

(C)    Any employment, severance, consulting or management services contract or any confidentiality or proprietary rights contract with any employee or other service provider of or to CMS or any of its Subsidiaries;

(D)    Any contract containing covenants limiting the freedom of CMS, any of its Subsidiaries or any employee or agent of CMS or its Subsidiaries (1) to compete in any line of business, (2) to compete with any individual, bank, corporation, partnership, limited liability company, joint venture, trust, unincorporated association or organization, government body, agency or instrumentality, or any other entity (each, a "*Person*") or in any area or territory, (3) to solicit or engage in business with customers, vendors, suppliers or any Person, or (4) to solicit, hire or contract with employees or other Persons;

(E)    Any partnership, joint venture, limited liability company arrangement or other similar agreement;

(F)    Any profit sharing, stock option, stock purchase, stock appreciation, deferred compensation, stock issuance, or other plan or arrangement still in effect (or pursuant to which CMS or any of its Subsidiaries has any remaining obligation to any party)

for the benefit of CMS's or any of its Subsidiaries' current or former directors, officers, employees, and other service providers;

(G)     Any material intellectual property license agreement, either as licensor or licensee, or any other contract of any type relating to any patent, trademark or trade name;

(H)     Any material contract with any director, officer or key employee of CMS or any of its Subsidiaries or any arrangement under which CMS or any of its Subsidiaries has advanced or loaned any amount to any of their directors, officers, and employees;

(I)     Any contract of any kind whatsoever, whether exclusive or otherwise, with any sales agent, representative, franchisee or distributor involving money or property, other than contracts entered into in the ordinary course of business consistent with past practice and policies;

(J)     Other than this Agreement and the ancillary agreements being executed in connection with this Agreement, any contract providing for the acquisition or disposition of any portion of CMS or any of its Subsidiaries;

(K)     Any contract of any kind whatsoever that requires the payment of royalties;

(L)     Any contract under which the consequences of a breach, violation or default would reasonably be expected to have a Material Adverse Effect on CMS or its Subsidiaries as a whole;

(L)     Any contract pursuant to which CMS or any of its Subsidiaries has any obligation to share revenues or profits derived from CMS or any of its Subsidiaries with any other entity; and

(M)     Any contract between CMS or any of its Subsidiaries, on the one hand, and any officer, director, employee or consultant of CMS or any of its Subsidiaries, or any natural person related by blood or marriage to such natural person, on the other hand (collectively, "*Affiliate Agreements*").

(ii)     "*Material Contracts*" shall mean those contracts in the CMS Disclosure Schedule listed under Section 5.02(k).  Except as Previously Disclosed, all of the Material Contracts are in full force and effect and are legal, valid, binding and enforceable in accordance with their terms (except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar Laws of general applicability relating to or affecting creditors' rights or by general equity principles) (i) as to CMS or any of its Subsidiaries, as the case may be, and (ii) to the knowledge of CMS, as to the other parties to such Material Contracts.  Except as disclosed in the CMS Disclosure Schedule, CMS and/or its Subsidiaries, as applicable, and to the knowledge of CMS, each other party to the Material Contracts, has in all material respects performed and is performing all obligations, conditions and covenants required to be performed by it under the Material Contracts.  Neither CMS nor any of its Subsidiaries, and to the knowledge of CMS, no other party, is in violation,

breach or default of any material obligation, condition or covenant under any of the Material Contracts, and neither CMS nor any of its Subsidiaries has received any notice that any of the Material Contracts will be terminated or will not be renewed.  Neither CMS nor any of its Subsidiaries, has received from or given to any other Person any notice of default or other violation under any of the Material Contracts, nor, to the knowledge of CMS, does any condition exist or has any event occurred which with notice or lapse of time or both would constitute a default thereunder.

(l)     *No Brokers.*  Except as Previously Disclosed, no action has been taken by CMS that would give rise to any valid claim against either party hereto for a brokerage commission, finder's fee or other like payment with respect to the transactions contemplated by this Agreement.

(m)     *Employee Benefit Plans.*

(i)     Section 5.02(m)(i) of the CMS Disclosure Schedule contains a true and complete list of each bonus, deferred compensation, incentive compensation, stock purchase, stock option, employment or consulting, severance pay or benefit, retention, change in control, savings, medical, life or other insurance, vacation, welfare benefit, fringe benefit, cafeteria, profit-sharing or pension benefit plan, program, agreement or arrangement, and each other employee benefit or compensation plan, program, agreement or arrangement, sponsored, maintained or contributed to or required to be contributed to by CMS or any of its Subsidiaries, or by any trade or business, whether or not incorporated, that together with CMS or any of its Subsidiaries would be deemed a "single employer" under Section 414 of the Code (an "*ERISA Affiliate*") or as to which CMS, any of its Subsidiaries, or any ERISA Affiliate has, or may have, any liability or obligation, contingent or otherwise, whether written or oral and whether legally binding or not (collectively, the "*CMS Plans*").  Neither CMS, any of its Subsidiaries, nor any ERISA Affiliate has any formal plan or commitment, whether legally binding or not, to create any additional plan, modify or change any existing CMS Plan that would affect any current or former employee, director or other service provider of or to CMS, any of its Subsidiaries, or any ERISA Affiliate.

(ii)     With respect to each of the CMS Plans, CMS will, a reasonable period prior to Closing, make available to Customers true and complete copies of each of the following documents:  (i) the CMS Plan, the related trust agreement (if any), any amendments to such CMS Plan or trust agreement), and, in the case of the Employee Stock Ownership Plan of CMS Bancorp, Inc. (the "ESOP"), all ESOP loan documentation; (ii) the three most recent annual reports, actuarial reports, and financial statements, if any; (iii) the most recent summary plan description, together with each summary of material modifications, required under ERISA with respect to such CMS Plan, and all material employee communications relating to such CMS Plan; (iv) the most recent determination letter or opinion letter received from the IRS with respect to each CMS Plan that is intended to be qualified under Section 4.01(a) of the Code; and (v) all material communications to or from the IRS or any other governmental or regulatory authority relating to each CMS Plan.

(iii)     Except as Previously Disclosed, no liability under Title IV of ERISA has been incurred by CMS, any of its Subsidiaries, or any ERISA Affiliate that has not

been satisfied in full, and no condition exists that presents a material risk to CMS, any Subsidiary of CMS or any ERISA Affiliate of incurring a liability under such Title. Except as Previously Disclosed, no CMS Plan subject to Section 412, 430, 431 or 432 of the Code or Section 302, 303, 304 or 305 of ERISA has (i) incurred an accumulated funding deficiency, whether or not waived, or (ii) been, is, or would be (if the provisions of Section 430 applied to such CMS Plan) in "at-risk status." None of the assets of CMS, any of its Subsidiaries, or any ERISA Affiliate are subject to any lien arising under ERISA or Subchapter D of Chapter 1 of the Code, and no condition exists that presents a material risk of any such lien arising.

(iv)   Neither CMS nor any of its Subsidiaries, nor any ERISA Affiliate, nor any of the CMS Plans, nor any trust created thereunder, nor, to the knowledge of CMS, any trustee or administrator thereof has engaged in a transaction in connection with which CMS, any of its Subsidiaries, any ERISA Affiliate, any of the CMS Plans or any such trust could (either directly or pursuant to any contractual indemnification or contribution obligation protecting any fiduciary, insurer or service provider with respect to any CMS Plan), be subject to any civil liability or penalty pursuant to Title I of ERISA, a tax imposed pursuant to Chapter 43 of the Code, or any other liability.

(v)   All contributions required to have been made under the terms of each CMS Plan or pursuant to ERISA and the Code have been timely made and all obligations in respect of each CMS Plan have been properly accrued and reflected in the financial statements in the CMS SEC Documents.

(vi)   The only CMS Plan that is subject to Title IV of ERISA is the Community Mutual Savings Bank Retirement Income Plan (the "*Pension Plan*"). There has been no "reportable event" within the meaning of Section 4043 of ERISA which required a notice to the PBGC which has not been fully and accurately reported in a timely fashion, as required, or which, whether or not reported, would constitute grounds for the PBGC to institute involuntary termination proceedings with respect to any CMS Plan that is subject to Title IV of ERISA, other than any reportable event occurring by reason of the transactions contemplated by this Agreement.

(vii)   None of the CMS Plans is, and neither CMS, nor any of its Subsidiaries, nor any ERISA Affiliate has within the last six years contributed to or had an obligation to contribute to or incurred any liability in respect of, any "multiemployer plan" (as defined in Section 3(37) of ERISA), a "multiple employer welfare arrangement" (as defined in Section 3(40) of ERISA), or a single employer plan that has two or more contributing sponsors, at least two of whom are not under common control, within the meaning of Section 4063(a) of ERISA.

(viii)   Except as Previously Disclosed, each CMS Plan that is intended to be "qualified" within the meaning of Section 401(a) of the Code is so qualified (and each corresponding trust is exempt under Section 501 of the Code) and has received or is the subject of a favorable determination letter, opinion letter, or advisory letter from the IRS relating to the most recently completed IRS remedial amendment period cycle ("*RAP Cycle*") applicable thereto covering all of the applicable provisions on the IRS cumulative list of covered qualification requirements for such RAP Cycle, and to the knowledge of CMS, nothing has

occurred that would reasonably be expected to adversely affect the qualified status of any CMS Plan (or the exempt status of any related trust) or require the filing of a submission under the IRS's employee plans compliance resolution system ("*EPCRS*") or the taking of other corrective action pursuant to EPCRS in order to maintain such qualified (or exempt) status.  No CMS Plan is the subject of any pending correction or application under EPCRS.

(ix)     Each of the CMS Plans that is intended to satisfy the requirements of Section 125, 423 or 501(c)(9) of the Code satisfies such requirements.  Each of the CMS Plans has been operated and administered in all material respects in accordance with its terms and applicable Laws, including but not limited to ERISA and the Code.

(x)     Except as Previously Disclosed, no payment or benefit paid or provided, or to be paid or provided, to current or former employees, directors or other service providers of or to CMS, any of its Subsidiaries, (including pursuant to this Agreement) will fail to be deductible for federal income tax purposes under Section 162(m) or Section 280G of the Code.  Each Person who performs services for CMS or any of its Subsidiaries, has been, and is, properly classified by CMS or the Subsidiary as an employee or independent contractor.

(xi)     There are no claims pending, or, to the knowledge of CMS, threatened or anticipated (other than routine claims for benefits) against or involving any CMS Plan, the assets of any CMS Plans or against CMS, any of its Subsidiaries, or any ERISA Affiliate with respect to any CMS Plan.  There is no judgment, decree, injunction, rule or order of any Governmental Authority or arbitrator outstanding against or in favor of any CMS Plan or any fiduciary thereof (other than rules of general applicability).  There are no pending or, to the knowledge of CMS, threatened audits or investigations by any Governmental Authority involving any CMS Plan.

(xii)     Each CMS Plan that is a "group health plan" (as defined in Section 5000(b)(1) of the Code or Title I of ERISA) has been operated in compliance in all material respects with (i) the group health plan continuation coverage requirements of Section 4980B of the Code and Sections 601 through 608 of ERISA ("*COBRA Coverage*") or similar state Law, (ii) Section 4980D of the Code, and (iii) Title I of ERISA, in each case to the extent applicable.  Except as Previously Disclosed, no CMS Plan or other written or oral agreement exists which obligates CMS to provide benefits (whether or not insured) to any current or former employee, consultant or other service provider of or to CMS following such current or former employee's or consultant's termination of employment or consultancy with CMS, other than (i) COBRA Coverage or coverage mandated by state Law, or (ii) death benefits or retirement benefits under any "employee pension benefit plan" (as defined in Section 3(2) of ERISA).  No CMS Plan is funded through a "welfare benefit fund" as defined in Section 419 of the Code.

(xiii)     Each CMS Plan may be amended or terminated without liability to CMS or any of its Subsidiaries, other than liability for accrued benefits through the date of the amendment or termination and administrative costs of amending or terminating the CMS Plan.  Except as Previously Disclosed, neither the execution of this Agreement, nor the consummation of the transactions contemplated hereby, will (either alone or together with any other event) result in or is a precondition to (i) any current or former employee, director or other service provider of or to CMS or any of its Subsidiaries becoming entitled to severance pay or

any similar payment, (ii) the acceleration of the time of payment or vesting of, or an increase in the amount of, any compensation due to any current or former employee, director or other service provider of or to CMS or any of its Subsidiaries, or (iii) the renewal or extension of the term of any agreement regarding the compensation of any current or former employee, director or other service provider of or to CMS or any of its Subsidiaries.

(xiv)    To the extent that any CMS Plan is or ever has been a "non-qualified deferred compensation plan" within the meaning of Section 409A of the Code and associated Treasury Department guidance, such CMS Plan was operated in good faith compliance with Section 409A of the Code prior to January 1, 2009, and has been operated in compliance with Section 409A of the Code in all material respects since January 1, 2009. None of the transactions contemplated by this Agreement will result in a violation of Section 409A of the Code.

(xv)    Except as Previously Disclosed, no CMS Plan subject to Title I of ERISA holds any "employer security" or "employer real property" (each as defined in Section 407(d) of ERISA).

(xvi)    All workers' compensation benefits paid or payable to any current or former employee, director or other service provider of or to CMS or any of its Subsidiaries are fully insured by a third party insurance carrier.

(xvii)    Each CMS Plan has been operated and administered in all material respects with the requirements of The Patient Protection and Affordable Care Act (Public Law 111-148) and the Health Care and Education Reconciliation Act of 2010 (Public Law 111-152), in each case as amended, to the extent applicable.

(n)    *Labor Matters.*  Neither CMS nor any of its Subsidiaries is a party to or is bound by any collective bargaining agreement, contract or other agreement or understanding with a labor union or labor organization, nor is CMS or any of its Subsidiaries the subject of a proceeding asserting that it or any such Subsidiary has committed an unfair labor practice (within the meaning of the National Labor Relations Act) or seeking to compel CMS or any such Subsidiary to bargain with any labor organization as to wages or conditions of employment, nor is there any strike or other labor dispute involving it or any of its Subsidiaries pending or, to CMS's knowledge, threatened, nor is CMS aware of any activity involving it or any of its Subsidiaries' employees seeking to certify a collective bargaining unit or engaging in other organizational activity.

(o)    *Takeover Laws.*  CMS has taken all action required to be taken by it in order to exempt this Agreement and the transactions contemplated hereby are exempt from, the requirements of any "moratorium," "control share," "fair price," "affiliate transaction," "business combination" or other antitakeover Laws of any state (collectively, *"Takeover Laws"*), including, without limitation, the State of Delaware, applicable to it. CMS has taken all action required to be taken by it in order to make this Agreement and the transactions contemplated hereby comply with, and this Agreement and the transactions contemplated hereby do comply with, the requirements of any Articles, Sections or provisions of CMS's or its Subsidiaries' Articles of

Incorporation or Bylaws concerning "business combination," "fair price," "voting requirement," "constituency requirement" or other related provisions (collectively, the *"Takeover Provisions"*).

(p)     *Environmental Matters.*  Except as Previously Disclosed, to CMS's knowledge, neither the conduct nor operation of CMS or its Subsidiaries nor any condition of any property presently or previously owned, leased or operated by any of them is in material violation of Environmental Laws and to CMS's knowledge, no condition has existed or event has occurred with respect to any of them or any such property that, with notice or the passage of time, or both, is reasonably likely to result in material liability under Environmental Laws.  To CMS's knowledge, neither CMS nor any of its Subsidiaries has used or stored any Hazardous Material in, on, or at any property presently or previously owned, leased or operated by any of them in violation of any Environmental Law.  To CMS's knowledge, neither CMS nor any of its Subsidiaries has received any unresolved notice from any Person that CMS or its Subsidiaries, or the operation or condition of any property ever owned, leased, operated, or held as collateral or in a fiduciary capacity by any of them, are in material violation of or otherwise are alleged to have any unresolved material liability under any Environmental Law, including, but not limited to, responsibility (or potential responsibility) for the cleanup or other remediation of any pollutants, contaminants, or hazardous or toxic wastes, substances or materials at, on, beneath, or originating from any such property.  Neither CMS nor any of its Subsidiaries is the subject of any material action, claim, litigation, dispute, investigation or other proceeding with respect to violations of, or liability under, any Environmental Law.  To CMS's knowledge, CMS and each of its Subsidiaries has timely filed all material reports and notifications required to be filed with respect to all of its operations and properties presently or previously owned, leased or operated by any of them and has materially complied with all requirements to generate and maintain records and data under all applicable Environmental Laws.

(q)     *Tax Matters.*

(i)     CMS and its Subsidiaries have duly and timely filed all material Tax Returns required to be filed with respect to all applicable Taxes, and all such Tax Returns are true, correct and complete in all material respects.

(ii)     (A) CMS and its Subsidiaries have timely paid all Taxes due and payable, whether or not shown on any Tax Return, (B) CMS and its Subsidiaries have established reserves in the financial statements in the CMS SEC Documents and in its internal financial statements (including, without limitation, financial statements immediately prior to the Effective Time) for Taxes which are sufficient for the payment of all unpaid Taxes as of the dates thereof, whether or not such Taxes are disputed or are yet due and payable, for or with respect to the period, (C) CMS and its Subsidiaries have withheld and timely paid to the proper Governmental Authority or taxing authority all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent consultant, creditor, member or other third party, (D) CMS and its Subsidiaries have furnished properly completed and valid exemption or other appropriate certificates for all transactions treated as exempt from sales, use, value added, ad valorem, transfer or other similar Taxes, (E) to the knowledge of CMS, CMS and its Subsidiaries have no liability for Taxes payable for or with respect to any periods prior to and including the Effective Time in excess of the amounts actually paid prior to the Effective Time or reserved for in the financial statements in the CMS SEC Documents and in

its internal financial statements (including, without limitations, financial statements immediately prior to the Effective Time), and (F) no claim has been made within the past three years by any taxing authority in any jurisdiction in which CMS and/or its Subsidiaries does not file Tax Returns that CMS and/or its Subsidiaries is or may be subject to taxation by that jurisdiction.

(iii)   CMS and its Subsidiaries have furnished or will furnish prior to the Effective Time, or otherwise made available to Customers true and correct copies of all Tax Returns and all written communications relating to any such Tax Returns or to any deficiency or claim proposed and/or asserted, irrespective of the outcome of such matter, but only to the extent such Tax Returns or items relate to tax years which are currently subject to an audit, investigation, examination or other proceeding, or with respect to which the applicable statute of limitations has not expired.

(iv)   (A) All deficiencies asserted or assessments made as a result of any Tax audit, investigation, examination or other proceeding have been paid in full, (B) there are no current audits, investigations, examinations or other administrative or judicial proceeding with respect to any Taxes or Tax Returns of CMS and its Subsidiaries and neither CMS nor any of its Subsidiaries has received any written notice that any such audit, investigation, examination or other administrative or judicial proceeding is threatened or pending, and (C) there are no agreements, waivers or extensions of any statute of limitations currently in effect with respect to a Tax Return or Tax assessment or deficiency of CMS or its Subsidiaries.

(v)   (A) Neither CMS nor any of its Subsidiaries is a party to any agreement relating to the sharing, allocation or payment of, or indemnity for, Taxes (other than agreements between members of a group of corporations, entities or other Persons of which CMS is or was the common parent), and (B) neither CMS nor any of its Subsidiaries has ever been a member of an affiliated group filing a consolidated federal income Tax Return (other than a group of which CMS is or was the common parent), nor any similar affiliated, consolidated, combined or unitary group for foreign, state or local Tax purposes, and neither CMS nor its Subsidiaries has any liability for the Taxes of any other Person under Treasury Regulation Section 1.1502-6 (or any corresponding or similar provision of foreign, state or local Tax law), as a transferee or successor, by contract, or otherwise (other than liability for the Taxes of corporations, entities or other Persons of which CMS is or was the common parent).

(vi)   (A) CMS and its Subsidiaries have disclosed on their Tax Returns all positions taken therein that could reasonably be expected to give rise to a substantial understatement of Tax within the meaning of Section 6662 of the Code (or any similar provision under any state, local, or foreign tax Law), (B) to the knowledge of CMS, neither CMS nor any of its Subsidiaries have engaged in or are currently participating in any "reportable transactions" as defined in Section 6707A of the Code and Section 1.6011-4 of the income tax regulations promulgated under the Code, and (C) to the knowledge of CMS, CMS and its Subsidiaries are in compliance with, and their records contain all information and documents (including properly completed IRS Forms W-9) necessary to comply with, all applicable information reporting and tax withholding requirements under federal, state, and local tax Laws.

(vii)   (A) Neither CMS nor any of its Subsidiaries has distributed stock of another person, or has had its stock distributed by another person, in a transaction that was

purported or intended to be governed in whole or in part by Section 355 or Section 361 of the Code, (B) neither CMS nor any of its Subsidiaries has entered into a written agreement with any Governmental Authority or taxing authority or is subject to an adjustment under Section 481(a) of the Code (or similar provision of state, local or foreign Law) that would have a material impact on the calculation of Taxes after the Effective Time, and (C) Neither CMS nor any of its Subsidiaries has been within the applicable period set forth in Section 897(c)(1)(A)(ii) of the Code, and shall not be as of the Effective Date, a "United States real property holding corporation" (as that term is defined under Section 897 of the Code).

(viii)   There are no Liens for Taxes (other than Taxes not yet due and payable) upon any of the assets of CMS or its Subsidiaries.

(ix)   Within the last 3 years, neither CMS nor any of its Subsidiaries has (A) made, revoked or changed any material federal Tax election, (B) changed any Tax accounting period, (C) revoked or changed any Tax accounting method, (D) surrendered any right to claim a refund of Taxes, or (E) settled or compromised any Tax liability.

(x)   Neither CMS nor any of its Subsidiaries will be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Effective Date as a result of any (A) change in accounting method for any taxable period ending on or prior to the Effective Date, (B) "closing agreement," as that term is defined in Section 7121 of the Code (or any corresponding or similar provision of foreign, state or local Tax law) executed on or prior to the Effective Date, (C) installment sale or open transaction disposition made on or prior to the Effective Date; or (D) prepaid amount received on or before the Effective Date.

(xi)   Except as Previously Disclosed, no payment or benefit paid or provided, or to be paid or provided, to current or former employees, directors or other service providers of or to CMS, any of its Subsidiaries, (including pursuant to this Agreement) will fail to be deductible for federal income tax purposes under Section 162(m) or Section 280G of the Code.

(xii)   No closing agreements, private letter rulings, technical advice memoranda or similar agreements or rulings relating to Taxes have been entered into or issued by a Governmental Authority or taxing authority with or in respect of CMS or its Subsidiaries.

(xiii)   To the knowledge of CMS, neither CMS nor any of its Subsidiaries (A) is a partner for Tax purposes with respect to any joint venture, partnership, or other arrangement or contract which is treated as a partnership for Tax purposes, (B) owns a single member limited liability company or other entity that is treated as a disregarded entity, (C) is a shareholder of a "controlled foreign corporation" as defined in Section 957 of the Code, (D) is a "personal holding company" as defined in Section 542 of the Code, or (E) is a shareholder in a "passive foreign investment company" within the meaning of Section 1297 of the Code.

(xiv)   To the knowledge of CMS, none of the assets of CMS or any of its Subsidiaries directly or indirectly, secures any debt the interest on which is tax exempt under Section 103(a) of the Code.  Neither CMS nor any of its Subsidiaries presently hold assets for

which an election under Section 108(b)(5) of the Code was made. None of the assets of CMS or any of its Subsidiaries is "tax-exempt use property" within the meaning of Section 168(h) of the Code.

(xv)    As of the date hereof, neither CMS nor any of its Subsidiaries has any reason to believe that any conditions exist that might prevent or impede the Parent Merger from qualifying as a reorganization within the meaning of Section 368(a) of the Code.

(xvi)    If CMS Bank (or its predecessor) is, or has been in the past, a "disqualified person" with respect to The Community Mutual Charitable Foundation (the "Foundation"), there have been no acts of "self-dealing" between the Foundation and CMS Bank since the time the Foundation was first incorporated through the Effective Time. For purposes of this representation, the term "disqualified person" shall have the meaning set forth in Section 4946 of the Code and the term self-dealing shall have meaning set forth in Section 4941 of the Code.

(r)    *Risk Management Instruments.* All material interest rate swaps, caps, floors, option agreements, futures and forward contracts and other similar risk management arrangements, whether entered into for CMS's own account, or for the account of one or more of CMS's Subsidiaries or their customers (all of which are listed in the CMS Disclosure Schedule), were entered into (i) in accordance with commercially reasonable business practices and all applicable Laws and (ii) with counterparties believed to be financially responsible at the time; and each of them constitutes the valid and legally binding obligation of CMS or one of its Subsidiaries, enforceable in accordance with its terms (except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar Laws of general applicability relating to or affecting creditors' rights or by general equity principles), and is in full force and effect. Neither CMS nor its Subsidiaries, nor to CMS's knowledge any other party thereto, is in breach of any of its obligations under any such agreement or arrangement.

(s)    *Books and Records; Minute Books.* The books and records of CMS and its Subsidiaries have been fully, properly and accurately maintained in all material respects, have been maintained in accordance with ordinary business practices in the banking industry, and there are no material inaccuracies or discrepancies contained or reflected therein and they fairly reflect the substance of events and transactions included therein. The minute books of CMS and its Subsidiaries contain records, which are accurate in all material respects, of all corporate actions of its stockholder(s) and Board of Directors (including committees of its Board of Directors).

(t)    *Insurance.* Section 5.02(t) of the CMS Disclosure Schedule sets forth a list of all of the insurance policies, binders, or bonds maintained by CMS or its Subsidiaries. CMS and its Subsidiaries are insured with insurers reasonably determined by CMS to be reputable against such risks and in such amounts as the management of CMS reasonably has determined to be prudent in accordance with industry practices. All such insurance policies are in full force and effect; CMS and its Subsidiaries are not in material default thereunder; and all material claims and material potential claims of which CMS is aware or has reason to believe exist have been filed in due and timely fashion.

(u)     *CMS Off Balance Sheet Transactions.*  Section 5.02(u) of the CMS Disclosure Schedule sets forth a true and complete list of all affiliated CMS entities, including without limitation all special purpose entities, limited purpose entities and qualified special purpose entities, in which CMS or any of its Subsidiaries or any officer or director of CMS or any of its Subsidiaries has an economic or management interest.  Section 5.02(u) of the CMS Disclosure Schedule also sets forth a true and complete list of all transactions, arrangements, and other relationships between or among any such CMS affiliated entity, CMS, any of its Subsidiaries, and any officer or director of CMS or any of its Subsidiaries that are not reflected in the consolidated financial statements of CMS (each, a "*CMS Off Balance Sheet Transaction*"), along with the following information with respect to each such CMS Off Balance Sheet Transaction:  (i) the business purpose, activities, and economic substance; (ii) the key terms and conditions; (iii) the potential risk to CMS or any of its Subsidiaries; and (iv) the amount of any guarantee, line of credit, standby letter of credit or commitment, or any other type of arrangement, that could require CMS or any of its Subsidiaries to fund any obligations under any such transaction.

(v)     *Material Adverse Change.*  Except as Previously Disclosed, CMS has not, on a consolidated basis, suffered a change in its business, financial condition or results of operations since September 30, 2011 that has had a Material Adverse Effect on CMS.

(w)     *Properties.*  CMS and its Subsidiaries have good and marketable title, free and clear of all liens, encumbrances, charges, defaults or equitable interests to all of the properties and assets, real and personal, reflected on the financial statements in the CMS SEC Documents as being owned by CMS as of September 30, 2011 or acquired after such date, except for:  (i) statutory liens for amounts not yet due and payable, (ii) pledges to secure deposits and other liens incurred in the ordinary course of banking business, (iii) such imperfections of title, easements, encumbrances, liens, charges, defaults or equitable interests, if any, as do not affect the use of properties or assets subject thereto or affected thereby or otherwise materially impair business operations at such properties, (iv) dispositions and encumbrances in the ordinary course of business, and (v) liens or claims on properties acquired in foreclosure or on account of debts previously contracted.  Except as Previously Disclosed, all leases pursuant to which CMS or any of its Subsidiaries, as lessee, leases any material real or personal property (except for leases that have expired by their terms or that CMS or any such Subsidiary has agreed to terminate since the date hereof) are valid without default thereunder by the lessee or, to CMS's knowledge, the lessor.

(x)     *Loans.*  Except as would not reasonably be expected to adversely affect CMS and its Subsidiaries (taken together) in any material respect, either individually or in the aggregate, each loan reflected as an asset in the financial statements in the CMS SEC Documents that is still an asset as of the date hereof (i) is evidenced by notes, agreements or other evidences of indebtedness that are true, genuine and what they purport to be, (ii) to the extent secured, has been secured by valid liens and security interests that have been perfected, and (iii) is the legal, valid and binding obligation of the obligor named therein, enforceable in accordance with its terms, subject to bankruptcy, insolvency, fraudulent conveyance and other Laws of general applicability relating to or affecting creditors' rights and to general equity principles.  Except as Previously Disclosed, as of September 30, 2011, CMS Bank is not a party to a loan, including any loan guaranty, with any director, executive officer or 5% stockholder of CMS or any of its

Subsidiaries or any Person controlling, controlled by or under common control with any of the foregoing. All loans and extensions of credit that have been made by CMS Bank that are subject either to Section 22(h) of the Federal Reserve Act, as amended, or to Section 337.3 of FDIC's Rules and Regulations comply therewith.

(y)      *Repurchase Agreements.*  With respect to all agreements pursuant to which CMS or any of its Subsidiaries has purchased securities subject to an agreement to resell, if any, CMS or such Subsidiary, as the case may be, has a valid, perfected first lien or security interest in or evidence of ownership in book entry form of the government securities or other collateral securing the repurchase agreement, and the value of such collateral equals or exceeds the amount of the debt secured thereby.

(z)      *Deposit Insurance.*  The deposits of CMS Bank are insured by the FDIC in accordance with FDIA, and CMS Bank has paid all assessments and filed all reports required by the FDIA.

(aa)      *Bank Secrecy Act, Anti-Money Laundering and OFAC and Customer Information.*  CMS is not aware of and has not been advised of any facts or circumstances which would cause it or any of its Subsidiaries to be deemed (i) to be operating in violation in any material respect of the Bank Secrecy Act, the Patriot Act, any order issued with respect to anti-money laundering by the U.S. Department of the Treasury's Office of Foreign Assets Control, or any other applicable anti-money laundering statute, rule or regulation; or (ii) not to be in satisfactory compliance in any material respect with the applicable privacy and customer information requirements contained in any federal and applicable state privacy Laws, including, without limitation, in Title V of the Gramm-Leach-Bliley Act of 1999 and the regulations promulgated thereunder, as well as the provisions of the information security program adopted by CMS pursuant to 12 C.F.R. Part 364. Except as Previously Disclosed, CMS is not aware that any non-public customer information has been disclosed to or accessed by an unauthorized third party in a manner that would cause it or any of its Subsidiaries to undertake any material remedial action. The CMS Board (or, where appropriate, the board of directors of any of CMS's Subsidiaries) has adopted and implemented an anti-money laundering program that contains adequate and appropriate customer identification verification procedures that comply with Section 326 of the Patriot Act and such anti-money laundering program meets the requirements in all material respects of Section 352 of the Patriot Act and the regulations thereunder, and it (or such other of its Subsidiaries) has complied in all material respects with any requirements to file reports and other necessary documents as required by the Patriot Act and the regulations thereunder.

(bb)      *Electronic Banking Business.*  Since September 30, 2011, CMS and its Subsidiaries have conducted all operations with respect to CMS Bank's electronic banking business in all material respects in the ordinary and usual course of business consistent with past practices, and CMS Bank's electronic banking business has not suffered any change that would reasonably be expected to materially and adversely affect the amount of electronic banking fees received by CMS, as such fees are reflected in the most recently filed CMS SEC Documents.

(cc)      *Mortgage Banking Business.*  Either CMS or one or more of its Subsidiaries is authorized: (i) as a supervised mortgagee by the Department of Housing and

Urban Development to originate Federal Housing Administration mortgage loans; and (ii) as a seller/servicer by the Federal Home Loan Mortgage Corporation ("*Freddie Mac*") to originate and service conventional residential mortgage loans. None of CMS or any of its Subsidiaries is now nor has it been within the past three years subject to any material fine, suspension, settlement or other administrative agreement or sanction by, or any reduction in any loan purchase commitment from, the Department of Housing and Urban Development, Freddie Mac or other investor or Governmental Authority relating to the origination, sale or servicing of mortgage or consumer loans. Neither CMS nor any of its Subsidiaries has received any written notice that Freddie Mac proposes to materially limit or terminate the underwriting authority of CMS and its Subsidiaries or to materially increase the guarantee fees payable to such investor, excluding generally applicable guarantee fee increases. Each of CMS and its Subsidiaries is in compliance in all material respects with the Truth-In-Lending Act and Regulation Z, the Equal Credit Opportunity Act and Regulation B, the Real Estate Settlement Procedures Act and Regulation X, the Fair Credit Reporting Act, the Fair Debt Collection Practices Act and all Department of Housing and Urban Development, Freddie Mac, and other investor and mortgage insurance company requirements relating to the origination, sale and servicing of mortgage and consumer loans.

(dd) *Repurchase Obligations.* Except as Previously Disclosed, CMS is not subject to and has not been notified of any material repurchase obligation under any loan sold by CMS to a third-party investor or purchaser, including, without limitation, in connection with a whole loan transfer, nor is CMS aware of any facts or circumstances which would reasonably be expected to give rise to any such material repurchase obligation.

(ee) *Fairness Opinion.* CMS has received the opinion of Sandler O'Neill & Partners, L.P., financial advisor to CMS, to the effect that, as of the date of this Agreement, the consideration to be received by CMS's stockholders in the Parent Merger is fair to CMS's stockholders from a financial point of view.

Section 5.03. *Representations and Warranties of Customers.* Subject to Section 5.01 and except as Previously Disclosed, Customers hereby represents and warrants to CMS as follows:

(a) *Organization, Standing and Authority.* Customers is a corporation duly organized, validly existing and in good standing under the Laws of the Commonwealth of Pennsylvania. Customers is duly qualified to do business and is in good standing in the Commonwealth of Pennsylvania and any foreign jurisdictions where its ownership or leasing of property or assets or the conduct of its business requires it to be so qualified. Customers is registered as a bank holding company under the Bank Holding Company Act. Customers Bank is a bank duly organized, validly existing and in good standing under the Laws of the Commonwealth of Pennsylvania.

(b) *Capital Structure of Customers.* The authorized capital stock of Customers consists of (i) 100,000,000 shares of Customers Voting Common Stock, of which 8,579,310 shares were issued and outstanding as of July 31, 2012, and (ii) 100,000,000 shares of Class B Non-Voting Common Stock, of which 2,844,142 shares were issued and outstanding as of July 31, 2012. 1,226,079 shares of Customers Voting Common Stock and 372,524 shares of

Class B Non-Voting Common Stock are authorized and reserved for issuance upon exercise of Customers Stock Options as of July 31, 2012. As of July 31, 2012, 552,475 restricted shares were outstanding. The outstanding shares of Customers Common Stock have been duly authorized, are validly issued and outstanding, fully paid and nonassessable, and are not subject to any preemptive rights (and were not issued in violation of any preemptive rights). Except pursuant to this Agreement or as Previously Disclosed, as of the date hereof, (i) there are no shares of Customers Common Stock authorized and reserved for issuance, (ii) Customers does not have any Rights issued or outstanding with respect to Customers Common Stock and (iii) Customers does not have any commitment to authorize, issue or sell any Customers Common Stock. The shares of Customers Common Stock to be issued in exchange for shares of CMS Common Stock in the Parent Merger, when issued in accordance with the terms of this Agreement, will be duly authorized, validly issued, fully paid and nonassessable, will have the same rights as every other share of Customers Common Stock and will be subject to no preemptive rights.

(c)    *Subsidiaries.*

(i)    (A) Customers has Previously Disclosed a list of all of its Subsidiaries, together with the jurisdiction of organization of each such Subsidiary, (B) Customers owns, directly or indirectly, all the issued and outstanding equity securities of each of its Subsidiaries, (C) no equity securities of any of Customers' Subsidiaries are or may become required to be issued (other than to it or its wholly-owned Subsidiaries) by reason of any Right or otherwise, (D) there are no contracts, commitments, understandings or arrangements by which any of such Subsidiaries is or may be bound to sell or otherwise transfer any equity securities of any such Subsidiaries (other than to it or its wholly-owned Subsidiaries), (E) there are no contracts, commitments, understandings, or arrangements relating to its rights to vote or to dispose of such securities and (F) all the equity securities of each Subsidiary held by Customers or its Subsidiaries are fully paid and nonassessable and are owned by Customers or its Subsidiaries free and clear of any Liens.

(ii)    Except as Previously Disclosed, Customers does not own beneficially, directly or indirectly, any equity securities or similar interests of any Person, or any interest in a partnership or joint venture of any kind, other than its Subsidiaries.

(iii)    Each of Customers' Subsidiaries has been duly organized and is validly existing in good standing under the Laws of the jurisdiction of its organization, and is duly qualified to do business and is in good standing in the jurisdictions where its ownership or leasing of property or the conduct of its business requires it to be so qualified except where the failure to be so licensed or qualified would not constitute a Material Adverse Effect.

(iv)    Customers Bank is an "insured bank" as defined in the FDIA.

(d)    *Corporate Power.* Each of Customers and its Subsidiaries has the corporate power and authority to carry on its business as it is now being conducted and to own all its properties and assets; and Customers has the corporate power and authority to execute, deliver and perform its obligations under this Agreement and to consummate the transactions contemplated hereby. Subject to the receipt of all requisite regulatory approvals and the

expiration of all waiting periods, Customers Bank has the corporate power and authority to consummate the Subsidiary Merger and the Agreement to Merge in accordance with the terms of this Agreement.

(e)     *Corporate Authority; Authorized and Effective Agreement*.  This Agreement and the transactions contemplated hereby have been authorized by all necessary corporate action of Customers and the Customers Board prior to the date hereof and no stockholder approval is required on the part of Customers.  The Agreement to Merge, when executed by Customers Bank, shall have been approved by the Board of Directors of Customers Bank and by Customers, as the sole stockholder of Customers Bank.  This Agreement is a valid and legally binding agreement of Customers, enforceable in accordance with its terms (except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar Laws of general applicability relating to or affecting creditors' rights or by general equity principles).

(f)     *Regulatory Approvals; No Defaults*.

(i)     No consents or approvals of, or filings or registrations with, any Governmental Authority or with any third party are required to be made or obtained by Customers or any of its Subsidiaries in connection with the execution, delivery or performance by Customers of this Agreement or to consummate the Merger except for (A) filings of applications, notices and the Agreement to Merge with, or requests for approvals and waivers from, as applicable, federal and state banking authorities and other Regulatory Authorities; (B) receipt of the regulatory approvals set forth in Section 7.01(b); (C) filings with state and federal securities authorities; (D) the filing of the articles of merger with the Department of State of the Commonwealth of Pennsylvania; (E) the expiration or termination of any applicable waiting period under any applicable regulation; (F) such filings as are required to be made or approvals as are required to be obtained under the securities or "Blue Sky" Laws of various states in connection with the issuance of Customers Common Stock in the Parent Merger; and (G) the third-party consents set forth on the Customers Disclosure Schedule under Section 5.03(f)(i).  Neither Customers nor any of its Subsidiaries has any reason to believe that any regulatory approvals required from any Regulatory Authorities in connection with the transactions contemplated by this Agreement will not be received, and received without imposition of conditions that violate the provisions of Section 7.01(b).

(ii)     Subject to the satisfaction of the requirements referred to in the preceding paragraph and expiration of the related waiting periods, and required filings under federal and state securities Laws, the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby do not and will not (A) constitute a breach or violation of, or a default under, or give rise to any Lien, any acceleration of remedies or any right of termination under, any Law, governmental permit or license, or agreement, indenture, instrument or material contract of Customers or of any of its Subsidiaries or to which Customers or any of its Subsidiaries or properties is subject or bound, (B) constitute a breach or violation of, or a default under, the Articles of Incorporation or Bylaws (or similar governing documents) of Customers or any of its Subsidiaries, or (C) require any consent or approval under any such Law, governmental permit or license, agreement, indenture, instrument or material contract.

(g)     *Financial Information and SEC Documents.*

(i)     Since Customers became subject to the reporting requirements of the Exchange Act, each of the consolidated balance sheets of Customers and its Subsidiaries and the related consolidated statements of operations, consolidated statements of changes in shareholders' equity and consolidated statements of cash flows, together with the notes thereto, included in any annual report and all other reports, registration statements, definitive proxy statements or information statements filed or to be filed by it or any of its Subsidiaries on or prior to the Effective Time with the SEC under the Securities Act, or under Section 13, 14 or 15(d) of the Exchange Act, in the form filed or to be filed (collectively, "*Customers SEC Documents*") as of the date filed, (A) complied or will comply in all material respects with the applicable requirements under the Securities Act or the Exchange Act, as the case may be, and (B) each of the balance sheets or statements of condition contained in or incorporated by reference into any such Customers SEC Document (including the related notes and schedules thereto) fairly presents, or will fairly present, the financial position of Customers and its Subsidiaries as of its date, and each of the statements of operations and statements of changes in shareholders' equity and statements of cash flows in such Customers SEC Documents (including any related notes and schedules thereto) fairly presents, or will fairly present, the results of operations, changes in shareholders' equity and cash flows, as the case may be, of Customers and its Subsidiaries for the periods to which they relate, in each case in accordance with GAAP consistently applied during the periods involved, except in each case as may be noted therein, subject to normal year-end audit adjustments and the absence of footnotes in the case of unaudited statements.

(ii)     Except as Previously Disclosed, since Customers became subject to the reporting requirements of the Exchange Act, Customers has filed all Customers SEC Documents required to be filed under applicable Law.  As of their respective filing dates or the filing dates of amendments, the Customers SEC Documents complied as to form in all material respects with the requirements of the Exchange Act, and none of the Customers SEC Documents as of such respective dates or the respective filing dates of amendments contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

(iii)     The records, systems, controls, data and information of Customers and its Subsidiaries are recorded, stored, maintained and operated under means (including any electronic, mechanical or photographic process, whether computerized or not) that are under the exclusive ownership and direct control of Customers or its Subsidiaries or accountants (including all means of access thereto and therefrom), except for any non-exclusive ownership and non-direct control that would not reasonably be expected to have a material adverse effect on the system of internal accounting controls described below in this Section 5.03(g)(iii).  Customers (A) has implemented and maintains disclosure controls and procedures (as defined in Rule 13a-15 promulgated under the Exchange Act) designed and maintained to ensure that material information relating to Customers, including its consolidated Subsidiaries, is made known to the chief executive officer and the chief financial officer of Customers by others within those entities, and (B) has disclosed, based on the most recent evaluation by such officers prior to the date hereof, to Customers' outside auditors and the audit committee of Customers' Board of Directors (y) any significant deficiencies and material weaknesses in the design or

operation of internal controls over financial reporting (as defined in Rule 13a-15 promulgated under the Exchange Act) that are reasonably likely to adversely affect Customers' ability to record, process, summarize and report financial information and (z) any fraud, whether or not material, that involves management or other employees who have a significant role in Customers' internal controls over financial reporting. These disclosures, if any, were made in writing by management to Customers' auditors and audit committee and a copy has previously been made available to CMS. As of the date hereof, and except as Previously Disclosed, Customers knows of no reason related to Customers to believe that Customers' chief executive officer and chief financial officer will not be able to give the certifications and assessments required pursuant to Sections 302, 404 and 906 of the Sarbanes-Oxley Act, without qualification, when next due.

(iv)     Since December 31, 2011, (A) through the date hereof, neither Customers nor any of its Subsidiaries nor, to Customers' knowledge, any director, officer, employee, auditor, accountant or representative of Customers or any of its Subsidiaries has received any material complaint, allegation, assertion or claim, whether written or oral, regarding questionable accounting or auditing practices, procedures, methodologies or methods of Customers or any of its Subsidiaries or their respective internal accounting controls, including any material complaint, allegation, assertion or claim that Customers or any of its Subsidiaries has engaged in questionable accounting or auditing practices and (B) no attorney representing Customers or any of its Subsidiaries, whether or not employed by Customers or any of its Subsidiaries, has reported evidence of a material violation of securities Laws, breach of fiduciary duty or similar violation by Customers or any of its Subsidiaries or any of their respective officers, directors, employees, or agents to the Board of Directors of Customers or any committee thereof or to any director or officer of Customers.

(h)     *Litigation.*  Except as Previously Disclosed, as of the date of this Agreement, there is no material suit, action, investigation, audit or proceeding (whether judicial, arbitral, administrative or other) pending or, to Customers' knowledge, threatened against or affecting Customers or any of its Subsidiaries, nor is there any judgment, decree, injunction, rule or order of any Governmental Authority or arbitration outstanding against Customers or any of its Subsidiaries.

(i)     *Regulatory Matters.*

(i)     Except as Previously Disclosed, neither Customers nor any of its Subsidiaries or properties is a party to or is subject to any order, decree, agreement, memorandum of understanding or similar arrangement with, or a commitment letter or similar submission to, or extraordinary supervisory letter from, any Regulatory Authority charged with the supervision or regulation of financial institutions and their subsidiaries (including their holding companies) or issuers of securities.

(ii)     Neither Customers nor any of its Subsidiaries has been advised by any Regulatory Authority that such Regulatory Authority is contemplating issuing or requesting (or is considering the appropriateness of issuing or requesting) any such order, decree, agreement, memorandum of understanding, commitment letter, supervisory letter or similar

submission nor to its knowledge has any Regulatory Authority commenced an investigation in connection therewith.

(j)     *Compliance with Laws*.  Except as Previously Disclosed, each of Customers and its Subsidiaries:

(i)     is in material compliance with all applicable federal, state, local and foreign Laws applicable thereto or to the employees conducting such businesses, including, without limitation, the Equal Credit Opportunity Act, the Fair Housing Act, the CRA (which includes a CRA Rating of "satisfactory" or better), the Home Mortgage Disclosure Act, and the rules and regulations promulgated thereunder, and all other applicable fair lending Laws and other Laws relating to discriminatory business practices;

(ii)     has all permits, licenses, authorizations, orders and approvals of, and has made all filings, applications and registrations with, all Governmental Authorities that are required in order to permit them to own or lease their properties and to conduct their businesses as presently conducted except where the failure to make any such filing or have any such licenses would not constitute a Material Adverse Effect; all such permits, licenses, certificates of authority, orders and approvals are in full force and effect and, to Customers' knowledge, no suspension or cancellation of any of them is threatened; and

(iii)     has not received, within the three years prior to the date hereof, any notification or communication from any Governmental Authority (A) asserting that Customers or any of its Subsidiaries is not in material compliance with any of the statutes, regulations, or ordinances which such Governmental Authority enforces or (B) threatening to revoke any license, franchise, permit, or governmental authorization (nor, to Customers' knowledge, do any grounds for any of the foregoing exist).

(k)     *No Brokers*.  Except as Previously Disclosed, no action has been taken by Customers that would give rise to any valid claim against any party hereto for a brokerage commission, finder's fee or other like payment with respect to the transactions contemplated by this Agreement.

(l)     *Employee Benefit Plans*.  Each of the Customers Plans complies in all material respects with the requirements of applicable Law, including ERISA and the Code.  For purposes of this Agreement, the term *"Customers Plan"* means each bonus, incentive compensation, severance pay, medical or other insurance program, retirement plan, or other employee benefit plan program, agreement or arrangement sponsored, maintained or contributed to by Customers or any of its Subsidiaries.  No liability under Title IV of ERISA has been incurred by Customers or any of its Subsidiaries that has not been satisfied in full, and no condition exists that presents a material risk to Customers or any of its Subsidiaries of incurring any such liability.  All payments required to have been paid by Customers and its Subsidiaries under the terms of each of the Customers Plans have been paid.

(m)     *Labor Matters*.  Neither Customers nor any of its Subsidiaries is a party to or is bound by any collective bargaining agreement, contract or other agreement or understanding with a labor union or labor organization, nor is Customers or any of its

Subsidiaries the subject of a proceeding asserting that it or any such Subsidiary has committed an unfair labor practice (within the meaning of the National Labor Relations Act) or seeking to compel Customers or any such Subsidiary to bargain with any labor organization as to wages or conditions of employment, nor is there any strike or other labor dispute involving it or any of its Subsidiaries pending or, to Customers' knowledge, threatened, nor is Customers aware of any activity involving it or any of its Subsidiaries' employees seeking to certify a collective bargaining unit or engaging in other organizational activity.

(n)    *Takeover Laws.*  Customers has taken all action required to be taken by it in order to exempt this Agreement and the transactions contemplated hereby from, and this Agreement and the transactions contemplated hereby are exempt from, the requirements of any Takeover Laws.

(o)    *Environmental Matters.*  Except as Previously Disclosed, to Customers' knowledge, neither the conduct nor operation of Customers or its Subsidiaries nor any condition of any property presently or previously owned, leased or operated by any of them in material violation of Environmental Laws and to Customers' knowledge, no condition has existed or event has occurred with respect to any of them or any such property that, with notice or the passage of time, or both, is reasonably likely to result in material liability under Environmental Laws.  To Customers' knowledge, neither Customers nor any of its Subsidiaries has used or stored any Hazardous Material in, on, or at any property presently or previously owned, leased or operated by any of them in violation of any Environmental Law.  To Customers' knowledge, neither Customers nor any of its Subsidiaries has received any unresolved notice from any Person that Customers or its Subsidiaries or the operation or condition of any property ever owned, leased, operated, or held as collateral or in a fiduciary capacity by any of them are in material violation of or otherwise are alleged to have any unresolved material liability under any Environmental Law, including, but not limited to, responsibility (or potential responsibility) for the cleanup or other remediation of any pollutants, contaminants, or hazardous or toxic wastes, substances or materials at, on, beneath, or originating from any such property.  Neither Customers nor any of its Subsidiaries is the subject of any material action, claim, litigation, dispute, investigation or other proceeding with respect to violations of, or liability under, any Environmental Law.  To Customers' knowledge, Customers and each of its Subsidiaries has timely filed all material reports and notifications required to be filed with respect to all of its operations and properties presently or previously owned, leased or operated by any of them and has materially complied with all requirements to generate and maintain records and data under all applicable Environmental Laws.

(p)    *Tax Matters.*

(i)    Customers and its Subsidiaries have duly and timely filed all material Tax Returns required to be filed with respect to all applicable Taxes, and all such Tax Returns are true, correct and complete in all material respects.

(ii)    (A) Customers and its Subsidiaries have timely paid all Taxes due and payable, whether or not shown on any Tax Return, (B) Customers and its Subsidiaries have established reserves in the financial statements in the Customers SEC Documents and in its internal financial statements (including, without limitation, financial statements immediately

prior to the Effective Time) for Taxes which are sufficient for the payment of all unpaid Taxes as of the dates thereof, whether or not such Taxes are disputed or are yet due and payable, for or with respect to the period, (C) Customers and its Subsidiaries have withheld and timely paid to the proper Governmental Authority or taxing authority all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent consultant, creditor, member or other third party, (D) Customers and its Subsidiaries have furnished properly completed and valid exemption or other appropriate certificates for all transactions treated as exempt from sales, use, value added, ad valorem, transfer or other similar Taxes, (E) to the knowledge of Customers, Customers and its Subsidiaries have no liability for Taxes payable for or with respect to any periods prior to and including the Effective Time in excess of the amounts actually paid prior to the Effective Time or reserved for in the financial statements in the Customers SEC Documents and in its internal financial statements (including, without limitations, financial statements immediately prior to the Effective Time), and (F) no claim has been made within the past three years by any taxing authority in any jurisdiction in which Customers and/or its Subsidiaries does not file Tax Returns that Customers and/or its Subsidiaries is or may be subject to taxation by that jurisdiction.

(iii)     Customers and its Subsidiaries have furnished or will furnish prior to the Effective Time, or otherwise made available to CMS true and correct copies of all Tax Returns and all written communications relating to any such Tax Returns or to any deficiency or claim proposed and/or asserted, irrespective of the outcome of such matter, but only to the extent such Tax Returns or items relate to tax years which are currently subject to an audit, investigation, examination or other proceeding, or with respect to which the applicable statute of limitations has not expired.

(iv)     (A) All deficiencies asserted or assessments made as a result of any Tax audit, investigation, examination or other proceeding have been paid in full, (B) there are no current audits, investigations, examinations or other administrative or judicial proceeding with respect to any Taxes or Tax Returns of Customers and its Subsidiaries and neither Customers nor any of its Subsidiaries has received any written notice that any such audit, investigation, examination or other administrative or judicial proceeding is threatened or pending, and (C) there are no agreements, waivers or extensions of any statute of limitations currently in effect with respect to a Tax Return or Tax assessment or deficiency Customers or its Subsidiaries.

(v)     (A) Neither Customers nor any of its Subsidiaries is a party to any agreement relating to the sharing, allocation or payment of, or indemnity for, Taxes (other than agreements between members of a group of corporations, entities or other Persons of which Customers is or was the common parent), and (B) neither Customers nor any of its Subsidiaries has ever been a member of an affiliated group filing a consolidated federal income Tax Return (other than a group of which Customers is or was the common parent), nor any similar affiliated, consolidated, combined or unitary group for foreign, state or local Tax purposes, and neither Customers nor its Subsidiaries has any liability for the Taxes of any other Person under Treasury Regulation Section 1.1502-6 (or any corresponding or similar provision of foreign, state or local Tax law), as a transferee or successor, by contract, or otherwise (other than liability for the Taxes of corporations, entities or other Persons of which Customers is or was the common parent).

(vi)    (A) Customers and its Subsidiaries have disclosed on their Tax Returns all positions taken therein that could reasonably be expected to give rise to a substantial understatement of Tax within the meaning of Section 6662 of the Code (or any similar provision under any state, local, or foreign tax Law), (B) to the knowledge of Customers, neither Customers nor any of its Subsidiaries have engaged in or are currently participating in any "reportable transactions" as defined in Section 6707A of the Code and Section 1.6011-4 of the income tax regulations promulgated under the Code, and (C) to the knowledge of Customers, Customers and its Subsidiaries are in compliance with, and their records contain all information and documents (including properly completed IRS Forms W-9) necessary to comply with, all applicable information reporting and tax withholding requirements under federal, state, and local tax Laws.

(vii)    (A) Neither Customers nor any of its Subsidiaries has distributed stock of another person, or has had its stock distributed by another person, in a transaction that was purported or intended to be governed in whole or in part by Section 355 or Section 361 of the Code, (B) neither Customers nor any of its Subsidiaries has entered into a written agreement with any Governmental Authority or taxing authority or is subject to an adjustment under Section 481(a) of the Code (or similar provision of state, local or foreign Law) that would have a material impact on the calculation of Taxes after the Effective Time, and (C) Neither Customers nor any of its Subsidiaries has been within the applicable period set forth in Section 897(c)(1)(A)(ii) of the Code, and shall not be as of the Effective Date, a "United States real property holding corporation" (as that term is defined under Section 897 of the Code).

(viii)    There are no Liens for Taxes (other than Taxes not yet due and payable) upon any of the assets of Customers or its Subsidiaries.

(ix)    Within the last 3 years, neither Customers nor any of its Subsidiaries has (A) made, revoked or changed any material federal Tax election, (B) changed any Tax accounting period, (C) revoked or changed any Tax accounting method, (D) surrendered any right to claim a refund of Taxes, or (E) settled or compromised any Tax liability.

(x)    Neither Customers nor any of its Subsidiaries will be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Effective Date as a result of any (A) change in accounting method for any taxable period ending on or prior to the Effective Date, (B) "closing agreement," as that term is defined in Section 7121 of the Code (or any corresponding or similar provision of foreign, state or local Tax law) executed on or prior to the Effective Date, (C) installment sale or open transaction disposition made on or prior to the Effective Date; or (D) prepaid amount received on or before the Effective Date.

(xi)    Except as Previously Disclosed, no payment or benefit paid or provided, or to be paid or provided, to current or former employees, directors or other service providers of or to Customers, any of its Subsidiaries, (including pursuant to this Agreement) will fail to be deductible for federal income tax purposes under Section 162(m) or Section 280G of the Code.

(xii)   No closing agreements, private letter rulings, technical advice memoranda or similar agreements or rulings relating to Taxes have been entered into or issued by a Governmental Authority or taxing authority with or in respect of Customers or its Subsidiaries.

(xiii)   To the knowledge of Customers, neither Customers nor any of its Subsidiaries (A) is a partner for Tax purposes with respect to any joint venture, partnership, or other arrangement or contract which is treated as a partnership for Tax purposes, (B) owns a single member limited liability company or other entity that is treated as a disregarded entity, (C) is a shareholder of a "controlled foreign corporation" as defined in Section 957 of the Code, (D) is a "personal holding company" as defined in Section 542 of the Code, or (E) is a shareholder in a "passive foreign investment company" within the meaning of Section 1297 of the Code.

(xiv)   To the knowledge of Customers, none of the assets of Customers or any of its Subsidiaries directly or indirectly, secures any debt the interest on which is tax exempt under Section 103(a) of the Code.  Neither Customers nor any of its Subsidiaries presently hold assets for which an election under Section 108(b)(5) of the Code was made.  None of the assets of Customers or any of its Subsidiaries is "tax-exempt use property" within the meaning of Section 168(h) of the Code.

(xv)   As of the date hereof, neither Customers nor any of its Subsidiaries has any reason to believe that any conditions exist that might prevent or impede the Parent Merger from qualifying as a reorganization within the meaning of Section 368(a) of the Code.

(q)   *Books and Records; Minute Books.*  The books and records of Customers and its Subsidiaries have been fully, properly and accurately maintained in all material respects, have been maintained in accordance with ordinary business practices in the banking industry, and there are no material inaccuracies or discrepancies contained or reflected therein and they fairly reflect the substance of events and transactions included therein.  The minute books of Customers and its Subsidiaries contain records, which are accurate in all material respects, of all corporate actions of its stockholder(s) and Board of Directors (including committees of its Board of Directors).

(r)   *Risk Management Instruments.*  All material interest rate swaps, caps, floors, option agreements, futures and forward contracts and other similar risk management arrangements, whether entered into for Customers' own account, or for the account of one or more of Customers' Subsidiaries or their customers, were entered into (i) in accordance with commercially reasonable business practices and all applicable Laws and (ii) with counterparties believed to be financially responsible at the time; and each of them constitutes the valid and legally binding obligation of Customers or one of its Subsidiaries, enforceable in accordance with its terms (except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar Laws of general applicability relating to or affecting creditors' rights or by general equity principles), and is in full force and effect.  Neither Customers nor its Subsidiaries, nor to Customers' knowledge any other party thereto, is in breach of any of its obligations under any such agreement or arrangement.

(s)     *Material Adverse Change.*  Except as Previously Disclosed, Customers has not, on a consolidated basis, suffered a change in its business, financial condition or results of operations since December 31, 2011 that has had a Material Adverse Effect on Customers.

(t)     *Allowance for Loan Losses.*  The allowance for loan losses reflected in any balance sheets or statements of condition contained in or incorporated by reference into any Customers SEC Documents, as of their respective dates, is adequate in all material respects under the requirements of GAAP to provide for reasonably estimated losses on outstanding loans.

(u)     *Deposit Insurance.*  The deposits of Customers Bank are insured by the FDIC in accordance with FDIA, and Customers Bank has paid all assessments and filed all reports required by the FDIA.

(v)     *Bank Secrecy Act, Anti-Money Laundering and OFAC and Customer Information.*  Customers is not aware of and has not been advised of any facts or circumstances which would cause it or any of its Subsidiaries to be deemed (i) to be operating in violation in any material respect of the Bank Secrecy Act, the Patriot Act, any order issued with respect to anti-money laundering by the U.S. Department of the Treasury's Office of Foreign Assets Control, or any other applicable anti-money laundering statute, rule or regulation; or (ii) not to be in satisfactory compliance in any material respect with the applicable privacy and customer information requirements contained in any federal and applicable state privacy Laws and regulations, including, without limitation, in Title V of the Gramm-Leach-Bliley Act of 1999 and the regulations promulgated thereunder, as well as the provisions of the information security program adopted by Customers pursuant to 12 C.F.R. Part 364. Customers is not aware that any non-public customer information has been disclosed to or accessed by an unauthorized third party in a manner that would cause it or any of its Subsidiaries to undertake any material remedial action. The Customers Board (or, where appropriate, the board of directors of any of Customers' Subsidiaries) has adopted and implemented an anti-money laundering program that contains adequate and appropriate customer identification verification procedures that comply with Section 326 of the Patriot Act and such anti-money laundering program meets the requirements in all material respects of Section 352 of the Patriot Act and the regulations thereunder, and it (or such other of its Subsidiaries) has complied in all material respects with any requirements to file reports and other necessary documents as required by the Patriot Act and the regulations thereunder.

(w)     *Ownership of CMS Shares.*  As of the date hereof, Customers does not own any shares of CMS Common Stock and has not heretofore entered into any agreement or understanding with any Person to purchase or sell shares of CMS Common Stock or any agreement or understanding concerning rights to acquire CMS Common Stock.

## ARTICLE VI
## COVENANTS

Section 6.01.  *Reasonable Best Efforts.*  Subject to the terms and conditions of this Agreement, each of Customers and CMS agrees to use its reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or

desirable, or advisable under applicable Laws, so as to permit consummation of the Merger as promptly as practicable and otherwise to enable consummation of the transactions contemplated hereby, including the satisfaction of the conditions set forth in ARTICLE VII hereof, and each shall cooperate fully with the other parties hereto to that end.

Section 6.02.  *Stockholder Approval.*  CMS agrees to use its reasonable best efforts to take, in accordance with applicable Law and the CMS Articles and CMS Bylaws, all action necessary to convene a meeting of its stockholders (including any adjournment or postponement, the *"CMS Meeting"*), as promptly as practicable after the Merger Registration Statement is declared effective by the SEC, to consider and vote upon the adoption and approval of this Agreement, as well as any other matters required to be approved by CMS's common stockholders for consummation of the Parent Merger, provided, however, that CMS shall not be required to take any steps related to the solicitation of shareholder approval (other than cooperation with Customers in connection with the preparation of the Proxy Statement-Prospectus provided in Section 6.03 below), including setting a record or meeting date related to the CMS Meeting until fifteen (15) calendar days after Customers has filed all required applications with Regulatory Authorities necessary to consummate the Parent Merger and the Subsidiary Merger. The CMS Board shall recommend that the stockholders of CMS vote in favor of such adoption and approval (the *"CMS Recommendation"*).

Section 6.03.  *Proxy Statement-Prospectus.*

(a)      For purposes of (x) of registering the offering of Customers Common Stock to holders of CMS Common Stock in connection with the Parent Merger with the SEC under the Securities Act, and (y) of holding the CMS Meeting, Customers will draft and prepare, and CMS shall participate in the preparation of, the Merger Registration Statement, including a combined proxy statement and prospectus satisfying all applicable requirements of applicable state securities and banking laws, and of the Securities Act and the Exchange Act, and the rules and regulations thereunder (such proxy statement/prospectus in the form mailed to the CMS stockholders, together with any and all amendments and supplements thereto, being referred to herein as the *"Proxy Statement-Prospectus"*). Customers shall file the Merger Registration Statement, including the Proxy Statement-Prospectus, with the SEC. CMS agrees to cooperate, and CMS shall cause its Subsidiaries to cooperate, with Customers, its counsel and its accountants, in preparation of the Proxy Statement-Prospectus. Provided that CMS and its Subsidiaries have cooperated as required above, Customers agrees to file the Merger Registration Statement with the SEC as promptly as reasonably practicable but in no event later than thirty (30) calendar days after all applications relating to the consummation of the Parent Merger and the Subsidiary Merger have been filed with applicable Regulatory Authorities. Each of Customers and CMS shall use their reasonable best efforts to have the Merger Registration Statement declared effective under the Securities Act as promptly as practicable after such filing and Customers and CMS shall cooperate thereafter to promptly mail the Proxy Statement-Prospectus to the CMS shareholders. Customers agrees to use all reasonable efforts to obtain, prior to the Effective Date, all necessary state securities Law or "Blue Sky" permits and approvals required to carry out the transactions contemplated by this Agreement. CMS agrees to furnish to Customers all information concerning CMS, its Subsidiaries, and their respective officers, directors and stockholders as may be reasonably requested in connection with the foregoing sentence.

(b)     CMS shall provide Customers with any information concerning itself that Customers may reasonably request in connection with the drafting and preparation of the Proxy Statement-Prospectus, and Customers shall notify CMS promptly of the receipt of any comments of the SEC with respect to the Proxy Statement-Prospectus and of any requests by the SEC for any amendment or supplement thereto or for additional information and shall provide to CMS promptly copies of all correspondence between Customers or any of their representatives and the SEC. Customers shall give CMS and its counsel the reasonable opportunity to review and comment on the Proxy Statement-Prospectus prior to its being filed with the SEC and shall give CMS and its counsel the reasonable opportunity to review and comment on all amendments and supplements to the Proxy Statement-Prospectus and all responses to requests for additional information and replies to comments prior to their being filed with, or sent to, the SEC.  Each of Customers and CMS agrees to use all reasonable efforts, after consultation with the other party hereto, to respond promptly to all such comments of and requests by the SEC and to cause the Proxy Statement-Prospectus and all required amendments and supplements thereto to be mailed to the holders of CMS Common Stock entitled to vote at the CMS Meeting at the earliest practicable time.

(c)     Each of Customers and CMS agrees, as to itself and its Subsidiaries, that none of the information supplied or to be supplied by it for inclusion or incorporation by reference in the Proxy Statement-Prospectus and Merger Registration Statement and any amendment or supplement thereto will, at the date of mailing to the stockholders of CMS Common Stock and at the time of the CMS Meeting, as the case may be, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein in light of the circumstances under which such statement is made, not false or misleading.  Each of Customers and CMS further agrees that if it shall become aware prior to the Effective Date of any information furnished by it that would cause any of the statements in the Proxy Statement-Prospectus or Merger Registration Statement to be false or misleading with respect to any material fact, or to omit to state any material fact necessary to make the statements therein not false or misleading, to promptly inform the other party thereof and to take the necessary steps to correct the Proxy Statement-Prospectus and Merger Registration Statement.

Section 6.04.  *Press Releases*.  Each of Customers and CMS agrees that it will not, without the prior approval of the other parties, which shall not be unreasonably withheld, issue any press release or written statement for general circulation relating to the transactions contemplated hereby, except as otherwise required by applicable Law or NASDAQ rules.

Section 6.05.  *Access; Information*.

(a)     CMS and Customers agree that upon reasonable notice and subject to applicable Laws relating to the exchange of information, each shall afford the other and their respective officers, employees, counsel, accountants and other authorized representatives, such reasonable access during normal business hours throughout the period prior to the Effective Time to the books, records (including, without limitation, tax returns and work papers of independent auditors), properties, personnel and to such other information as each may reasonably request and, during such period, it shall furnish promptly to the other (i) a copy of each material report, schedule, application, notice and other document filed by it pursuant to

federal or state securities or banking Laws, and (ii) all other information concerning the business, properties and personnel of such party as the other party may reasonably request. In no event, however, shall CMS or Customers be obligated to (i) provide access or disclose any information to the other where such access or disclosure would violate any agreement not to disclose confidential information; or (ii) provide access to board minutes that discuss the transactions contemplated by this Agreement, any Acquisition Proposal or any other subject matter such party reasonably determines should be treated as confidential.

(b)     Each of CMS and Customers agrees that it will not, and will cause its representatives not to, use any information obtained pursuant to this Section 6.05 (as well as any other information obtained prior to the date hereof in connection with the entering into of this Agreement) for any purpose unrelated to the consummation of the transactions contemplated by this Agreement. Subject to the requirements of Law, each party will keep confidential, and will cause its representatives to keep confidential, all information and documents obtained pursuant to this Section 6.05 (as well as any other information obtained prior to the date hereof in connection with the entering into of this Agreement) unless such information (i) was already known to such party, (ii) becomes available to such party from other sources not known by such party to be bound by a confidentiality obligation, (iii) is disclosed with the prior written approval of the party to which such information pertains or (iv) is or becomes readily ascertainable from published information or trade sources. No investigation by either party of the business and affairs of the other shall affect or be deemed to modify or waive any representation, warranty, covenant or agreement in this Agreement, or the conditions to either party's obligation to consummate the transactions contemplated by this Agreement.

(c)     During the period from the date of this Agreement to the Effective Time, each of CMS and Customers shall cause one or more of its representatives to confer with representatives of the other party and report the general status of its ongoing operations at such times as the other party may reasonably request. Each of CMS and Customers will promptly notify the other party of any material change in the normal course of its business or in the operation of its properties and, to the extent permitted by applicable Law, of any governmental complaints, investigations or hearings (or communications indicating that the same may be contemplated), or the institution or the threat of material litigation involving such party or any of its Subsidiaries. Without limiting the foregoing, senior officers of CMS and Customers shall meet on a reasonably regular basis (expected to be at least monthly) to review the financial and operational affairs of CMS and Customers and their Subsidiaries, in accordance with applicable law, and each party shall give due consideration to the other's input on such matters, with the understanding that, notwithstanding any other provision contained in this Agreement, neither Customers nor any of its Subsidiaries shall under any circumstance be permitted to exercise control of CMS or any of its Subsidiaries prior to the Effective Time.

(d)     Representatives of Customers Bank and CMS Bank shall meet on a regular basis to discuss and plan for the conversion of the data processing and related electronic informational systems used by CMS Bank to those used by Customers Bank, or vice versa, which planning shall include, but not be limited to, discussion of the possible termination by Customers Bank or CMS Bank of third-party service provider arrangements effective at the Effective Time or at a date thereafter, non-renewal of personal property leases and software licenses used by Customers Bank or CMS Bank in connection with its systems operations,

retention of outside consultants and additional employees to assist with the conversion, and outsourcing, as appropriate, of proprietary or self-provided system services.  Neither Customers Bank nor CMS Bank shall be obligated to take any such action prior to the Effective Time and, unless otherwise agreed by Customers Bank and CMS Bank, no conversion shall take place prior to the Effective Time.  In the event that CMS Bank takes, at the request of Customers Bank, any action relative to third parties to facilitate the conversion that results in the imposition of any termination fees or charges, Customers Bank shall indemnify CMS Bank for any such fees and charges, and the costs of reversing the conversion process, if for any reason the Parent Merger is not consummated for any reason other than a breach of this Agreement by CMS.

Section 6.06.   *Acquisition Proposals.*

(a)      CMS agrees that:

(i)      neither it nor any of its Subsidiaries nor any of its officers and directors or the officers and directors of any of its Subsidiaries shall, and it shall direct and use its reasonable best efforts to cause its employees and agents, including any investment banker, attorney or accountant retained by it or by any of its Subsidiaries (collectively, its "*Representatives*") not to, (A) initiate, solicit or encourage, directly or indirectly, any inquiries regarding or the making or implementation of any Acquisition Proposal, (B) furnish information or access to any Person that has made an Acquisition Proposal to the CMS Board or that makes an Acquisition Proposal to the CMS Board after the date hereof, or (C) participate in discussions or negotiate with any Person concerning any Acquisition Proposal;

(ii)      notwithstanding Section 6.06(a)(i) above, prior to the receipt of the CMS Stockholder Approval, CMS may, directly or indirectly through its Representatives, (A) furnish information and access to any Person that has made an Acquisition Proposal to the CMS Board or that makes an Acquisition Proposal to the CMS Board after the date hereof and (B) participate in discussions and negotiate with such Person concerning any such Acquisition Proposal, if and only if, in either such case set forth in clause (A) or (B) of this sentence, (1) such Acquisition Proposal did not result from a breach of this Section 6.06(a), (2) the CMS Board determines in good faith, after consultation with CMS's financial and legal advisors, that such Acquisition Proposal constitutes, or is reasonably likely to lead to a Superior Proposal, and (3) CMS receives from the Person making such an Acquisition Proposal an executed confidentiality agreement the material terms of which are in all material respects (x) no less favorable to CMS and (y) no less restrictive to the Person making such Acquisition Proposal than those contained in the confidentiality agreement between Customers and CMS and any information provided to such Person has previously been provided to Customers or is provided to Customers concurrently with its provision to such Person;

(iii)      notwithstanding anything in this Agreement to the contrary, CMS shall (i) promptly (but in no event later than two (2) Business Days) advise Customers, orally and in writing, of (x) the receipt by it (or any of its Representatives) of any Acquisition Proposal, or any inquiry which could reasonably be expected to lead to an Acquisition Proposal, or any material modification of or material amendment to any Acquisition Proposal, or any request for nonpublic information relating to CMS or any of its Subsidiaries or for access to the properties, books or records of CMS or any of its Subsidiaries by any Person or entity that informs the CMS

Board or the board of directors of any of its Subsidiaries that it is considering making, or has made, an Acquisition Proposal and (y) the material terms and conditions of such proposal or inquiry (whether written or oral) or modification or amendment to an Acquisition Proposal, and (ii) keep Customers fully informed of the status and material details of any such proposal or inquiry and any material developments with respect thereto; and

(iv)    CMS shall use its reasonable best efforts to enforce any existing confidentiality or standstill agreements in accordance with the terms thereof, and shall immediately take all steps necessary to terminate any approval that may have been given prior to the date hereof under any such provisions authorizing any Person to make an Acquisition Proposal.

(b)    Prior to the receipt of the CMS Stockholder Approval, CMS may terminate this Agreement if (i) the CMS Board authorizes CMS, subject to complying with the terms of this Section 6.06, to enter into a definitive agreement with respect to a Superior Proposal and (ii) immediately prior to or concurrently with the termination of this Agreement, CMS enters into a definitive agreement with respect to a Superior Proposal.

(c)    Except as expressly permitted by this Section 6.06(c), neither the CMS Board nor any committee thereof shall (i) fail to make, withdraw, modify, qualify or place any condition on, or propose publicly to withhold, withdraw, modify, qualify or place any condition on, in any manner adverse to Customers or its affiliates, the approval and adoption of this Agreement and the transactions contemplated hereby, including the Parent Merger, or the CMS Recommendation, or (ii) approve, endorse or recommend, or propose publicly to approve, endorse or recommend, any Acquisition Proposal other than the Merger (any of the foregoing, a "*Change in Recommendation*").  Notwithstanding the preceding sentence, in the event that subsequent to the date of this Agreement the CMS Board determines in good faith after consultation with outside legal counsel that it would be inconsistent with its fiduciary duties to its stockholders under applicable law not to withdrawal, modify or qualify such recommendation, the CMS Board may, prior to the CMS Meeting, effect a Change in Recommendation.  Nothing in this Section 6.06(c) shall restrict the right of Customers to receive the Termination Fee pursuant to Section 8.02.  For the avoidance of doubt, this Section 6.06(c) shall not survive the termination of this Agreement.  For purposes of this Agreement, a Change in Recommendation shall not include any notice provided with respect to any Acquisition Proposal and CMS's views thereof prior to any definitive Change in Recommendation.

(d)    Prior to terminating this Agreement pursuant to Section 6.06(b) or making any Change in Recommendation in connection with an Acquisition Proposal pursuant to Section 6.06(c): (i) CMS shall have complied in all material respects with Section 6.06(a) and Section 6.06(f); (ii) CMS shall have given Customers written notice of the intention of the CMS Board to take such action, with such notice specifying the material terms and conditions of the Acquisition Proposal, including the identity of the Person making such Acquisition Proposal, a copy of all material documents relating thereto and a copy of and all information provided to such Person that had not previously been provided to Customers, and five Business Days after delivery of such notice for Customers to propose revisions to the terms of this Agreement (or make another proposal), and if Customers proposes to revise the terms of this Agreement, CMS shall not have submitted to the vote of its stockholders any Acquisition Proposal other than the Merger during

the pendency of any negotiations during such five Business Day period between CMS (including its financial and legal advisors) and Customers and its Representatives with respect to such proposed revisions; and (iii) the CMS Board shall have determined in good faith, after considering the results of such negotiations with Customers and giving effect to any proposals, amendments or modifications offered or agreed to by Customers, if any, that such Acquisition Proposal constitutes a Superior Proposal.  In the event the CMS Board does not make the determination referred to in clause (iii) of this paragraph, the CMS Board shall not effect such termination or Change in Recommendation and thereafter if the CMS Board determines that it proposes or intends to effect a termination of this Agreement or Change in Recommendation, the procedures referred to above shall apply to any subsequent proposed termination of this Agreement or Change in Recommendation.  In the event of any material revisions to any Acquisition Proposal subject to the provisions of this Section 6.06(d), CMS shall be required to deliver a new written notice to Customers and to again comply with the requirements of this Section 6.06(d) with respect to such new written notice, except that the five Business Day period referred to above shall be reduced to three Business Days.

(e)     Subject to Customers' rights under ARTICLE VIII, nothing in this Section 6.06 shall prohibit the CMS Board from taking and disclosing to CMS's stockholders a position contemplated by Rule 14e-2(a), Rule 14d-9 or Item 1012(a) of Regulation M-A promulgated under the Exchange Act, or other applicable Law; provided, however, that any such disclosure that relates to an Acquisition Proposal shall not change the effect of such actions under this Agreement unless the CMS Board reaffirms the CMS Recommendation in such disclosure.

(f)     CMS and its Subsidiaries shall immediately cease and cause to be terminated any existing discussions or negotiations with any Persons (other than Customers) conducted heretofore with respect to any Acquisition Proposal, and shall use reasonable best efforts to cause all Persons other than Customers who have been furnished confidential information regarding CMS or its Subsidiaries in connection with the solicitation of or discussions regarding an Acquisition Proposal within the 12 months prior to the date hereof promptly to return or destroy such information.  Neither CMS nor the CMS Board shall approve or take any action to render inapplicable to any Acquisition Proposal any applicable Takeover Laws or Takeover Provisions.

(g)     For purposes of this Agreement, the following terms shall have the following respective meanings:

(i)     "*Acquisition Proposal*" means any proposal or offer with respect to the following involving CMS or any of its Significant Subsidiaries (other than the Merger): (1) any merger, consolidation, share exchange, business combination or other similar transaction; (2) any sale, lease, exchange, pledge, transfer or other disposition of 25% or more of its consolidated assets or liabilities in a single transaction or series of transactions; (3) any tender offer or exchange offer for, or other acquisition of, 25% or more of the outstanding shares of its capital stock; or (4) any public announcement of a proposal, plan or intention to do any of the foregoing or any agreement to engage in any of the foregoing.

(ii)     "*Superior Proposal*" means a bona fide written Acquisition Proposal not solicited or initiated in violation of this Section 6.06, that (1) relates to (A) the

issuance by CMS of securities representing a majority of its outstanding voting securities (including upon the conversion, exercise or exchange of securities convertible into or exercisable or exchangeable for such voting securities) or (B) the acquisition by any person of any of (i) a majority of the outstanding CMS Common Stock, by tender or exchange offer, merger or otherwise, or (ii) all or substantially all of the consolidated total assets of CMS, (2) is otherwise on terms that the CMS Board determines in good faith, after consultation with CMS's financial and legal advisors and taking into account all the terms and conditions of such proposal and this Agreement, are more favorable to CMS and its stockholders than the transactions contemplated by this Agreement and (3) is, in the reasonable judgment of the CMS Board, reasonably capable of being completed on its stated terms, taking into account the material financial, regulatory, legal and other aspects of such inquiry, proposal or offer.

(h)     For the avoidance of doubt, this Section 6.06 shall not survive the termination of this Agreement.

Section 6.07.   *Financial and Other Statements.*

(a)     Promptly upon receipt thereof, each of CMS and Customers will furnish to the other party copies of each annual, interim or special audit of the books of such party and its Subsidiaries made by its independent auditors and copies of all internal control reports submitted to such party by such auditors in connection with each annual, interim or special audit of the books of such party and its Subsidiaries made by such auditors.

(b)     During the period from the date of this Agreement to the Effective Time, each of CMS and Customers shall promptly furnish the other party with copies of all monthly and other interim financial statements produced in the ordinary course of business as the same shall become available.

(c)     To the extent permitted by applicable Law, each of CMS and Customers will advise the other party promptly of the receipt of any examination report of any Regulatory Authority with respect to the condition or activities of such party or any of its Subsidiaries.

(d)     With reasonable promptness, each of CMS and Customers will furnish to the other party such additional financial data that such party possesses and as the other party may reasonably request, including without limitation, detailed monthly financial statements and loan reports.

Section 6.08.   *Takeover Laws.*   No party hereto shall take any action that would cause the transactions contemplated by this Agreement to be subject to requirements imposed by any Takeover Law and each of them shall take all necessary steps within its control to exempt (or ensure the continued exemption of) the transactions contemplated by this Agreement from, or, if necessary, challenge the validity or applicability of, any applicable Takeover Law, as now or hereafter in effect.  No party hereto will take any action that would cause the transactions contemplated hereby not to comply with any Takeover Provisions and each of them will take all necessary steps within its control to make those transactions comply with (or continue to comply with) the Takeover Provisions.

Section 6.09.  *Reports.*  Each of Customers and CMS shall file (and shall cause their respective Subsidiaries to file), between the date of this Agreement and the Effective Time, all reports required to be filed by it with the SEC and any other Regulatory Authorities having jurisdiction over such party, and each party shall deliver to the other parties copies of all such reports promptly after the same are filed.  Any financial statements contained in any reports to a Regulatory Authority shall be prepared in accordance with requirements applicable to such reports.

Section 6.10.  *Intentionally omitted.*

Section 6.11.  *Regulatory Applications.*

(a)  CMS and Customers and their respective Subsidiaries shall cooperate and use their respective reasonable best efforts to prepare all documentation, to timely effect all filings and to obtain all permits, consents, approvals and authorizations of all third parties and Governmental Authorities necessary to consummate the transactions contemplated by this Agreement.  However, Customers shall have no obligation to file any regulatory applications related to the Parent Merger or the Subsidiary Merger until all requisite regulatory approvals have been received for its pending acquisition of Acacia Federal Savings Bank.  Initial filings with Governmental Authorities shall be made by Customers related to the Parent Merger and Subsidiary Merger *promptly* following the receipt of approvals of Customer's regulatory applications related to the acquisition of Acacia Federal Savings Bank.  Each party hereto agrees that it will consult with the other parties hereto with respect to the obtaining of all material permits, consents, approvals and authorizations of all third parties and Governmental Authorities necessary or advisable to consummate the transactions contemplated by this Agreement and each party will keep the other parties apprised of the status of material matters relating to completion of the transactions contemplated hereby.  Each party shall permit the other party to review substantially complete drafts of its filings to be made with Governmental Authorities no later than two business days prior to filing.  Subject to applicable Laws relating to the exchange of information, each of the parties hereto shall, to the extent practicable, consult with the others on all material written information submitted to any third party and/or any Governmental Authority in connection with the Merger and the other transactions contemplated by this Agreement.  In exercising the foregoing right, each of such parties agrees to act reasonably and as promptly as practicable.

(b)  Each party agrees, upon request, to furnish the other parties with all information concerning itself, its Subsidiaries, directors, officers and stockholders and such other matters as may be reasonably necessary or advisable in connection with any filing, notice or application made by or on behalf of such other parties or any of its Subsidiaries to any third party or Governmental Authority.

Section 6.12.  *CMS Employees; Director and Management; Indemnification.*

(a)  All employees of CMS and its Subsidiaries immediately prior to the Effective Time shall be designated as *"Business Employees"* for purposes of this Agreement.  Between the date of signing of this Agreement and the Effective Date, Customers will identify those Business Employees who Customers seeks to retain following the Effective

Time (hereinafter referred to as *"Continuing Employees"*), whether as an employee or a consultant. Such employment or engagement of the Continuing Employees shall be subject to Customers' and its Subsidiaries' usual terms, conditions and policies of employment or consultancy, as the case may be. Notwithstanding anything contained herein to the contrary, neither Customers, nor any of its Subsidiaries are obligated to continue to employ or engage any employee or consultant of Customers or CMS for any period of time following the Effective Date.

(b)     Customers shall honor, or to cause one of its Subsidiaries to honor, in accordance with their terms, all employment agreements listed on Section 6.12(b) of the CMS Disclosure Schedule, subject to any limitations imposed under applicable Law or by any Regulatory Authority; provided, however, that the foregoing shall not prevent Customers or any of its Subsidiaries from amending or terminating any such agreement in accordance with its terms and applicable Law.

(c)     Beginning on or after the Effective Date, each Business Employee who was not a party to an agreement listed on Section 6.12(b) of the CMS Disclosure Schedule and whose employment with CMS (or one of its Subsidiaries) is terminated by Customers (or the applicable Subsidiary) without cause (as determined by Customers in its discretion) within six months following the Effective Time shall be eligible to receive severance benefits in accordance with Section 6.12(c) of the CMS Disclosure Schedule, subject to the terms thereof and any limitations imposed under applicable Law or by any Regulatory Authority.

(d)     During the period from the date of this Agreement to the Effective Time, Representatives of CMS and Customers or their Subsidiaries shall review the existing employee benefit plans and programs of CMS, Customers, and their Subsidiaries and work toward developing a package of employee benefit plans and programs that could be implemented or continued by Customers and its Subsidiaries on or after the Effective Date; provided, however, that nothing in this Section 6.12(d) shall obligate Customers or any of its Subsidiaries to make any changes to employee benefit plans and programs. Notwithstanding anything contained herein to the contrary, Customers agrees that for a period of twelve (12) months following the Closing Date (but only so long as they are employed by Customers during such 12 month period), Continuing Employees shall be provided with cash compensation and employee benefits, plans and programs on substantially the same basis as officers and employees as Customers and its Subsidiaries having similar responsibilities and positions. To the extent that as of Closing, the Continuing Employees become participants in a Customers Plan (whether previously existing or created solely for participation by Continuing Employees), for purposes of eligibility to participate and vesting, but not for benefit accrual purposes or for the purposes of providing benefits under defined benefit pension plan, in any such Customer Plan, the Continuing Employees shall be credited with their years of service with CMS and any predecessors thereof to the extent service with Customers and its Subsidiaries and any predecessors thereof is taken into account under such Customers Plan, except where the recognition of such service would result in a duplication of benefits with respect to the same period of service. In addition, no pre-existing condition limitation or exclusion that would not have been applicable under the CMS Plans shall apply to participation and coverage for the Continuing Employees, and Customers shall use its reasonable best efforts to ensure that any amounts previously expended by Continuing Employees and their covered dependents for the

current plan year for purposes of satisfying out-of-pocket requirements, deductibles and co-payments under the CMS Plans that are group health plans shall be credited for purposes of satisfying out-of-pocket requirements, deductibles and co-payments, under any Customers Plan that is a group health plan.

(e)     Notwithstanding anything in this Section 6.12 to the contrary, (i) nothing in this Agreement shall limit the ability of Customers or its Subsidiaries from revising, amending or terminating any CMS Plan or other employee benefit plan, program or policy from time to time, (ii) nothing in this Agreement shall be construed as an amendment of any CMS Plan, and (iii) no provision of this Section 6.12 shall create any third-party beneficiary rights in any employee or former employee (including any beneficiary or dependent of such employee or former employee) of CMS or any of its Subsidiaries in respect of continued employment (or resumed employment) or any other matter.  Prior to the Effective Date, CMS shall take all actions that may be requested by Customers with respect to (i) causing one or more of the CMS Plans to terminate as of the Effective Date, or as of the date immediately preceding the Effective Date, as requested by Customers, (ii) causing benefit accruals or entitlements under any CMS Plan to cease as of the Closing Date, (iii) causing the continuation on and after the Effective Date of any insurance policy or arrangement relating to any CMS Plan, or (iv) facilitating the merger of any CMS Plan into any employee benefit plan of Customers or any of its Subsidiaries; provided, however, that any such request by Customers shall be made at least sixty (60) days in advance of the Closing Date.  All resolutions, notices, or other documents issued, adopted or executed in connection with the implementation of this Section 6.12 shall be subject to Customers' prior review and approval.  This Agreement shall not be construed to limit the ability of Customers or its Subsidiary to review employee benefits plans and programs from time to time and to make such changes (including terminating any program) as they deem appropriate.

(f)     In the event of any threatened or actual claim, action, suit, proceeding or investigation, whether civil, criminal or administrative, including, without limitation, any such claim, action, suit, proceeding or investigation in which any person who is now, or has been at any time prior to the date of this Agreement, or who becomes prior to the Effective Date, a director or officer of CMS (the "*Indemnified Parties*") is, or is threatened to be, made a party based in whole or in part on, or arising in whole or in part out of, or pertaining to (i) the fact that he is or was a director or officer of CMS, or any of their Subsidiaries or any of their respective predecessors or (ii) this Agreement or any of the transactions contemplated hereby, whether in any case asserted or arising before or after the Effective Date, the parties hereto agree to cooperate and use their reasonable best efforts to defend against and respond thereto.  On and after the Effective Date, Customers shall indemnify and hold harmless, as and to the fullest extent permitted by Law, each such Indemnified Party against any losses, claims, damages, liabilities, costs, expenses (including reasonable attorney's fees and expenses in advance of the final disposition of any claim, suit, proceeding or investigation to each Indemnified Party to the fullest extent permitted by Law upon receipt of any undertaking required by applicable Law), judgments, fines and amounts paid in settlement in connection with any such threatened or actual claim, action, suit, proceeding or investigation.  Any Indemnified Party wishing to claim Indemnification under this Section 6.12(f), upon learning of any such claim, action, suit, proceeding or investigation, shall promptly notify Customers thereof, provided that the failure of any Indemnified Party to so notify Customers shall not relieve it of its obligations hereunder except (and only) to the extent that such failure materially prejudices Customers.  Customers'

obligations under this Section 6.12(f) continue in full force and effect for a period of six years from the Effective Date; provided, however, that all rights to indemnification in respect of any claim (a *"Claim"*) asserted or made within such period shall continue until the final disposition of such Claim.

(g)     Customers agrees that all rights to indemnification and all limitations on liability existing in favor of the directors, officers and employees of Customers and CMS and any of their Subsidiaries (the *"Covered Parties"*) as provided in their respective articles of incorporation, bylaws or similar governing documents as in effect as of the date of this Agreement with respect to matters occurring prior to the Effective Date shall survive the Merger and shall continue in full force and effect, and shall be honored by such entities or their respective successors as if they were the indemnifying party thereunder, without any amendment thereto, for a period of six years from the Effective Date; provided, however, that all rights to indemnification in respect of any Claim asserted or made within such period shall continue until the final disposition of such Claim; provided, further, however, that nothing contained in this Section 6.12(g) shall be deemed to preclude the liquidation, consolidation or merger of Customers or any of its Subsidiaries, in which case all of such rights to indemnification and limitations on liability shall be deemed to so survive and continue as an obligation of the successor to Customers or its Subsidiary notwithstanding any such liquidation, consolidation or merger.

(h)     Customers, from and after the Effective Date, will cause the persons who served as directors or officers of CMS on or before the Effective Date to be covered by Customers' existing directors' and officers' liability insurance policy (provided that Customers may substitute therefor policies of at least the same coverage and amounts containing terms and conditions which are not less advantageous than such policy) but in no event shall any insured person be entitled under this Section 6.12(h) to insurance coverage more favorable than that provided to him or her in such capacities as of the date hereof with respect to acts or omissions resulting from their service as such on or prior to the Effective Date.  Such insurance coverage shall commence on the Effective Date and will be provided for a period of no less than six years after the Effective Date; provided, however, that in no event shall Customers be required to expend more than 250% of the current amount expended by it (the *"Insurance Amount"*) to maintain or procure insurance coverage pursuant hereto and, if such premiums for such insurance would at any time exceed 250% of the Insurance Amount, then Customers shall cause to be maintained policies of insurance which, in Customers' good faith determination, provide the maximum coverage available at annual premium equal to 250% of the Insurance Amount.  CMS agrees to renew any existing insurance or to purchase any "discovery period" insurance provided for thereunder at Customers' request.

(i)     Customers shall pay (as incurred) all expenses, including reasonable fees and expenses of counsel, that an Indemnified Party or Covered Party may incur in enforcing the indemnity and other obligations provided for in this Section 6.12.

(j)     The provisions of Section 6.12(f), Section 6.12(g), Section 6.12(h) and Section 6.12(i) are intended to be for the benefit of, and shall be enforceable by, each Indemnified Party and Covered Party and their respective heirs and representatives.

Section 6.13. *Notification of Certain Matters.* Each of Customers and CMS shall give prompt notice to the other of any fact, event or circumstance known to it that (i) is reasonably likely, individually or taken together with all other facts, events and circumstances known to it, to result in any Material Adverse Effect with respect to it or (ii) would cause or constitute a material breach of any of its representations, warranties, covenants or agreements contained herein.

Section 6.14. *Governance Matters.* Customers will form a Hudson Valley Advisory Board and all members of the Board of Directors of CMS will be eligible to serve on the newly-formed Hudson Valley Advisory Board after the Effective Time.

Section 6.15. *Tax Treatment.* (i) Each of CMS and Customers agrees not to take any actions subsequent to the date of this Agreement that would adversely affect the qualification of the Parent Merger as a reorganization under Section 368(a) of the Code, and (ii) each of CMS and Customers agrees to take any action as may be reasonably required, if such action may be reasonably taken to reverse the impact of any past actions that would adversely impact the qualification of the Parent Merger as a reorganization under Section 368(a) of the Code.

Section 6.16. *No Breaches of Representations and Warranties.* Between the date of this Agreement and the Effective Time, without the written consent of the other party, each of CMS and Customers will not do any act or suffer any omission that would cause any of the representations or warranties made in ARTICLE V of this Agreement to become untrue or incorrect in any material respect.

Section 6.17. *Consents.* Each of CMS and Customers shall use its reasonable best efforts to obtain any required third party consents to the transactions contemplated by this Agreement.

Section 6.18. *Insurance Coverage.* Each of CMS and Customers shall cause each of the policies of insurance listed in the CMS Disclosure Schedule to remain in effect between the date of this Agreement and the Effective Date.

Section 6.19. *Correction of Information.* Each of CMS and Customers shall promptly correct and supplement any information furnished under this Agreement so that such information shall be correct and complete in all material respects at all times, and shall include all facts necessary to make such information correct and complete in all material respects at all times, provided that any such correction that may result in a change to a party's Disclosure Schedule shall not be made without the prior written consent of the other party.

Section 6.20. *Confidentiality.* Except for the use of information in connection with the Proxy Statement-Prospectus described in Section 6.03 hereof and any other governmental filings required in order to complete the transactions contemplated by this Agreement, all information (collectively, the "*Information*") received by each of Customers and CMS, pursuant to the terms of this Agreement shall be kept in strictest confidence; provided that, subsequent to the filing of the Merger Registration Statement with the SEC, this Section 6.20 shall not apply to information included in the Proxy Statement-Prospectus. Customers and CMS agree that the Information will be used only for the purpose of completing the transactions contemplated by this

Agreement. Customers and CMS agree to hold the Information in strictest confidence and shall not use, and shall not disclose directly or indirectly any of such Information except when, after and to the extent such Information (i) is or becomes generally available to the public other than through the failure of Customers or CMS to fulfill its obligations hereunder, (ii) was already known to the party receiving the Information on a nonconfidential basis prior to the disclosure or (iii) is subsequently disclosed to the party receiving the Information on a nonconfidential basis by a third party having no obligation of confidentiality to the party disclosing the Information. It is agreed and understood that the obligations of Customers and CMS contained in this Section 6.20 shall survive the Closing or termination of this Agreement.

Section 6.21.   *Certain Policies.*  Prior to the Effective Time, to the extent permitted by Law, CMS shall, consistent with generally accepted accounting principles and on a basis mutually satisfactory to it and Customers, modify and change its loan, investments, liquidity, litigation and real estate valuation policies and practices (including loan classifications and levels of reserves) so as to be applied on a basis that is consistent with that of Customers; provided, however, that CMS shall not be obligated to take any such action pursuant to this Section 6.21 unless and until (i) Customers irrevocably acknowledges to CMS in writing that all conditions to consummate the Parent Merger have been satisfied; and (ii) Customers irrevocably waives in writing any and all rights that it may have to terminate this Agreement.

Section 6.22.   *Taxes.*  From the date hereof until the earlier of the Closing Date or the termination of this Agreement pursuant to Section 8.01, CMS shall not, and shall cause each of its Subsidiaries not to:  (1) fail to prepare and file or cause to be prepared and filed in a manner consistent with past practice all Tax Returns (whether separate or consolidated, combined, group or unitary Tax Returns that include CMS or any of its Subsidiaries) that are required to be filed (with extensions) on or before the Effective Time, (2) make, change or revoke any material election (including any accounting method) in respect of Taxes, enter into any material closing agreement, settle any material claim or assessment in respect of Taxes or offer or agree to do any of the foregoing or surrender its rights to do any of the foregoing or to claim any refund in respect of Taxes, (3) file an amended Tax Return, (4) fail to maintain the books, accounts and records of CMS or any of its Subsidiaries in accordance with past custom and practice, including without limitation, making the proper accruals for Taxes, bonuses, vacation and other liabilities and expenses, (5) incur any material Tax liability outside of the ordinary course of business, or (6) consent to any extension or waiver of any statute of limitations with respect to any Tax claim.

## ARTICLE VII
## CONDITIONS TO CONSUMMATION OF THE PARENT MERGER

Section 7.01.   *Conditions to Each Party's Obligation to Effect the Parent Merger.*  The respective obligation of each of CMS and Customers to consummate the Parent Merger is subject to the fulfillment or written waiver by CMS and Customers prior to the Effective Time of each of the following conditions:

(a)     *Stockholder Approval.*  This Agreement shall have been duly adopted by the requisite vote of CMS's common stockholders.

(b)    *Regulatory Approvals.*  All regulatory approvals required to consummate the transactions contemplated hereby shall have been obtained prior to the Termination Date, unless otherwise extended pursuant to Article VIII, and shall remain in full force and effect and all statutory waiting periods in respect thereof shall have expired and no such approvals shall contain (i) any conditions, restrictions or requirements that the Customers Board or CMS Board reasonably determines would either before or after the Effective Time have a Material Adverse Effect on Customers after giving effect to the consummation of the Merger, or (ii) any conditions, restrictions or requirements that the Customers Board or CMS Board reasonably determines would either before or after the Effective Date be unduly burdensome.

(c)    *No Injunction.*  No Governmental Authority of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, judgment, decree, injunction or other order (whether temporary, preliminary or permanent) that is in effect and prohibits consummation of the transactions contemplated by this Agreement.

(d)    *Effectiveness of Merger Registration Statement.*  The Merger Registration Statement shall have become effective under the Securities Act and no stop order suspending the effectiveness of the Merger Registration Statement shall have been issued, and no proceedings for that purpose shall have been initiated or threatened by the SEC and, if the offer and sale of Customers Common Stock in the Parent Merger is subject to the "Blue Sky" laws of any state, shall not be subject to a stop order of any state securities commissioner.

(e)    *Tax Opinion.*  On the basis of facts, representations and assumptions which shall be consistent with the state of facts existing at the Closing Date, CMS shall have received an opinion of Paul Hastings LLP,  and Customers  shall have received an opinion of Stradley Ronon Stevens & Young, LLP, each reasonably acceptable in form and substance to CMS and Customers, dated as of the Closing Date, substantially to the effect that for federal income tax purposes, the Parent Merger will qualify as a reorganization within the meaning of Section 368(a) of the Code.   In rendering the tax opinion described in this Section 7.01(e), the law firms may require and rely upon customary representations contained in certificates of officers of CMS and Customers and their respective Subsidiaries.

Section 7.02.    *Conditions to Obligation of CMS.*  The obligation of CMS to consummate the Parent Merger is also subject to the fulfillment or written waiver by CMS prior to the Effective Time of each of the following conditions:

(a)    *Representations and Warranties.*  The representations and warranties of Customers set forth in this Agreement shall be true and correct as of the date of this Agreement and as of the Effective Date as though made on and as of the Effective Date (except to the extent that they by their terms speak as of an earlier date, in which case they shall be true and correct as of such earlier date); provided, however, that for purposes of determining the satisfaction of this condition, no effect shall be given to any exception or qualification in such representations and warranties relating to materiality or Material Adverse Effect, and provided, further, that, for purposes of this condition, such representations and warranties (other than those set forth in Section 6.03(a), which shall be true and correct in all material respects) shall be deemed to be true and correct in all respects unless the failure or failures of such representations and warranties to be so true and correct, individually or in the aggregate, results or would reasonably

be expected to result in a Material Adverse Effect on Customers. CMS shall have received a certificate, dated the Effective Date, signed on behalf of Customers by its President to such effect.

(b)     *Performance of Obligations of Customers.*  Customers shall have performed in all material respects all obligations required to be performed by Customers under this Agreement at or prior to the Effective Time, and CMS shall have received a certificate, dated the Effective Date, signed on behalf of Customers by its President to such effect.

Section 7.03.   *Conditions to Obligation of Customers.*  The obligation of Customers to consummate the Parent Merger is also subject to the fulfillment or written waiver by Customers prior to the Effective Time of each of the following conditions:

(a)     *Representations and Warranties.*  The representations and warranties of CMS set forth in this Agreement shall be true and correct as of the date of this Agreement and as of the Effective Date as though made on and as of the Effective Date (except to the extent that they by their terms speak as of an earlier date, in which case they shall be true and correct as of such earlier date) ; provided, however, that for purposes of determining the satisfaction of this condition, no effect shall be given to any exception or qualification in such representations and warranties relating to materiality or Material Adverse Effect, and provided, further, that, for purposes of this condition, such representations and warranties (other than those set forth in Section 6.02(b), which shall be true and correct in all material respects) shall be deemed to be true and correct in all respects unless the failure or failures of such representations and warranties to be so true and correct, individually or in the aggregate, results or would reasonably be expected to result in a Material Adverse Effect on CMS. Customers shall have received a certificate, dated the Effective Date, signed on behalf of CMS by the Chief Executive Officer and the Chief Financial Officer of CMS to such effect.

(b)     *Performance of Obligations of CMS.*  CMS shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Effective Time, and Customers shall have received a certificate, dated the Effective Date, signed on behalf of CMS by the Chief Executive Officer and the Chief Financial Officer of CMS to such effect.

(c)     *Financial Conditions.*

(i)     As of the Closing Date (before giving effect to the Merger), CMS and its Subsidiaries shall have, on a consolidated basis, as reflected on the most recent financial statements contained in the CMS SEC Documents, Nonperforming Assets less than or equal to $12,000,000.

(ii)     Between the date of this Agreement and the Closing Date, CMS shall provide to Customers copies of all asset quality reporting provided to the CMS Board, including any quarterly internal asset quality reports provided by C.E.I.S. (CMS' third party loan reviewer), a monthly delinquency list, a monthly list of all other watch list credits, a monthly listing of all Nonperforming Loans, a monthly list of all OREO, a monthly list of all charge-offs and any other asset quality related reporting.

(iii)    Between the date of this Agreement and the Closing Date, CMS shall promptly provide to Customers third party appraisals for all loans which become non-accrual or OREO.  In the absence of any third party assessment of value or other form of value acceptable to Customers, Customers shall be notified of any such loans where no additional write-downs were recorded.

(iv)    CMS shall provide written certification to Customers that CMS has complied, in the normal course of business, with all CMS policies, GAAP and all regulations related to asset quality.  Such certification shall be made by CMS (A) immediately following determination of the CMS Valuation, effective as of the date of the CMS Valuation, and (B) on the Closing Date, effective as of the Closing Date.

## ARTICLE VIII
## TERMINATION

Section 8.01.    *Termination*.  This Agreement may be terminated, and the Parent Merger may be abandoned:

(a)    *Mutual Consent*.  At any time prior to the Effective Time, by the mutual written consent of CMS and Customers.

(b)    *Breach*.  At any time prior to the Effective Time, by CMS or Customers in the event of either:  (i) a breach by CMS on the one hand or by Customers on the other hand of any representation or warranty of it contained herein (subject to the matters set forth in each party's Disclosure Schedule, as applicable), which breach cannot be or has not been cured within 30 days after the giving of written notice to the breaching party of such breach; or (ii) a breach by CMS on the one hand or by Customers on the other hand of any of its covenants or agreements contained herein, which breach cannot be or has not been cured within 30 days after the giving of written notice to the breaching party of such breach, provided that (A) such breach (under either clause (i) or (ii)) would entitle the non-breaching party not to consummate the Parent Merger under ARTICLE VII, and (B) the terminating party is not itself in material breach of any provision of this Agreement.

(c)    *Delay*.  At any time prior to the Effective Time, upon written notice given by CMS or Customers, if its Board of Directors so determines by vote of a majority of the members of its entire Board, in the event that the Parent Merger is not consummated by April 30, 2013 ("*Termination Date*"), provided that if (i) the Effective Time has not occurred by such date by reason of non-satisfaction of any condition set forth in Section 7.01(b) and (ii) all other conditions in Article VIII have theretofore been satisfied or are capable of being satisfied, either CMS or Customers may extend the Termination Date until June 30, 2013 upon written notice to the other party prior to April 30, 2013; provided, however, that the right to terminate this Agreement or delay the Termination Date pursuant to this Section 8.01(c) shall not be available to a party if the failure of the Parent Merger then to be consummated arises out of or results from the action or inaction, in breach of the obligation in Section 6.01, of the party seeking to terminate the Agreement or delay the Termination Date.  Further, CMS may be entitled to reimbursement of reasonable and document expenses pursuant to Section 8.02(b).

(d)    *No Approval.*  Upon written notice given by Customers or CMS in the event:  (i) the approval of any Governmental Authority required for consummation of the Merger and the other transactions contemplated by this Agreement shall have been denied by final nonappealable action of such Governmental Authority or an application therefore shall have been permanently withdrawn at the invitation, request or suggestion of a Governmental Authority (subject to reimbursement of fees and expenses in accordance with Item 8.02(b) below); (ii) the stockholders of CMS Common Stock fail to adopt this Agreement at the CMS Meeting and approve the Parent Merger; or (iii) any of the closing conditions have not been met as required by ARTICLE VII hereof and cannot be met prior to the Termination Date, unless otherwise agreed to by the parties pursuant to Article VIII.

(e)    *Acceptance of a Superior Proposal.*  By CMS, upon written notice to Customers, pursuant to Section 6.06(b) and subject to complying with the terms of Section 6.06.

(f)    *Adverse Action.*  By Customers, if (i) the CMS Board submits this Agreement (or the plan of merger contained herein) to its stockholders without a recommendation for approval or with any adverse conditions on, or qualifications of, such recommendation for approval; or (ii) the CMS Board otherwise withdraws or materially and adversely modifies (or discloses its intention to withdraw or materially and adversely modify) its recommendation referred to in Section 6.02; or (iii) the CMS Board recommends to its stockholders an Acquisition Proposal other than the Parent Merger.

Section 8.02.  *Termination Fee.*

(a)    *Payment of Fee by CMS.*  In the event that:

(i)    (x) prior to the Effective Time and after the date hereof, any Person shall have made an Acquisition Proposal, which proposal has been publicly disclosed and not withdrawn, or any Person shall have publicly announced an intention (whether or not conditional) to make an Acquisition Proposal, (y) thereafter this Agreement is terminated by either party pursuant to Section 8.01(c) without the approval of the CMS stockholders of this Agreement and the Merger having been obtained or pursuant to Section 8.01(d)(ii) and (z) within one year after the termination of this Agreement, an Acquisition Proposal shall have been consummated or any definitive agreement with respect to such Acquisition Proposal shall have been entered into (provided that for purposes of this clause (z) the references to "25%" in the definition of "Acquisition Proposal" shall be deemed to be references to "50%"); or

(ii)    this Agreement is terminated by Customers pursuant to Section 8.01(b) (if such termination is based on a material breach of Section 6.02 or Section 6.06) or pursuant to Section 8.01(e) or Section 8.01(f);

then CMS shall pay to Customers a termination fee of $1,000,000 (the "*Termination Fee*") (A) in the case of clause (i) above, one Business Day after the earlier of the execution of a definitive agreement with respect to, or the consummation of, any Acquisition Proposal referred to in subclause (i)(z) above, (B) in the case of a termination described in clause (ii) above, one Business Day after the delivery of the written notice of termination required by Section

8.01(b)(ii).  In no event shall CMS be required to pay the Termination Fee on more than one occasion.

(b)  *Reimbursement of CMS' Expenses by Customers.*  CMS shall be entitled to reimbursement from Customers of CMS' reasonable and documented expenses incurred by CMS in connection with pursuing this Agreement, pursuant to either of the following circumstances:

(i)  In the event that (A) Customers fails to receive any required approval from a Government Authority prior to April 30, 2013, (B) neither party has elected to extend the Termination Date beyond April 30, 2013 as provided in Section 8.01(c), and (C) the Agreement is terminated by either party pursuant to Section 8.01(c), then CMS shall be entitled to reimbursement by Customers of all of CMS' reasonable and documented expenses incurred by CMS relating to the transactions contemplated by this Agreement in an amount not to exceed Three Hundred Thousand Dollars ($300,000) within fifteen (15) business days of the Termination Date, except as provided under Section 8.02(b)(ii) below.

(ii)  In the event that the term of this Agreement extended beyond April 30, 2013 by either party pursuant to Item 8.01(c), thereafter, CMS shall, upon termination of this Agreement, be entitled to receive reimbursement by Customers of CMS' reasonable and documented expenses incurred by CMS in connection with pursuing this Agreement in an amount not to exceed Three Hundred Thousand Dollars ($300,000), within fifteen (15) business days of the request for reimbursement, if Customers terminates or abandons this Agreement, other than pursuant to Sections 8.01(b), 8.01(d)(ii) or 8.01(f)(unless due to the breach of a provision of this Agreement by Customers) of this Agreement, or is otherwise unable to obtain the regulatory approvals necessary to consummate the Parent Merger pursuant to the terms of this Agreement.

(iii)  The parties hereto agree that this Section 8.02(b) shall survive Termination of this Agreement if Customers fails to receive all required approvals from Government Authorities.

(c)  *Continuing Liability.*  In the event of termination of this Agreement and the abandonment of the Merger pursuant to this ARTICLE VIII, no party to this Agreement shall have any liability or further obligation to any other party hereunder except (i) as set forth in Section 8.02(a) or (b) and Section 9.01, or as otherwise set forth in this agreement; and (ii) that termination will not relieve a breaching party from liability or damages for any breach of this Agreement giving rise to such termination.

(d)  *Enforcement of Customers Obligation.*  Customers acknowledges that the agreements contained in Section 8.02(b) are an integral part of the transactions contemplated by this Agreement, and that, without these agreements, CMS would not enter into this Agreement. Accordingly, if Customers fails to pay in a timely manner the amounts due pursuant to Section 8.02(b), and, in order to obtain such payment, CMS makes a claim that results in a judgment against Customers for the amounts set forth in Section 8.02(b), Customers shall pay to CMS the reasonable costs and expenses of CMS (including reasonable attorneys' fees and expenses) in connection with such suit, together with interest on the amounts set forth in Section 8.02(b) at the

prime rate published by The Wall Street Journal (Eastern Edition) and in effect on the date such payment was required to be made.

(e) *Enforcement of CMS Obligation.* CMS acknowledges that the agreements contained in Section 8.02(a) are an integral part of the transactions contemplated by this Agreement, and that, without these agreements, Customers and Customers Bank would not enter into this Agreement. Accordingly, if CMS fails to pay in a timely manner the amounts due pursuant to Section 8.02(a), and, in order to obtain such payment, Customers makes a claim that results in a judgment against CMS for the amounts set forth in Section 8.02(a), CMS shall pay to Customers the reasonable costs and expenses of Customers (including reasonable attorneys' fees and expenses) in connection with such suit, together with interest on the amounts set forth in Section 8.02(a) at the prime rate published by The Wall Street Journal (Eastern Edition) and in effect on the date such payment was required to be made.

## ARTICLE IX
## MISCELLANEOUS

Section 9.01. *Survival.* The representations and warranties of the parties contained in this Agreement, or in any instrument delivered pursuant to this Agreement, shall terminate as of the Effective Time and only the agreements and covenants that by their terms survive the Effective Time and this Article IX shall survive the Effective Time.

Section 9.02. *Waiver; Amendment.* Prior to the Effective Time, any provision of this Agreement may be waived by the party benefited by the provision, by an agreement in writing between the parties hereto executed in the same manner as this Agreement. Subject to applicable Law, this Agreement may be amended by the parties hereto, by an agreement in writing between the parties hereto executed in the same manner as this Agreement, at any time before or after approval of the Parent Merger by the stockholders of CMS; provided, however, that after approval of the Parent Merger by the stockholders of the CMS, no amendment to this Agreement may be made which under applicable Law or the applicable listing and corporate governance rules and regulations of NASDAQ further approval by the stockholders of CMS is required, unless such further stockholder approval is so obtained.

Section 9.03. *Governing Law.* This Agreement shall be governed by, and interpreted in accordance with, the Laws of the Commonwealth of Pennsylvania applicable to contracts made and to be performed entirely within such State (except to the extent that mandatory provisions of federal Law are applicable).

Section 9.04. *Expenses.* Except as otherwise provided herein, each party hereto will bear all expenses incurred by it in connection with this Agreement and the transactions contemplated hereby.

Section 9.05. *Notices.* All notices, requests and other communications hereunder to a party shall be in writing and shall be deemed given upon delivery if personally delivered or telecopied (with confirmation) or on the next business day if mailed by registered or certified mail (return receipt requested) to such party at its address set forth below or such other address as such party may specify by notice to the parties hereto.

If to CMS, to:

CMS Bancorp, Inc.
123 Main Street, White Plains, New York 10601
Attention: John E. Ritacco
Facsimile No: (914) 422 - 2703

With copies to:
Paul Hastings LLP
875 15th Street, N.W.
Washington, DC 20005
Attention: V. Gerard Comizio
Fax: (202) 551-0419

If to Customers, to:

Customers Bancorp, Inc.
1015 Penn Avenue, Suite 103
Wyomissing, PA 19610
Attention: Jay S. Sidhu
Facsimile No: (610) 933 - 6922

With a copy to:
Stradley Ronon Stevens & Young, LLP
2600 One Commerce Square
Philadelphia, PA 19103
Attention: Christopher S. Connell
Facsimile No: (215) 564-8120

Section 9.06. *Entire Understanding; No Third-Party Beneficiaries.* This Agreement and any ancillary agreements entered into by the parties represent the entire understanding of the parties hereto with reference to the transactions contemplated hereby and thereby and this Agreement and any such ancillary agreements supersede any and all other oral or written agreements heretofore made (other than any such separate agreement). Nothing in this Agreement, whether express or implied, is intended to confer upon any Person, other than the parties hereto or their respective successors, any rights, remedies, obligations or liabilities under or by reason of this Agreement; provided that the Indemnified Parties and Covered Parties shall be third party beneficiaries of and entitled to enforce Section 6.13.

Section 9.07. *Interpretation; Effect.* When a reference is made in this Agreement to Sections, Exhibits or Schedules, such reference shall be to a Section of, or Exhibit or Schedule to, this Agreement unless otherwise indicated. The table of contents and headings contained in this Agreement are for reference purposes only and are not part of this Agreement. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."

Section 9.08.  *Waiver of Jury Trial*.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 9.09.  *Severability*.  If any provision of this Agreement or the application thereof to any Person or circumstance is determined by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions, or the application of such provision to Persons or circumstances other than those as to which it has been held invalid or unenforceable, will remain in full force and effect and will in no way be affected, impaired or invalidated thereby, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to either party.  Upon such determination, the parties will negotiate in good faith in an effort to agree upon a suitable and equitable substitute provision to effect the original intent of the parties.

Section 9.10.  *Specific Performance; Jurisdiction*.  The parties hereto agree that irreparable damage would occur in the event that the provisions contained in this Agreement were not performed in accordance with its specific terms or was otherwise breached.  It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions thereof in the United States District Court for the Eastern District of Pennsylvania or in any state court in the Commonwealth of Pennsylvania, this being in addition to any other remedy to which they are entitled at law or in equity.  In addition, each of the parties hereto (a) consents to submit itself to the personal jurisdiction of the United States District Court for the Eastern District of Pennsylvania or of any state court located in the Commonwealth of Pennsylvania in the event any dispute arises out of this Agreement or the transactions contemplated by this Agreement, (b) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court and (c) agrees that it will not bring any action relating to this Agreement or the transactions contemplated by this Agreement in any court other United States District Court for the Eastern District of Pennsylvania or a state court located in the Commonwealth of Pennsylvania.

Section 9.11.  *Assignment*.  Except to the extent provided in this Agreement, CMS and Customers may not assign any of their rights or obligations under this Agreement to any other Person, except upon the prior written consent of the other party.  Any purported agreement in violation hereof shall be void.

Section 9.12.  *Time of Essence*.  With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

Section 9.13.  *Counterparts*.  This Agreement may be executed in one or more counterparts, each of which shall be deemed to constitute an original.

[Signature page follows]

I

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties hereto have caused this Agreement to be executed in counterparts by their duly authorized officers, all as of the day and year first above written.

CMS BANCORP, INC.

By:

Name:  John E. Ritacco
Title:   President and CEO

CUSTOMERS BANCORP, INC.

By:

Name:  Jay S. Sidhu
Title:   Chairman and Chief Executive Officer

Signature Page to Agreement and Plan of Merger

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties hereto have caused this Agreement to be executed in counterparts by their duly authorized officers, all as of the day and year first above written.

CMS BANCORP, INC.

By:_____
    Name:  John E. Ritacco
    Title:   President and CEO

CUSTOMERS BANCORP, INC.

By:_____
    Name:  Jay S. Sidhu
    Title:   Chairman and Chief Executive Officer

EXHIBIT A

Articles of Incorporation of Customers

EXHIBIT B

Bylaws of Customers

EXHIBIT C

Form of CMS Voting and Lock Up Agreement

# EXHIBIT

# B

EXECUTION VERSION

# AMENDMENT
# TO
# AGREEMENT AND PLAN OF MERGER

This Amendment to the Agreement and Plan of Merger dated as of August 10, 2012 (the "Agreement") by and between Customers Bancorp, Inc., a Pennsylvania corporation ("Customers"), on the one hand, and CMS Bancorp, Inc., a Delaware corporation ("CMS"), on the other hand, is made and entered into as of April 22, 2013.

**WHEREAS,** in accordance with Section 9.02 of the Agreement, the parties desire to amend the Agreement as set forth herein.

**NOW, THEREFORE,** in consideration of the mutual terms, covenants and conditions contained herein, the parties hereby agree as follows:

1.    The definitions of *CMS Valuation* and *Customers Valuation* as included in Section 1.01 of the Agreement shall be revised to read as follows:

"*CMS Valuation*" means (i) 95% of CMS' common stockholders' equity (as determined according to GAAP, but excluding any merger-related charges or accruals) as of March 31, 2013, divided by (ii) the number of shares of CMS Common Stock outstanding at March 31, 2013.

"*Customers Valuation*" means (i) 125% of Customers' common stockholders' equity (as determined according to GAAP) as of March 31, 2013, divided by (ii) the number of shares of Customers Common Stock outstanding at March 31, 2013.

2.    Section 8.01 of the Agreement shall be revised to read as follows:

\*      \*      \*

(c)    *Delay.* At any time prior to the Effective Time, upon written notice given by CMS or Customers, if its Board of Directors so determines by vote of a majority of the members of its entire Board, in the event that the Parent Merger is not consummated by December 31, 2013 ("*Termination Date*"); *provided* that if (i) the Effective Time has not occurred by such date by reason of non-satisfaction of any condition set forth in Section 7.01(b), (ii) Customers shall have made all filings with Governmental Authorities required in connection with the Parent Merger and the Subsidiary Merger and no such applications shall have been withdrawn and/or requested to be withdrawn by any Governmental Authority, and (iii) all other conditions in Article VII have theretofore been satisfied or are capable of being satisfied on or prior to March 31, 2014, either CMS or Customers may extend the Termination Date until March 31, 2014 upon written notice to the other party prior to December 31, 2013; *provided, however,* that the right to

BUSINESS # 1829316 v.1

terminate this Agreement or delay the Termination Date pursuant to this Section 8.01(c) shall not be available to a party if the failure of the Parent Merger then to be consummated arises out of or results from the action or inaction, in breach of the obligation in Section 6.01, of the party seeking to terminate the Agreement or delay the Termination Date. Further, CMS may be entitled to reimbursement of reasonable and document expenses pursuant to Section 8.02(b).

       \*       \*       \*

(g)    *Capital Transactions.*  Upon written notice by CMS to Customers at any time after May 20, 2013 in the event that either (i) Customers shall not have made the contemplated investment in CMS of $1.5 million of CMS Preferred Stock, or (ii) Customers and CMS shall not have agreed upon the terms of a $2 million senior secured lending facility that shall be made available to CMS from Customers.

3.    Section 8.02(b) of the Agreement shall be revised to read as follows:

(b)    *Payment of Fees and Expenses by Customers.*

(i)    On or before April 22, 2013, Customers shall pay to CMS Three Hundred Thousand Dollars ($300,000) as partial reimbursement for its documented expenses incurred as of March 31, 2013 relating to the transactions contemplated by this Agreement.

(ii)    In the event that the Agreement is terminated pursuant to Section 8.01(c), 8.01(d)(i) or 8.01(d)(iii) of this Agreement, Customers shall pay to CMS a termination fee of One Million dollars ($1,000,000), which shall be paid within fifteen (15) business days of the date of termination.

(iii)    The parties hereto agree that this Section 8.02(b) shall survive Termination of this Agreement.

4.    Section 6.11(a) of the Agreement shall be revised to read as follows:

(a)    CMS and Customers and their respective Subsidiaries shall cooperate and use their respective reasonable best efforts to prepare all documentation, to timely effect all filings and to obtain all permits, consents, approvals and authorizations of all third parties and Governmental Authorities necessary to consummate the transactions contemplated by this Agreement. Each party hereto agrees that it will consult with the other parties hereto with respect to the obtaining of all material permits, consents, approvals and authorizations of all third parties and Governmental Authorities necessary or advisable to consummate the transactions contemplated by this Agreement and each party will keep the other parties promptly (in no event later than 24 hours) apprised of the status of material matters relating to completion of the transactions contemplated hereby. Each party shall permit the other party to review substantially complete drafts of its

2

filings to be made with Governmental Authorities no later than two business days prior to filing. Subject to applicable Laws relating to the exchange of information, each of the parties hereto shall, to the extent practicable, consult with the others on all material written information submitted to any third party and/or any Governmental Authority in connection with the Merger and the other transactions contemplated by this Agreement. In exercising the foregoing right, each of such parties agrees to act reasonably and as promptly as practicable.

5.      Capitalized terms used herein and not otherwise defined herein shall have the meanings given to them in the Agreement.

6.      The other terms and provisions of the Agreement shall not be affected by this Amendment, and the Agreement shall continue in full force and effect as amended hereby.

7.      This Amendment may be executed in counterparts each of which shall be deemed to constitute an original, but all of which together shall constitute one and the same instrument.

[signature page follows]

3

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties hereto have caused this Amendment to Agreement and Plan of Merger to be executed in counterparts by their duly authorized officers, all as of the day and year first above written.

CMS BANCORP, INC.

By: _____

Name:  John E. Ritacco
Title:   President and Chief Executive Officer

CUSTOMERS BANCORP, INC.

By: _____

Name:  Jay S. Sidhu
Title:   Chairman and Chief Executive Officer

4

# EXHIBIT

# C

8-K ! customers8k.htm CUSTOMERS BANCORP, INC. FORM 8-K

# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C.  20549

---

## FORM 8-K

---

### CURRENT REPORT
**Pursuant to Section 13 or 15(d)**
**of the**
**Securities Exchange Act of 1934**

**Date of Report (date of earliest event reported):  April 22, 2013**

---

# CUSTOMERS BANCORP, INC.
### (Exact Name of Registrant as specified in its charter)

---

| **Pennsylvania** | **333-166225** | **27-2290659** |
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**1015 Penn Avenue**
**Suite 103**
**Wyomissing PA 19610**

**Registrant's telephone number, including area code:  (610) 933-2000**

**None**
**(Former name or former address, if changed since last report)**

Check the appropriate box below if the form 8-K filing is intended to simultaneously satisfy the filing obligations of the registrant under any of the following provisions (see General Instructions A.2. below):

☒   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 1.01  Entry into a Material Definitive Agreement**

Effective as of April 22, 2013, Customers Bancorp, Inc. (the "Company") entered into an Amendment to Agreement and Plan of Merger ("Amendment") to that certain Agreement and Plan of Merger, dated as of August 10, 2012 ("Merger Agreement"), by and between the Company and CMS Bancorp, Inc. ("CMS").

The Amendment extended from April 30, 2013 to December 31, 2013 the initial date at which, if the merger of the Company with and into the Company pursuant to the Merger Agreement, as amended, has not closed, either the Company or CMS may terminate the Agreement, subject to the termination date being extended until March 31, 2014 under certain specified circumstances.

The Amendment also updated the definitions of "CMS Valuation" and "Customers Valuation," establishing the valuation date for book value as of March 31, 2013. The exchange ratio will remain fixed for the pendency of the transaction, using the multiples of 0.95x for CMS common equity, and 1.25x for Customers common equity for purposes of calculating the exchange ratio.

Other key terms agreed to by the Company and CMS under the Amendment provide for:

- CMS's ability to terminate the Merger Agreement, as amended, exercisable at any time after May 20, 2013, if either (i) the Company has not made an investment in CMS of $1.5 million of CMS Preferred Stock, or (ii) the Company and CMS have not agreed upon the terms of a $2.0 million senior secured lending facility that the Company will make available to CMS;

- the Company to pay $300,000 to CMS as partial reimbursement for merger-related expenses incurred as of March 31, 2013; and

- the Company to pay to CMS a termination fee of $1.0 million in the event the Merger Agreement, as amended, is terminated under certain provisions primarily relating to failure to consummate the Parent Merger due to non-receipt of required government approvals.

The foregoing summary of the Amendment is not complete and is qualified in its entirety by reference to the complete text of the Amendment, which is attached as Exhibit 2.1 hereto and incorporated herein by reference in its entirety into this Item 1.01.

For information about the Agreement and Plan of Merger, dated as of August 10, 2012, by and between CMS Bancorp, Inc. and Customers Bancorp, Inc., see the Company's Current Report on Form 8-K filed with the SEC on August 10, 2012.

**IMPORTANT ADDITIONAL INFORMATION**
This communication does not constitute an offer to sell or the solicitation of an offer to buy any securities or a solicitation of any vote or approval.  In connection with the transaction described herein, the Company and CMS will be filing documents with the SEC, including a registration statement on Form S-4 to be filed by the Company that will include a proxy statement of CMS and prospectus of the Company. A definitive proxy statement/prospectus, when available, will be sent to CMS stockholders seeking their approval of the proposed merger between the Company and CMS. **INVESTORS AND STOCKHOLDERS ARE URGED TO READ CAREFULLY THE DEFINITIVE PROXY STATEMENT/PROSPECTUS AND OTHER MATERIALS WHEN THEY BECOME AVAILABLE BEFORE MAKING ANY VOTING OR INVESTMENT DECISION BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION REGARDING CUSTOMERS BANCORP, CMS AND THE PROPOSED MERGER.** You may obtain copies of all documents filed with the SEC regarding this transaction, free of charge, at the SEC's website (www.sec.gov).  The documents filed with the SEC by the Company may be obtained free of charge from the Company's website www.customersbank.com or by directing a request to the Company at 1015 Penn Avenue, Wyomissing, PA 19610, Attention: Investor Relations. The documents filed with the SEC by CMS may be obtained free of charge from CMS's website www.cmsbk.com or by directing a request to CMS at 123 Main Street, Suite 750, White Plains, New York 10601, Attention: Investor Relations.

customers8k.htm

The Company and CMS and their respective directors and executive officers and other members of management and employees may be deemed to be "participants" in the solicitation of proxies in respect of the proposed transaction.  You can find current information about CMS's executive officers and directors in the proxy statement related to its 2012 annual meeting of shareholders, which was filed with the SEC on Schedule 14A on January 11, 2012.  You can find information about the Company's executive officers and directors in its definitive proxy statement filed with the SEC on June 6, 2012.  Other information regarding the participants in the proxy solicitation and a description of their direct and indirect interests, by security holdings or otherwise, will be contained in the proxy statement/prospectus and other relevant materials to be filed with the SEC when they become available. Investors and stockholders are urged to read the proxy statement/prospectus carefully before making any voting or investment decisions.  You may obtain free copies of these documents using the contact information provided above.

This communication shall not constitute an offer to sell or the solicitation of an offer to buy any securities nor shall there be any sale of securities in any jurisdiction in which the offer, solicitation, or sale is unlawful before registration or qualification of the securities under the securities laws of the jurisdiction. No offer of securities shall be made except by means of a prospectus satisfying the requirements of the Securities Act of 1933, as amended.

**SAFE HARBOR**

In addition to historical information, this information may contain "forward-looking statements" which are made in good faith by the Company, pursuant to the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995. These forward-looking statements include statements with respect to the Company's strategies, goals, beliefs, expectations, estimates, intentions, and financial condition, results of operations, future performance and business. Statements preceded by, followed by or that include the words "may," "could," "should," "pro forma," "looking forward," "would," "believe," "expect," "anticipate," "estimate," "intend," "plan," or similar expressions generally indicate a forward-looking statement. These forward-looking statements involve risks and uncertainties that are subject to change based on various important factors (some of which, in whole or in part, are beyond the Company's control). Numerous competitive, economic, regulatory, legal and technological factors, among others, could cause the Company's financial performance to differ materially from the goals, plans, objectives, intentions and expectations expressed in such forward-looking statements. In addition, important factors relating to the proposed merger with CMS also could cause The Company's actual results to differ from those in the forward-looking statements, including: the possibility that the anticipated benefits from the merger will not be realized, or will not be realized within the expected time period; the possibility that the merger does not close, including, but not limited to, due to the failure to receive regulatory approval or satisfy the closing conditions; the risk that CMS's operations will not be integrated successfully with the Company; and potential disruption from the merger making it more difficult to maintain business and operational relationships.  The Company cautions that the foregoing factors are not exclusive, and neither such factors nor any such forward-looking statement takes into account the impact that any future acquisition may have on the Company and any such forward-looking statement. The Company does not undertake to update any forward-looking statement whether written or oral, that may be made from time to time by the Company or by or on behalf of Customers Bank.

customers8k.htm

**Item 8.01  Other Events.**

On April 23, 2013, the Company issued a press release, attached hereto as Exhibit 99.1, which is incorporated in this Item 8.01 by reference.

**Item 9.01.  Financial Statements and Exhibits**

(d) Exhibits.

| Exhibit | Description |
|---------|-------------|
| Exhibit 2.1 | Amendment to Agreement and Plan of Merger, dated as of April 22, 2013, by and between Customers Bancorp, Inc. and CMS Bancorp, Inc. |
| Exhibit 99.1 | Press Release |

## SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, hereunto duly authorized.

### CUSTOMERS BANCORP, INC.


By:  /s/ Jay S. Sidhu
Name:  Jay S. Sidhu
Title:  Chairman and Chief Executive Officer


Date:        April 24, 2013

**EXHIBITS INDEX**

| Exhibit | Description |
| --- | --- |
| Exhibit 2.1 | Amendment to Agreement and Plan of Merger, dated as of April 22, 2013, by and between Customers Bancorp, Inc. and CMS Bancorp, Inc. |
| Exhibit 99.1 | Press Release |

# EXHIBIT

# D

REDACTED

**From:** Sidhu, Jay [mailto:jsidhu@customersbank.com]
**Sent:** Friday, October 25, 2013 9:23 AM
**To:** John Ritacco
**Cc:** Ehst, Richard; H. Rodgin Cohen
**Subject:** Re: Question

Sure. Please have them call Rodgin Cohen.( I have copied him) We would feel very comfortable about assuring you that the deal will close if we can extend till end of next year. Thanks.

Sent from my iPhone

Jay Sidhu
Chairman and CEO
Customers Bancorp, Inc.
Wyomissing, Pa 19610

Cell 610 301 6476
Jsidhu@customersbank.com

On Oct 25, 2013, at 2:05 PM, "John Ritacco" <jritacco@cmsbk.com> wrote:

Good morning, Jay,

The CMS Board is meeting next Tuesday. I will be giving the Board an update about the matters we discussed over dinner a few weeks ago. In order for the Board to fully understand the current situation, our lawyers at Paul Hastings have asked whether they can have a quick call with your counsel at Sullivan & Cromwell to get a better sense of how things are moving along with the regulators on the CRA/DOJ matter. Please let me know if this call would be possible for them to make either today or early next week before our Board meeting.

Thanks,
JR

1

*John E. Ritacco*
President & CEO
CMSBank
123 Main Street, Suite 750
White Plains, New York 10601
(914) 422-2700
jritacco@cmsbk.com
<image001.jpg>

This e-mail and any accompanying attachments contain information from CMSBank which are confidential. The information is intended only for the use of the intended recipient(s) named above. If you are not the intended recipient, you are hereby notified that any review, retention, disclosure, copying or distribution, or the taking of any action in reliance on the contents hereof is strictly prohibited. If you have received this e-mail in error, please notify us immediately by either contacting the sender directly or by contacting CMSBank at (914) 422-2700.

This e-mail and any files transmitted with it are intended only for the use of the addressee and may contain information that is legally privileged and confidential; it may not be forwarded without permission of the sender. If you are not the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. Please notify the sender electronically or by telephone immediately by calling Customers Bank Security Department at 1-484-923-8801 if you have received this e-mail in error.

# EXHIBIT

# E

## REDACTED

**From:** Sidhu, Jay [mailto:jsidhu@customersbank.com]
**Sent:** Tuesday, November 26, 2013 7:43 AM
**To:** John Ritacco
**Cc:** Ehst, Richard; Yeager, Glenn; Wahlman, Robert
**Subject:** Fwd: CUBI - A Growth Stock at a Value Price--Raise Target to $23 - FBR Capital Markets

Lets chat today please. We need to either extend or terminate this week. We have others who are willing to jump in with us for the future. Thanks John. I do hope we can get this done.

Sent from my iPhone

Jay Sidhu
Chairman and CEO
Customers Bancorp, Inc.
Wyomissing, Pa 19610

Cell  610 301 6476
Jsidhu@customersbank.com

Begin forwarded message:

> **From:** "Bob Ramsey, CFA" <bramsey@fbr.com>
> **Date:** November 26, 2013, 2:34:33 AM EST
> **To:** <jsidhu@customersbank.com>
> **Subject:** CUBI - A Growth Stock at a Value Price--Raise Target to $23 - FBR Capital Markets
> **Reply-To:** "Bob Ramsey, CFA" <bramsey@fbr.com>

Click Here to View Full PDF Version



REDACTED

REDACTED



REDACTED

**REDACTED**

**REDACTED**

**REDACTED**

This electronic message and all attachments transmitted with it may contain confidential and legally privileged information belonging to the sender. Please visit http://www.fbr.com/ecdisclosures.asp for important related disclosures, by either following the attached hyperlink or copying and pasting the URL into your internet browser.

This e-mail and any files transmitted with it are intended only for the use of the addressee and may contain information that is legally privileged and confidential; it may not be forwarded without permission of the sender. If you are not the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. Please notify the sender electronically or by telephone immediately by calling Customers Bank Security Department at 1-484-923-8801 if you have received this e-mail in error.

# EXHIBIT

## F

REDACTED

**From:** Sidhu, Jay [mailto:jsidhu@customersbank.com]
**Sent:** Tuesday, November 26, 2013 9:49 AM
**To:** John Ritacco
**Cc:** Ehst, Richard; Yeager, Glenn; Wahlman, Robert; Christopher S. Connell Esquire
**Subject:** Re: CUBI - A Growth Stock at a Value Price--Raise Target to $23 - FBR Capital Markets

John,

Enjoyed our conversation.

Here is our revised proposal.

1. We increase the price payable to CMS shareholders to 1.2X book at time of closing. The exchange ratio will be determined based on CUBI price at time of closing and book value at CMS at time of closing. However, the exchange ratio will in no circumstance be lower than what our agreement calls for today.
2. We agree to extend time period to allow CUBI to file application with Fed by Sept 30,2014 and a drop dead date for closing of Dec 31,2014.
3. In the event CUBI is not able to meet its obligations by Sept 30,2014, CMS has a right to terminate the agreement.
4. If the transaction is not consummated by Dec 31,2014, CUBI pays $1 million fee to CMS.
4. John Rittaco will be provided an employment agreement by CUBI and asked to serve as Regional President of CUBI Hudson Valley upon closing of our transaction.

I assure you we will close this deal and make it an absolute win win for all.

Look forward to closing this with you.

Thanks.

1

Sent from my iPhone

Jay Sidhu
Chairman and CEO
Customers Bancorp, Inc.
Wyomissing, Pa 19610

Cell 610 301 6476
Jsidhu@customersbank.com

On Nov 26, 2013, at 9:08 AM, "John Ritacco" <jritacco@cmsbk.com> wrote:

> Jay: Like to discuss with you today as well. I will be out of the office from 10:30-11:30 and 1:00-2:30 so I'm in but for those times. Not knowing your schedule, please call at your convenience, 914-422-2700. Thanks, JR
>
> **From:** Sidhu, Jay [mailto:jsidhu@customersbank.com]
> **Sent:** Tuesday, November 26, 2013 7:43 AM
> **To:** John Ritacco
> **Cc:** Ehst, Richard; Yeager, Glenn; Wahlman, Robert
> **Subject:** Fwd: CUBI - A Growth Stock at a Value Price--Raise Target to $23 - FBR Capital Markets
>
> Lets chat today please. We need to either extend or terminate this week. We have others who are willing to jump in with us for the future. Thanks John. I do hope we can get this done.
>
> Sent from my iPhone
>
> Jay Sidhu
> Chairman and CEO
> Customers Bancorp, Inc.
> Wyomissing, Pa 19610
>
> Cell 610 301 6476
> Jsidhu@customersbank.com
>
> Begin forwarded message:
>
>> **From:** "Bob Ramsey, CFA" <bramsey@fbr.com>
>> **Date:** November 26, 2013, 2:34:33 AM EST
>> **To:** <jsidhu@customersbank.com>
>> **Subject:** CUBI - A Growth Stock at a Value Price--Raise Target to $23 - FBR Capital Markets
>> **Reply-To:** "Bob Ramsey, CFA" <bramsey@fbr.com>



**REDACTED**

2

**REDACTED**

REDACTED

REDACTED

REDACTED



**REDACTED**

**REDACTED**

This electronic message and all attachments transmitted with it may contain confidential and legally privileged information belonging to the sender. Please visit http://www.fbr.com/ecdisclosures.asp for important related disclosures, by either following the attached hyperlink or copying and pasting the URL into your internet browser.

This e-mail and any files transmitted with it are intended only for the use of the addressee and may contain information that is legally privileged and confidential; it may not be forwarded without permission of the sender. If you

9

are not the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. Please notify the sender electronically or by telephone immediately by calling Customers Bank Security Department at 1-484-923-8801 if you have received this e-mail in error.

This e-mail and any files transmitted with it are intended only for the use of the addressee and may contain information that is legally privileged and confidential; it may not be forwarded without permission of the sender. If you are not the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. Please notify the sender electronically or by telephone immediately by calling Customers Bank Security Department at 1-484-923-8801 if you have received this e-mail in error.

# EXHIBIT
# G



November 29, 2013

Mr. Jay Sidhu
Chairman and CEO
Customers Bancorp, Inc.
1015 Penn Avenue
Suite 103
Wyomissing, PA 19610

RE:   <u>Agreement and Plan of Merger Dated as of August 10, 2012 By and Between CMS
Bancorp, Inc. and Customers Bancorp, Inc., as Amended Effective April 22, 2013
("Agreement")</u>

Dear Jay:

On behalf of CMS Bancorp, Inc. ("CMS"), I want to thank you for the recent opportunity to have
our legal counsel review a number of documents we previously requested from Customers
Bancorp, Inc. ("Customers") related to Customers Bank's most recent CRA and consumer
compliance exams, and related matters.[1]  Based on a subsequent briefing of CMS's Board of
Directors by our counsel regarding the contents of these documents, it appears that Customers
currently faces a number of regulatory issues and challenges to consummating our proposed
merger within the timeframes specified in the Agreement.

In this regard, Section 8.01 of the Agreement provides that the Agreement shall terminate in the
event the merger is not consummated by December 31, 2013 ("Termination Date").  Section 8.01
further provides that, upon written notice by CMS or Customers, the Termination Date may be
extended until March 31, 2014 if, among other things, (1) Customers "shall have made all filings
with the appropriate Governmental Authorities required in connection with" the merger, and (2)
all other conditions for closing the merger "have been satisfied or are capable of being satisfied"
on or prior to March 31, 2014.  Clearly, the filing by Customers of all required applications and
filings necessary to consummate the merger with the appropriate regulatory agencies, as well as
receipt of all required regulatory approvals by Customers is a condition of the Agreement that
must be satisfied prior to closing, and before the Termination Date.  Further, these provisions
also reflect the fact that such regulatory approvals are required under the relevant federal banking
laws.

---

[1] Our counsel, Paul Hastings LLP, reviewed these documents at the offices of your counsel, Buckley Sandler LLP
on November 13, 2013.

Due to what we believe to be regulatory issues and challenges currently facing Customers, it does not appear that Customers is in a position to meet the above described grounds for extending the Agreement beyond December 31, 2013, nor, for that matter, does it appear that Customers will be in a position to obtain regulatory approval for, and consummate the proposed merger on or prior to March 31, 2014.

I would note that this view seems consistent with Customers' own assessment of these issues, as evidenced by both our April 2013 amendment to our original Agreement executed in August 2012, which extended the timeframe for consummating the merger by an additional eight months beyond the original Termination Date, and also our recent discussions which you initiated with us regarding a proposal to further extend the Agreement beyond the current Termination Date.

In light of the foregoing, the CMS Board is not willing at this time to consider any further extension of the Termination Date. While the CMS Board is disappointed that the proposed merger will not proceed, we would plan to work with Customers to announce the parties' decision to terminate the Agreement by issuing the appropriate joint press release and public securities disclosure on Form 8-K. We request that any such decision and disclosure be made by the parties as promptly as possible, due to CMS's obligation to file, by December 29, 2013, its annual report on Form 10-K for its fiscal year ended September 30, 2013.

On behalf of the CMS Board of Directors, we very much appreciated the potential opportunity provided by the Agreement. We would very much appreciate your prompt response no later than December 5, 2013. Please contact me should you have any questions.

Sincerely,

John E. Ritacco
President and Chief Executive Officer

2

# EXHIBIT H



1015 Penn Avenue
Wyomissing, PA 19610

Contacts:
Jay Sidhu, Chairman & CEO 610-935-8693
Richard Ehst, President & COO 610-917-3263
Investor Contact:
Robert Wahlman, CFO 610-743-8074

### Customers Bancorp, Inc. Announces Actions to Support Capital Allocation Strategies

### Cap of Religare Enterprises Investment

### Termination of CMS Bancorp, Inc. Agreement and Plan of Merger

WYOMISSING, Pa., December 20, 2013 /PRNewswire/--Today Customers Bancorp, Inc. ("Customers") announced two actions designed to better align its activities with its shareholder wealth generation strategy. First, Customers announced that it will cap its investment in Religare Enterprises Limited ("Religare") at $23.0 million (4.1 million common shares). Customers' had the ability to purchase warrants to acquire up to an additional $28.0 million of Religare stock (approximately 5.0 million Religare common shares). By not acquiring the warrants, Customers has limited its investment to the $23.0 million invested in the common shares of Religare during the fiscal quarter ending September 30, 2013. Religare is a diversified financial services company domiciled in New Delhi, India and is listed on the Bombay Stock Exchange and National Stock Exchange in India. Customers' current holdings represent 2.8% of current outstanding Religare shares.

Customers, in mutual consent with CMS Bancorp, Inc. ("CMS"), also announced the termination of the August 10, 2012 Agreement and Plan of Merger (the "Agreement") between Customers and CMS Bancorp, Inc. ("CMS"). CMS is a Mount Vernon, New York bank holding company with approximately $250 million in assets. Under the provisions of the Agreement, there are no termination fees involved with the termination of this Agreement by mutual consent.

"Capping our investment in Religare and consenting to terminate the Agreement with CMS allows Customers to focus its capital allocation and management efforts to support the growth and development of existing businesses, and build out book value per share through continued strong earnings" said Jay Sidhu, Customers CEO. "Our existing businesses and footprint provide above average opportunities to grow assets and deposits, increase profitability, and expand shareholder value. We are allocating all our capital at this time to organically develop these interest income and fee businesses. Customers will consider merger and acquisition activity only if any resulting book value dilution can be overcome quickly. We do not envision

any significant M & A activity until we are trading at or above our peer group valuations. We have a bright future ahead and will remain absolutely focused on above average shareholder value creation," concluded Sidhu.

**About Customers Bank**

Customers Bancorp, Inc. is a bank holding company located in Wyomissing, Pennsylvania engaged in banking and related businesses through its bank subsidiary, Customers Bank. Customers Bank is a community-based, full-service bank with assets of approximately $3.9 billion. A member of the Federal Reserve System and deposits insured by the Federal Deposit Insurance Corporation ("FDIC"), Customers Bank is an equal housing lender that provides a range of banking services to small and medium-sized businesses, professionals, individuals and families through offices in Pennsylvania, New York, Rhode Island, Massachusetts, New Jersey, and Northern Virginia. Committed to fostering customer loyalty, Customers Bank uses a High Tech/High Touch strategy that includes use of industry-leading technology to provide customers better access to their money, as well as a continually expanding portfolio of loans to small businesses, multi-family projects, mortgage companies and consumers. Customers Bancorp, Inc. is listed on the NASDAQ exchange under the symbol CUBI. Additional information about Customers Bancorp, Inc. can be found on the company's website, www.customersbank.com.

**"Safe Harbor" Statement**

In addition to historical information, this press release may contain "forward-looking statements" which are made in good faith by Customers Bancorp, Inc., pursuant to the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995, the Securities Act of 1933, as amended and the Securities Exchange Act of 1934, as amended. These forward-looking statements include statements with respect to Customers Bancorp, Inc.'s strategies, goals, beliefs, expectations, estimates, intentions, capital raising efforts, financial condition and results of operations, future performance and business. Statements preceded by, followed by or that include the words "may," "could," "should," "pro forma," "looking forward," "would," "believe," "expect," "anticipate," "estimate," "intend," "plan," or similar expressions generally indicate a forward-looking statement. These forward-looking statements involve risks and uncertainties that are subject to change based on various important factors (some of which, in whole or in part, are beyond Customers Bancorp, Inc.'s control). Numerous competitive, economic, regulatory, legal and technological factors, among others, could cause Customers Bancorp, Inc.'s financial performance to differ materially from the goals, plans, objectives, intentions and expectations expressed in such forward-looking statements. Customers Bancorp, Inc. cautions that the foregoing factors are not exclusive, and neither such factors nor any such forward-looking statement takes into account the impact of any future events. All forward-looking statements and information set forth herein are based on management's current beliefs and assumptions as of the

date hereof and speak only as of the date they are made. For a more complete discussion of the assumptions, risks and uncertainties related to our business, you are encouraged to review Customers Bancorp, Inc.'s filings with the Securities and Exchange Commission, including its most recent annual report on Form 10-K, as well as any changes in risk factors that may be identified in its quarterly or other reports filed with the SEC. Customers Bancorp, Inc. does not undertake to update any forward looking statement whether written or oral, that may be made from time to time by Customers Bancorp, Inc. or by or on behalf of Customers Bank.

MZ North America
Ted Haberfield, President
Tel: +1-760-755-2716
Email: thaberfield@mzgroup.us
Web: www.mzgroup.us

# EXHIBIT

# I



CMS Bancorp, Inc.

December 24, 2013

Mr. Jay Sidhu
Chairman and CEO
Customers Bancorp, Inc.
1015 Penn Avenue
Suite 103
Wyomissing, PA 19610

RE:   Merger Agreement

Dear Jay:

I am in receipt of your letter dated December 19, 2013[1] regarding the plans of CMS Bancorp, Inc. ("CMS") and Customers Bancorp, Inc. ("Customers") not to extend the December 31, 2013 termination date of the Merger Agreement.  While our board is open to discussing a merger with Customers once your issues are resolved, I am disappointed in the position that you have taken regarding the termination fee.  Jay, from my perspective, this is totally inconsistent with the Merger Agreement as well as all of our discussions for the last several months, and particularly since October, when you asked us to consider another extension to the agreement.

We informed you and your representatives on multiple occasions prior to December 20, 2013 that the decision of CMS' Board of Directors to not extend the Merger Agreement beyond the December 31, 2013 termination date was due to the uncertainty in the timing of receipt of regulatory approvals that you shared with us.  It is my understanding that we had agreed that the merger of CMS and Customers as contemplated under the Merger Agreement could not be consummated by December 31st due to the current regulatory issues faced by Customers and delay in receipt of required regulatory approvals.  Therefore, it is CMS's understanding that the Merger Agreement will be terminated pursuant to Sections 8.01(c) and 8.01(d)(iii) of the Merger Agreement, and this letter serves as formal written notice of termination, effective as of December 31, 2013, pursuant to such provisions of the Merger Agreement.

CMS never waived its right to the termination fee, nor did it agree to a termination of the Merger Agreement with Customers, and told you and your representatives that Customers' press release contained material misstatements of fact, before it was issued.  Pursuant to Section 8.02(b)(ii) of the Merger Agreement, Customers is obligated to pay to CMS the $1 million termination fee, as we are terminating the Merger Agreement due to delay in the receipt of regulatory approvals by Customers.  Customers' public misstatements about termination of the Merger Agreement by mutual consent, and its non-liability for the $1 million termination fee owed to CMS, are false

---

[1] On December 19, 2013, you sent me an earlier draft of the letter, dated December 17, 2013.

and misleading, and will constitute an intentional breach of the Merger Agreement if Customers fails to make the termination fee payment as agreed to by the parties. If necessary, CMS intends to pursue all legal courses of action to enforce payment of the termination fee from Customers, along with all expenses, legal and otherwise, as well as any appropriate damages as provided for in the agreement.

Jay, I want to emphasize that we are open to becoming a part of the Customers family; however, if this situation goes much further, or escalates, the Board and our shareholders may not allow that to happen.

Please contact me at (914) 422-2710 or jritacco@cmsbk.com should you have any questions.

Regards,

John E. Ritacco
President and Chief Executive Officer

cc:     CMS Board of Directors

        Christopher S. Connell, Esq.
        Stradley Ronon Stevens & Young, LLP

        V. Gerard Comizio, Esq.
        Paul Hastings LLP

2

# EXHIBIT

# J

# PAUL
# HASTINGS

(212) 318-6772
douglaskoff@paulhastings.com

January 22, 2014

**Via Overnight Mail and Email to** *jsidhu@customersbank.com*

Mr. Jay S. Sidhu
Chairman and CEO
Customers Bancorp, Inc.
1015 Penn Avenue, Suite 103
Wyomissing, PA 19610

Re:   <u>Termination of Agreement and Plan of Merger By and Between CMS Bancorp, Inc. and
     Customers Bancorp, Inc. ("Merger Agreement")</u>

Dear Mr. Sidhu:

We are in receipt of your letter dated December 31, 2013 to John Ritacco, President and CEO of CMS
Bancorp ("CMS"). CMS remains deeply disappointed that the anticipated merger between CMS and
Customers Bancorp ("Customers") could not proceed due to Customers' ongoing regulatory, enforcement
and supervisory issues with the Federal Reserve Board and investigation by the U.S. Department of
Justice regarding its lending practices. However, CMS is clearly disturbed by the events that have
transpired in recent weeks as Customers has sought to evade its clear obligations under the Merger
Agreement to pay the required termination fee of $1 million. The purpose of this letter is to notify you that
CMS expects Customers to satisfy its clear obligations under the contract to pay the termination fee by
January 23, 2014. Failure to do so by that date will force CMS to consider legal action against Customers
to compel Customers' performance under the Merger Agreement.

By letter dated December 24, 2013, CMS provided Customers with written notice under 8.01(c) and
8.01(d)(iii) of the Merger Agreement of termination of the agreement, effective December 31, 2013. As
such, under Section 8.02(b)(ii) of the Merger Agreement, Customers is obligated to make payment of the
termination fee within 15 business days of December 31, 2013, i.e., <u>**by close of business on Thursday,
January 23, 2014**</u>.

You are well aware of the fact that CMS did not agree to any terms of termination of the Merger
Agreement with Customers that would allow for the Merger Agreement to terminate by mutual consent
prior to December 31, 2013. Customers' clear attempt to distort the facts has been greatly disheartening.

Your repeated assertions that CMS requested an early termination of the Merger Agreement in CMS'
November 29th letter to you are untrue, and clearly contradicted by your November 26th email to John
Ritacco, which indicated "Let"s chat today please. *We need to either extend or terminate this week.*"
You specifically pushed CMS to make a decision on whether it would extend the Merger Agreement
beyond December 31, 2013. In that context, CMS' November 29[th] response was clearly to inform
Customers that the CMS Board <u>had decided not to extend the Merger Agreement beyond December 31,
2013, the termination date of the Merger Agreement</u>.

LEGAL_US_E # 108212815.2



**PAUL**
**HASTINGS**

Mr. Jay S. Sidhu
January 22, 2014
Page 2

CMS tried repeatedly without success to reach out to you in the days following Mr. Ritacco's November 29th letter to you, to have the parties' lawyers coordinate issuance of a press release announcing that the Merger Agreement would not be extended beyond December 31st and to work through the terms of termination. However, you intentionally avoided making yourself or your lawyers available to have these discussions with CMS. In fact, you did not get back to CMS until December 19th, at which time CMS was shocked when you informed Mr. Ritacco for the first time – the night before Customers planned to issue a press release – that Customers had decided that the Merger Agreement had been terminated by "mutual consent" prior to the actual December 31, 2013 termination date.

Despite repeated assertions by CMS to you and your counsel that that this assertion had no basis in fact and was simply untrue – and thus, the information in Customers' press release was potentially false and misleading – Customers nonetheless went ahead and issued its press release on December 20, 2013. Further, Customers' press release makes absolutely no mention of Customers' ongoing and substantial regulatory problems which are the real reasons Customers cannot obtain regulatory approval in order to consummate the merger – or for that matter even get regulatory clearance to file regulatory applications – to seek approval for such a transaction prior to the December 31st termination date.

As you are well aware, the termination fee was specifically negotiated and agreed to in April 2013, when CMS and Customers amended the Merger Agreement precisely to address the situation that has now occurred: Customers' continuing inability to obtain required regulatory approvals for the proposed merger due to its ongoing regulatory problems as revealed to CMS in November 2013 upon a review of regulatory documents relating to Customers at Customers' counsel's office. Accordingly, Customers' assertion that it did not believe CMS would seek the termination fee due to Customers' continued failure to be in a position to receive required government approvals by Customers is nonsensical, and clearly inconsistent with the agreement that CMS and Customers executed in April 2013. We view Customers' denial of its clear obligation to pay the termination fee as a clear, intentional, and potentially fraudulent breach of the Merger Agreement.

CMS hopes that it will not need to resort to litigation to settle this matter. However, if CMS is forced to do so, please note that CMS intends to seek recovery for not only the termination fee, but also for costs and expenses of litigation and other compensation, as well as appropriate punitive damages for Customers' intentional and fraudulent breach of the Merger Agreement.

Sincerely,

Douglas Koff
of PAUL HASTINGS LLP

cc:   CMS Board of Directors
      John Ritacco, CMS President and CEO
      V. Gerard Comizio, Esq., Paul Hastings LLP
      Christopher Connell, Esq., Stradley Ronon Stevens & Young, LLP